UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x
UNITED STATES OF AMERICA, :
:
   v. :
: Case No. S4 14-CR-272 (JSR)
ANTHONY ALLEN, :
PAUL THOMPSON, :
TETSUYA MOTOMURA, and :
ANTHONY CONTI, :
:
   Defendants. :
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' MOTION TO COMPEL THE GOVERNMENT TO IMMUNIZE
SUBMITTER-R3 OR, IN THE ALTERNATIVE, FOR A JURY INSTRUCTION
<u>REGARDING SUBMITTER-R3'S TESTIMONY</u>**

| | |
|---|---|
| **WILLKIE FARR & GALLAGHER LLP** | **TOR EKELAND, P.C.** |
| Michael S. Schachter | Tor Ekeland |
| Casey E. Donnelly | Aaron Williamson |
| 787 Seventh Avenue | 195 Plymouth Street, 5th Floor |
| New York, New York 10019 | Brooklyn, New York 11201-1133 |
| (212) 728-8000 | (718) 737-7264 |
| | |
| *Attorneys for Defendant Anthony Allen* | *Attorneys for Defendant Anthony Conti* |

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ...........................................................................................................1

STATEMENT OF FACTS ..................................................................................................................3

LEGAL STANDARD..........................................................................................................................6

ARGUMENT......................................................................................................................................8

    I.      SUBMITTER-R3'S TESTIMONY IS MATERIAL, EXCULPATORY, NON-CUMULATIVE, AND CANNOT BE OBTAINED FROM ANY OTHER SOURCE. ..........................................................................................................8

    II.     THE GOVERNMENT HAS MISUSED THE POWER OF IMMUNITY TO GAIN TACTICAL ADVANTAGE. ..................................................................................10

    III.    IT IS WITHIN THE GOVERNMENT'S POWER TO PRODUCE SUBMITTER-R3 AT TRIAL AND ITS FAILURE TO DO SO WARRANTS AN INSTRUCTION TO THE JURY............................................................12

CONCLUSION.................................................................................................................................13

## TABLE OF AUTHORITIES

**Case**                                                                                                                         **Page(s)**

*Blissett v. Lefevre*,
    924 F.2d 434 (2d Cir. 1991)..................................................................................................10

*Graves v. United States*,
    150 U.S. 118 (1893)................................................................................................................7

*United States v. Bahadar*,
    954 F.2d 821 (2d Cir. 1992)...............................................................................................6, 10

*United States v. Dixon*,
    536 F.2d 1388 (2d Cir. 1976)..................................................................................................7

*United States v. Dolah*,
    245 F.3d 98 (2d Cir. 2001), *abrogated on other grounds by*
    *Crawford v. Washington*, 541 U.S. 36 (2004) ........................................................................6

*United States v. Ebbers*,
    458 F.3d 110 (2d Cir. 2006)..........................................................................................7, 8, 10

*United States v. Gil*,
    297 F.3d 93 (2d Cir. 2002)......................................................................................................8

*United States v. Pellon*,
    475 F. Supp. 467 (S.D.N.Y. 1979).....................................................................................7, 11

*United States v. Torres*,
    845 F.2d 1165 (2d Cir. 1988)............................................................................................7, 12

*United States v. Turkish*,
    623 F.2d 769 (2d Cir. 1980)..............................................................................................7, 11

**Other Authorities**

*Sand et al.*, Modern Federal Jury Instructions-Criminal ¶ 6.04.......................................................7

Defendants Anthony Allen and Anthony Conti respectfully submit this memorandum of law in support of their motion to compel the Government to immunize Submitter-R3 or, in the alternative, for a jury instruction regarding Submitter-R3's testimony.[1]

**PRELIMINARY STATEMENT**

The Government alleges that Mr. Allen, as supervisor of Rabobank's London Money Markets Desk (the "MM Desk"), which was responsible for making Rabobank's daily LIBOR submissions, instructed Rabobank's LIBOR submitters—among them Mr. Conti—to solicit and accommodate requests from swaps traders for LIBOR submissions that would benefit their swap trading positions. (Superseding Ind. ¶ 29(a).)

On April 16, 2015, during discussions between the Government and defense counsel regarding the avoidance of potentially time-consuming Rule 15 depositions of foreign witnesses, the Government represented that it would make individuals employed by entities cooperating with its LIBOR investigation available for testimony at trial, if requested by Defendants. Consistent with this representation, on September 22, 2015, Defendants asked the Government to make available Submitter-R3, a U.K. citizen, a current employee of Rabobank, and a LIBOR submitter who worked under Mr. Allen and alongside Mr. Conti.

On September 25, 2015, the Government informed Defendants that although it had asked Rabobank to please make Submitter-R3 available, Submitter-R3 was not willing to testify and planned to invoke his Fifth Amendment privilege. The Government knows that Submitter-R3 is not a viable prosecution target—he is not charged or even mentioned in the Indictment, and has never once been interviewed by the Government during its five-year-long investigation. Notwithstanding, the Government has declined to tell Rabobank that its

---

[1] Defendants are filing *in camera* a version of this motion that identifies Submitter-R3 by name.

1

cooperation agreement requires it to make current employees available to testify, and has refused Defendants' request to immunize Submitter-R3 or even give him a simple assurance that that he has no criminal exposure: it prefers that Submitter-R3 remain silent.

Given the expected content of Submitter-R3's testimony, it is not difficult to understand why the Government is unenthusiastic about the prospect of him testifying. Submitter-R3 was supervised by Mr. Allen and worked mere feet away from both Defendants for eight years. Submitter-R3 would testify that he never heard Mr. Allen instruct any of Rabobank's LIBOR submitters to accommodate or solicit requests from swaps traders for favorable LIBOR submissions and views the allegation that Defendants were engaged in a criminal conspiracy to be outrageous. Submitter-R3 would also confirm that his LIBOR submissions at Rabobank were based on his best estimate of where Rabobank could obtain funding, and that the idea of an objectively correct or incorrect LIBOR submission is a fiction, especially during times when there was little actual cash trading in the interbank market.

Submitter-R3's testimony would be a breath of fresh air at trial for the simple reason that he has no personal interest in this action. Submitter-R3 is practically the only former colleague of Defendants who is not either under indictment or a cooperating witness with a strong incentive to testify in accordance with the Government's wishes, and who remains a current Rabobank employee. With no realistic criminal exposure himself, Submitter-R3's testimony is especially reliable and unlike any other factual testimony that will be offered at trial. Furthermore, without Submitter-R3's testimony, Defendants will be forced to stand trial without a fact witness who will corroborate their truthful account of what actually occurred at Rabobank during the period in question.

Submitter-R3's reticence to testify is understandable. He has already seen two of his former colleagues—Mr. Allen and Mr. Conti, men who he believes to be honest and innocent—indicted and brought to trial thousands of miles from home. To this end, the Government has been happy to exploit Submitter-R3's fear of prosecution—which it knows to be unfounded—to ensure that the exculpatory and unique testimony he has to offer is never heard by the jury. This constitutes impermissible, discriminatory, and tactical misuse of the immunity power described by the Second Circuit in *United States v. Ebbers*. As such, this Court should order the Government to immunize Submitter-R3 to ensure that Defendants receive a fair trial. Failing that, the Government should not be permitted to benefit from the eleventh hour reversal of its April 16 representation, and this Court should instruct the jury that it may infer that Submitter-R3's testimony would have been as defense counsel reports (and as the Government could confirm by interviewing him).

## STATEMENT OF FACTS

The Indictment charges Defendants with having devised a scheme to "manipulate . . . to [Defendants'] advantage the benchmark interest rates referenced by derivatives products… by the…submission of false and fraudulent statements intended to influence and manipulate the benchmark interest rates to which the profitability of interest rate derivative trades was tied. . . ." (Superseding Ind. ¶ 27.) Additionally, the Indictment alleges that Mr. Allen, "who supervised Rabobank's submission process for LIBOR, directed Rabobank traders to advise Rabobank's LIBOR setters of any financial interest they had in LIBOR on a particular day and also directed Rabobank's LIBOR setters to seek out that information and make LIBOR submissions that favored the traders' positions." (Superseding Ind. ¶ 29(a).) The allegations against Mr. Allen and Mr. Conti are unfounded. The evidence will show that Mr. Allen never instructed Rabobank's LIBOR submitters to solicit or accommodate requests from swaps traders for

3

favorable LIBOR submissions, and that Defendants' U.S. Dollar LIBOR submissions reflected good faith estimates of Rabobank's cost of funding.

Defendants' indictment comes at the culmination of a multi-year investigation of Rabobank, resolved by a Deferred Prosecution Agreement (the "Rabobank DPA"), the terms of which require Rabobank to "use its best efforts" to make current employees "available for interviews or testimony, as requested by the Department," including at trial. (Ex. 1 (Rabobank DPA) at 8-9.)  During its investigation, the Government was provided with access to the relevant communications of the Rabobank employees involved with the LIBOR submission process, including Submitter-R3.  The Government has interviewed at least eighteen of Rabobank's former and current employees.  The Government did not even bother to interview Submitter-R3. Submitter-R3 was not mentioned in either the Original or the two Superseding Indictments, or in the Statement of Facts attached to the Rabobank DPA.

On March 20, 2015, Mr. Allen was arraigned.  Shortly thereafter, defense counsel engaged the Government in a dialogue concerning the need for Rule 15 depositions of certain witnesses knowledgeable about the facts at issue, but located in the United Kingdom, in advance of trial.  In response to these inquiries, on April 16, 2015, the Government informed defense counsel that Rule 15 depositions of current Rabobank employees would not be necessary as the Government would make such witnesses available at trial, either for the prosecution or the defense.  The Government made the following written representation:

> You had asked whether individuals currently employed at cooperating banks will be available to testify at trial for the defense.  Banks cooperating in the various LIBOR investigations pursuant to formal agreements are expected, as part of their cooperation, to provide any necessary witnesses at trial, whether to testify on behalf of the government or the defense. The expectation would be that the current employees would be made available

4

>to testify at trial. Needless to say, we reserve the right to make evidentiary objections to the substance of the witnesses' testimony.

(Ex. 2 (Apr. 16, 2015 email from the Department of Justice).)

On September 10 and 21, 2015, counsel for Mr. Allen spoke with Submitter-R3.[2] Submitter-R3 was a LIBOR submitter at Rabobank during the relevant period, sat several feet away from both Defendants, and was supervised by Mr. Allen. (Declaration of Casey Donnelly ("Donnelly Decl.") at ¶¶ 1, 3, 8.) During this conversation, Submitter-R3 stated that he was "100 percent" certain that Mr. Allen had never directed him or Rabobank's other LIBOR submitters to accommodate or solicit request from swaps traders for favorable LIBOR submissions, was emphatic that there had been no conspiracy within Rabobank to make false LIBOR submissions, and declared the notion of Mr. Allen as a "criminal mastermind" to be "outrageous." (Donnelly Decl. at ¶¶ 4-6, 11.) Submitter-R3 confirmed that LIBOR was based on a submitter's "best guess" of where his bank could obtain unsecured interbank funding, and that there "was no such thing as a right or wrong LIBOR," especially with little or no actual cash trading in the interbank market. (*Id.* at ¶¶ 4, 10) Finally, Submitter-R3 explained that he viewed responding in the affirmative to a swap trader's request for a favorable LIBOR submission to be a convenient and effective way of politely dismissing the requesting trader while avoiding unnecessary tension or a workplace altercation.[3] (*Id.* at ¶ 9.)

---

[2] Counsel for Mr. Conti was not present during the September 10 and 21, 2015 conversations with Submitter-R3. However, during that conversation, Submitter-R3 declared that Mr. Conti was "the most honest guy he knew," and was incredulous of the notion that Mr. Conti had been involved in a criminal conspiracy to defraud Rabobank's counterparties. (Donnelly Decl. at ¶¶ 7, 12.)

[3] Submitter-R3's testimony on the topic of seemingly affirmative responses to requests for favorable LIBOR submissions is especially important given that the Government has built its case around the fact that in three emails over four years, Mr. Allen responded in an affirmative manner to such requests, despite ultimately ignoring the trader's request and making a good faith LIBOR submission.

5

Given the highly exculpatory nature of Submitter-R3's expected testimony, on September 22, 2015, defense counsel informed the Government that pursuant to its April 16 representation, they wished to call Submitter-R3 as a defense witness at trial. (*See* Ex. 3 (Sept. 22, 2015 email to Department of Justice).) On September 25 and 29, 2015, the Government informed counsel for Defendants that although it had asked Rabobank to make Submitter-R3 available to testify, it had been informed by Rabobank that Submitter-R3—a current employee—declined to testify and intended to invoke his Fifth Amendment privilege.

Over a series of subsequent telephone conversations, and in written correspondence, defense counsel requested that the Government advise Rabobank that its failure to make a current employee available to testify would constitute a breach of its Deferred Prosecution Agreement. Defense counsel further requested that the Government immunize Submitter-R3, or at the very least, assure him verbally that it "has no intention of and does not contemplate prosecuting Submitter-R3," in the hopes that doing so would assuage Submitter-R3's fear and allow Defendants to have a fair trial. (Ex. 4 (Sept. 29, 2015 email to Department of Justice).) The Government declined to do so. (Ex. 5 (Oct. 3, 2015 email from Department of Justice).)

## LEGAL STANDARD

The Second Circuit has recognized that the use of prosecutorial grants of immunity "in a one-sided manner can result in a basic unfairness that rises to the level of a violation of procedural due process." *United States v. Dolah*, 245 F.3d 98, 106 (2d Cir. 2001), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36 (2004). In such instances, the trial court is permitted to use its "coercive powers to force the government to grant immunity." *United States v. Bahadar*, 954 F.2d 821, 825 (2d Cir. 1992). A court should order the prosecution to immunize defense witnesses when "(1) the government has engaged in

discriminatory use of immunity to gain tactical advantage or, through its own overreaching, has forced the [defense] witness to invoke the Fifth Amendment; and (2) the witness' testimony will be material, exculpatory and not cumulative and is not obtainable from any other source." *United States v. Ebbers*, 458 F.3d 110, 118 (2d Cir. 2006).

For the purposes of a motion for defense witness immunity, courts may consider Government witnesses who "plea[ded] guilty to participation in the conspiracy and had received letter agreements that they would not be prosecuted" for related crimes "if they testified truthfully" as immunized. *United States v. Turkish*, 623 F.2d 769, 771 (2d Cir. 1980); *see also United States v. Pellon*, 475 F. Supp. 467, 479 (S.D.N.Y. 1979) (where a cooperation agreement promises use immunity in return for testimony, the agreement is enforceable to the same extent as formal grant of immunity under 18 U.S.C. § 6002).

Courts may permit the jury to draw the inference that an uncalled witness would have testified adversely to the party that failed to produce him where that witness was particularly available to that party and would have offered material testimony. *Sand et al.*, Modern Federal Jury Instructions-Criminal ¶ 6.04; *see also United States v. Torres*, 845 F.2d 1165, 1169 (2d Cir. 1988) (citing *Graves v. United States*, 150 U.S. 118, 121 (1893) for proposition that "when 'a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses, the jury may infer that 'the testimony, if produced, would be unfavorable' to that party."); *United States v. Dixon*, 536 F.2d 1388, 1394 (2d Cir. 1976) (missing witness instruction appropriate where accountants were questioned by both sides prior to trial, defendant claimed testimony would have been material but neither side called them as witnesses).

## ARGUMENT

### I. SUBMITTER-R3'S TESTIMONY IS MATERIAL, EXCULPATORY, NON-CUMULATIVE, AND CANNOT BE OBTAINED FROM ANY OTHER SOURCE.

"[E]xculpatory evidence is material when it 'tends to show that the accused is not guilty.' The bottom line at all times is whether the non-immunized witness's testimony would materially alter the total mix of the evidence before the jury." *Ebbers*, 458 F.3d at 119 (quoting *United States v. Gil*, 297 F.3d 93, 101 (2d Cir. 2002)).  Submitter-R3's testimony is exculpatory because he would testify that during the relevant period, he never once heard Mr. Allen direct Rabobank's LIBOR submitters to solicit and accommodate requests from swaps traders for favorable LIBOR submissions.  Additionally, Submitter-R3 has emphatically denounced the notion that there existed at Rabobank any sort of conspiracy to make false LIBOR submissions.  (Donnelly Decl. at ¶¶ 5-6, 11.)  Thus, Submitter-R3's testimony would refute the Government's principal allegation in this case.  Submitter-R3 would also explain to the jury that LIBOR submissions were generally calculated by estimating Rabobank's cost of interbank funding, and as such, there was almost always a range of acceptable rates that a submitter could choose from on any given day, especially during the period at issue when there was little or no actual cash trading in the interbank market.  (Donnelly Decl. at ¶¶ 4, 9-10.)

Submitter-R3's testimony would be non-cumulative and unobtainable from any other source because no similar evidence will be presented from such a witness at trial.  The Government's case against Defendants is ostensibly predicated on the conduct of Rabobank's LIBOR submitters, and yet, without Submitter-R3's testimony, the jury will be unable to hear from a single Rabobank LIBOR submitter who does not either have an incentive to testify in accordance with the Government's theory (*i.e.*, cooperating witness Paul Robson), or is under

8

indictment (*i.e.*, Defendants themselves).  This is because the Government has gone to great lengths to keep exculpatory defense witnesses off the stand.

Despite pressure from the Government, Mr. Conti refused to participate in the Government's case and would not point the finger at Mr. Allen.  (Ex. 6 (Aug. 25, 2014 internal Baker & McKenzie LLP email summarizing conversation with C. Sipperly) (describing the Government's interest in Mr. Conti's cooperation against Mr. Allen who was "not on a lot of documents" and therefore required the Government to rely "heavily . . . on [cooperator] testimony.").)  Now he stands beside Mr. Allen at the defense table.  The Government has also prevented former Rabobank employee and U.S. Dollar LIBOR submitter Damon Robbins from testifying by naming him as an unindicted coconspirator despite the fact that even after a five-year-long investigation of Rabobank, the Government was *still* unable to state affirmatively, in open court or in its briefings on the matter, that Mr. Robbins was a legitimate prosecution target.  (*See* Ex. 7 (Excerpts from Tr. of Aug. 14, 2015 Oral Argument) at 21:25-26:19; Opp. to Mot. to Immunize Damon Robbins, at 11 Jul. 31, 2015, ECF No. 88.)  Like Submitter-R3, Mr. Robbins worked alongside Defendants and would similarly have testified that Mr. Allen never instructed him to make false LIBOR submissions, or that Rabobank's LIBOR submitters accommodated requests from swaps traders.  (*See* (Ex. 8 (July 30, 2013 FBI Interview of Damon Robbins) at 8, 10.)

The testimony of Submitter-R3 is crucial because the allegations in this case revolve around a single desk—the London MM Desk.  However, only *one* Government witness, Paul Robson—who has an extraordinary incentive to point the finger at Mr. Allen in order to obtain a cooperation agreement for himself—actually sat on the MM Desk during the period at issue.  Every other individual who sat on the MM Desk has confirmed that Mr. Allen never gave

9

any instruction that LIBOR rates should reflect trading positions and that it was the policy of the MM Desk to make LIBOR submissions based on good faith estimates of Rabobank's cost of funding. And yet the jury will not hear this testimony.

### II. THE GOVERNMENT HAS MISUSED THE POWER OF IMMUNITY TO GAIN TACTICAL ADVANTAGE.

Where the prosecution has engaged in discriminatory use of immunity to gain tactical advantage, courts are permitted to use their "coercive powers to force the government to grant immunity." *See Bahadar*, 954 F.2d at 825; *Ebbers*, 458 F.3d at 118. A violation of *Ebbers'* rule regarding prosecutorial misuse of immunity occurs where the prosecution has used or misused the power of immunity "for the purpose of withholding exculpatory evidence and gaining a tactical advantage through such manipulation" *Blissett v. Lefevre*, 924 F.2d 434, 442 (2d Cir. 1991). Such a case is present here.

Despite representing to Defendants that it would make current employees of cooperating banks available to testify at Defendants' request, the Government has taken only the most perfunctory steps to make good on its promise. Defendants contend that if it was the Government that was requesting Submitter-R3's trial testimony, it would be unlikely to take the position that a Deferred Prosecution Agreement, which mandates that a cooperating entity make its employees "available" to testify at trial, means, available . . . unless the employee has *any* involvement, however insubstantial, in the relevant events and can therefore conjure a facially valid Fifth Amendment invocation. When defense counsel requested that the Government immunize Submitter-R3 so that he might feel free to tell his story to the jury, or at least confirm to Submitter-R3 that he was not, in fact, a prospective prosecution focus—thus rendering his assertion of the privilege against self-incrimination unnecessary—it declined to do so. (Ex. 4

(Sept. 29, 2015 email to Department of Justice); Ex. 5 (Oct. 3, 2015 email from Department of Justice).)

The Government cannot credibly claim it is considering prosecuting Submitter-R3.  Over the course of five years, the Government conducted an intensive investigation into potential malfeasance related to LIBOR submissions at Rabobank.  (Ex. 9 (noting Government's information request of July 1, 2010).)  It had in its possession the relevant communications of the Rabobank employees involved in the LIBOR submission process.  It was able to interview any Rabobank employee it suspected might have been engaged in culpable behavior.  The facts with respect to Submitter-R3 speak for themselves:  at the conclusion of the Government's investigation, Submitter-R3 has never been mentioned in any of the indictments filed in this case, and during the entirety of the investigation, the Government did not deem Submitter-R3 sufficiently culpable to warrant even a *single* interview.

The Government has misused the immunity power in a discriminatory and tactical fashion to prevent evidence that contradicts its theory of this case to be presented to the jury.[4]  These actions put Defendants in a position where—already forced to stand trial thousands of miles from where the events in question took place and the relevant witnesses reside—they must enter that trial without the otherwise available testimony of a critical exculpatory witness.  As such, this Court should intervene by compelling the Government to immunize Submitter-R3 so that his exculpatory and unique testimony may be heard.

---

[4] Although the Government has not granted *formal* immunity to any other witnesses in this case, the cooperating witnesses should be treated as if they were, in fact, immunized.  *Turkish*, 623 F.2d at 771; *Pellon*, 475 F. Supp. at 479.  This is precisely the case presented here.  All three of the Government cooperators have agreed to plead guilty to a single count of conspiracy and to testify in the Government's case-in-chief, in exchange for which the Government agreed to drop all other charges against them, forego any future action against them in connection with LIBOR, and recommend leniency to the Court at sentencing.

**III.    IT IS WITHIN THE GOVERNMENT'S POWER TO PRODUCE SUBMITTER-R3 AT TRIAL AND ITS FAILURE TO DO SO WARRANTS AN INSTRUCTION TO THE JURY.**

Under *United States v. Torres*, "when 'a party has it peculiarly within his power to produce witnesses whose testimony would elucidate the transaction' and fails to produce such witnesses, the jury may infer that 'the testimony, if produced, would be unfavorable' to that party." 845 F.2d at 1169.  It is peculiarly within the Government's power to make Submitter-R3 available as a trial witness.  Pursuant to its Deferred Prosecution Agreement, Rabobank is required to make employees "available for interviews or testimony, as requested by the Department." (Ex. 1 (Rabobank DPA) at 8-9.)  Thus, the Government can exert leverage that would likely result in Submitter-R3 testifying at trial, given that his refusal to do so would constitute a direct violation by his employer of the Rabobank DPA.

Nevertheless, the Government has declined to take any meaningful steps to make Submitter-R3 available, notwithstanding its representation, in writing, to the Defendants that "[b]anks cooperating in the various LIBOR investigations pursuant to formal agreements are expected, as part of their cooperation, to provide any necessary witnesses at trial, whether to testify on behalf of the government or the defense. The expectation would be that the current employees would be made available to testify at trial." (Ex. 2 (Apr. 16, 2015 email from the Department of Justice).)

If this Court will not compel the Government to immunize Submitter-R3 so that his material, exculpatory, and otherwise unavailable testimony may be heard by the jury, the issuance of the following instruction at trial is appropriate:

> You have heard evidence about Mr. Submitter-R3, who has not been called to testify.  The Government was in the best position to produce Submitter-R3 because Submitter-R3 is a current employee of Rabobank, and Rabobank is required to make its employees available to testify at the Government's request.  Had Submitter-

R3 been called as a witness, he would have testified that he worked alongside Mr. Conti and was supervised by Mr. Allen at Rabobank during the time when the facts at issue in this case occurred, and that he was never instructed by Mr. Allen, and never heard Mr. Allen instruct others, to accommodate or solicit requests from Rabobank swaps traders for favorable LIBOR submissions. Submitter-R3 would also have testified that he ignored requests from Rabobank swaps traders for favorable LIBOR submissions and the he did not observe a conspiracy among Rabobank's LIBOR submitters to make false LIBOR submissions to benefit swaps traders. Submitter-R3 would also have testified that Mr. Conti did not conspire to defraud any Rabobank counterparties.

Because the Government was in the best position to make Submitter-R3 available, but failed to do so, you are permitted to infer that Submitter-R3's testimony would have been favorable to Mr. Allen and Mr. Conti and unfavorable to the Government.

## CONCLUSION

Accordingly, the Defendants respectfully move this Court for an order compelling the Government to immunize Submitter-R3, or in the alternative for the issuance of the proposed instruction to the jury.[5]

Dated:   New York, New York
         October 5, 2015

| | |
|---|---|
| **WILLKIE FARR & GALLAGHER LLP** | **TOR EKELAND, P.C.** |
| By: /s/ Michael S. Schachter | By: /s/ Tor Ekeland |
| | (electronic signature w/permission) |
| Michael S. Schachter | Tor Ekeland |
| Casey E. Donnelly | Aaron Williamson |
| 787 Seventh Avenue | 195 Plymouth Street, 5th Floor |
| New York, New York 10019 | Brooklyn, New York 11201-1133 |
| Phone: (212) 728-8000 | Phone: (718) 737-7264 |
| *Attorneys for Defendant Anthony Allen* | *Attorneys for Defendant Anthony Conti* |

---

[5] If the Court orders that Submitter-R3 be immunized and he nonetheless declines to appear in the United States for trial, Rabobank's cooperation agreement notwithstanding, Defendants request an adjournment in order to pursue Submitter-R3's deposition pursuant to Rule 15 of the Federal Rule of Criminal Procedure. The resulting delay of the trial would be the fault of the Government, which has failed to secure this current Rabobank employee's appearance at trial.

13