UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK


UNITED STATES OF AMERICA          :
                                  :
                                  :
        v.                        :       S4:14-cr-00272-JSR
                                  :
                                  :
ANTHONY ALLEN, et al              :
                                  :
            Defendants.           :
                                  :


### GOVERNMENT'S MOTIONS *IN LIMINE*


ANDREW WEISSMANN                              JEFFREY D. MARTINO
Chief, Fraud Section                          Chief, New York Office

/s Brian R. Young                             /s Michael T. Koenig
CAROL SIPPERLY                                MICHAEL T. KOENIG
Senior Litigation Counsel                     Trial Attorney
BRIAN R. YOUNG                                U.S. Department of Justice
Senior Trial Attorney                         Antitrust Division
U.S. Department of Justice                    450 5th Street, N.W.
Criminal Division                             Washington, D.C., 20001
1400 New York Ave., NW                        (202) 616-2165
Washington, D.C. 20005
(202) 616-3114

# TABLE OF CONTENTS

I.      BECAUSE A "SCHEME TO DEFRAUD" DOES NOT REQUIRE
        PROOF OF AN OBJECTIVELY "FALSE" STATEMENT, THE
        DEFENDANTS SHOULD BE PROHIBITED FROM ARGUING THAT
        THE "REASONABLENESS" OR "ACCURACY" OF BIASED LIBOR
        SUBMISSIONS IS A DEFENSE TO WIRE FRAUD. .............................2

II.     EVIDENCE THAT SOME OF RABOBANK'S SWAP
        COUNTERPARITES MANIPULATED LIBOR SHOULD BE
        EXCLUDED UNDER FED. R. EVID. 402 AND 403 BECAUSE
        RELIANCE IS NOT AN ELEMENT OF WIRE FRAUD.........................7

        A.  Evidence that five of Rabobank's counterparties manipulated the
            LIBOR rate is irrelevant under Fed. R. Evid. 402 because reliance is
            not an element of wire fraud. ...............................................................9
        B.  Even if it were relevant, evidence that some of Rabobank's
            counterparties manipulated LIBOR should be excluded under Fed. R.
            Evid. 403 because its probative value is substantially outweighed by
            the danger of confusion of the issues, unfair prejudice, and waste of
            time. ...................................................................................................12

III.    FEDERAL RULE OF EVIDENCE 701 PERMITS THE UNITED
        STATES TO OFFER LAY OPINION TESTIMONY FROM (1)
        INTEREST RATE SWAPS TRADERS WHOSE EMPLOYERS
        TRADED WITH RABOBANK AND (2) COOPERATING WITNESSES
        WHO CAN EXPLAIN AND PUT IN CONTEXT CO-CONSPIRATOR
        STATEMENTS TO WHICH THEY WERE NOT PARTY. ....................14

        A.  Because materiality is an objective standard, any derivative trader with
            knowledge of what considerations are capable of influencing a person
            of ordinary prudence should be permitted to offer testimony on this
            element. ..............................................................................................16
        B.  Cooperating witnesses who have knowledge of the operation of a
            conspiracy are qualified to provide testimony on co-conspirator
            statements to which the witnesses were not party. .............................19

IV.     EVIDENCE THAT RABOBANK PAID A $325 MILLION FINE TO
        SETTLE ALLEGATIONS OF LIBOR MANIPULATION SHOULD BE
        ADMITTED TO SHOW THAT THE DEFENDANTS' SCHEME
        "AFFECTED" RABOBANK, WHICH IS A "FINANCIAL
        INSTITUTION." ....................................................................................22

V.      THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE
        STATEMENTS THAT DEFENDANT CONTI MADE DURING A
        PROFFER SESSION FOR WHICH HE WAIVED FED. R. EVID. 410
        PROTECTION TO REBUT ANY INCONSISTENT EVIDENCE OR
        ARGUMENT THAT HE OFFERS AT TRIAL. .....................................23

VI.     EVIDENCE THAT, IN CONVERSATIONS OCCURING BEFORE
        MAY 2006, MR. ALLEN ADVISED MR. ROBSON TO CONSIDER
        TRADING POSITIONS WHEN SUBMITTING LIBOR RATES IS
        INTRINSIC EVIDENCE OF THE SCHEME ALLEGED IN THE
        INDICTMENT..........................................................................................24

## TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*A. Terzi Productions, Inc. v. Theatrical Protective Union,*
    2 F. Supp. 2d 485 (S.D.N.Y. 1998) ................................................................. 3

*Neder v. United States,*
    527 U.S. 1 (1999) ................................................................................................ 10

*Spires v. United States,*
    317 U.S. 492 (1943) ............................................................................................. 7

*United States v. Alfisi,*
    308 F.3d 144 (2d Cir. 2002) ............................................................................... 5

*United States v. Allen,*
    201 F.3d 163 (2d Cir. 2000) ............................................................................... 11

*United States v. Allen,*
    Mem. Order at 5, Aug. 18, 2015, Dkt. No. 100 ......................................... 11, 13

*United States v. Barrow,*
    400 F.3d 109 (2d Cir. 2005) ............................................................................... 27

*United States v. Biaggi,*
    909 F.2d 662 (2d Cir. 1990) ............................................................................... 8

*United States v. Bouyea,*
    152 F.3d 192 (2d Cir. 1998) ............................................................................... 25

*United States v. Carboni,*
    204 F.3d 39 (2d Cir. 2000) ................................................................................. 28

*United States v. Corsey,*
    723 F.3d 366 (2d Cir. 2013) ......................................................................... 11, 18

*United States v. Countrywide Financial Corporation,*
    961 F.Supp. 2d 598 (S.D.N.Y. 2013) ............................................................... 25

*United States v. Cuti,*
    720 F.3d 453 (2d Cir. 2013) ......................................................................... 18, 21

*United States v. D'Amato,*
    39 F.3d 1249 (2d Cir. 1994) ............................................................................... 4

*United States v. Dula,*
    39 F.3d 591 (5th Cir. 1994) ........................................................................... 6

*United States v. Facchini,*
    832 F.2d 1159 (9th Cir. 1987) ............................................................... 11, 19

*United States v. Figueroa,*
    618 F.2d 934 (2d Cir. 1980) ...................................................................... 14

*United States v. Garcia,*
    291 F.3d 127 (2d Cir. 2002) ...................................................................... 16

*United States v. Ghavami,*
    23 F.Supp. 3d 148 (S.D.N.Y. 2014) ............................................. 21, 22, 23

*United States v. Goldfine,*
    538 F.2d 815 (9th Cir. 1976) ...................................................................... 12

*United States v. Heinz,*
    790 F.3d 365 (2d Cir. 2015) ................................................................. 25, 26

*United States v. Johnson,*
    139 F.3d 1359 (11th Cir. 1998) ................................................................. 12

*United States v. Kerley,*
    784 F.3d 327 (6th Cir. 2015) ...................................................................... 19

*United States v.* Manton,
    107 F.2d 834 (2d Cir. 1939). ....................................................................... 4

*United States v. Martin,*
    411 F. Supp. 2d 370 (S.D.N.Y. 2006) ......................................................... 3

*United States v. Md. & Va. Milk Producers Co-op. Ass'n, Inc.,*
    1992 WL 224928 (4th Cir. Sept. 15, 1992) ................................................. 5

*United States v. Molinaro,*
    11 F.3d 853 (9th Cir. 1993) ........................................................................ 13

*United States v. Morgenstern,*
    933 F.2d 1108, 1113 (2d Cir. 1991) ............................................................. 4

*United States v. Ojeikere,*
    545 F.3d 220 (2d Cir. 2008) ...................................................................... 13

*United States v. Oldbear*,
    568 F.3d 814 (10th Cir. 2009) ................................................................................. 15

*United States v. Peterson*,
    538 F.3d 1064 (9th Cir. 2008) ........................................................................... 11, 19

*United States v. Ranney*,
    719 F.2d 1183 (1st Cir. 1988) ................................................................................. 19

*United States v. Reicin*,
    497 F.2d, 563 (7th Cir. 1974) ................................................................................... 6

*United States v. Rigas*,
    490 F.3d 208 (2d Cir. 2007) .............................................................................. 19, 20

*United States v. Royer*,
    549 F.3d 886 (2d Cir. 2008) ..................................................................................... 4

*United States v. Rubin/Chambers Dunhill Insurance Services, et al.*,
    828 F. Supp. 2d 698 (S.D.N.Y. 2011) ...................................................... 21, 22, 24

*United States v. Saks*,
    964 F.2d 1514 (5th Cir. 1992) ................................................................................ 13

*United States v. Stewart*,
    433 F.3d 273 (2d Cir. 2006) .................................................................................... 15

*United States v. Technodyne, LLC*,
    753 F.3d 368 (2d Cir. 2014) ..................................................................................... 7

*United States v. Thomas*,
    377 F.3d 232 (2d Cir. 2004) ............................................................................... 3, 11

*United States v. Trapilo*,
    130 F.3d 547 (2d Cir. 1997) ..................................................................................... 3

*United States v. Valencia*,
    600 F.3d 389 (5th Cir. 2010) .................................................................................. 20

*United States v. Velez*,
    354 F.3d 190 (2d Cir. 2004) .................................................................................... 27

*United States v. Vest*,
    116 F.3d 1179 (7th Cir. 1997) ............................................................................. 5, 6

*United States v. Yannotti*,
    541 F.3d 112 (2d Cir. 2007) ............................................................................ 21, 22, 23

**Statutes**                                                                                    **Page(s)**

12 U.S.C. § 1813(w)(1)............................................................................................... 25

12 U.S.C. § 1841(a)(2)............................................................................................... 25

18 U.S.C. § 1001 ........................................................................................................ 12

18 U.S.C. § 1343 .................................................................................................... 3, 12

18 U.S.C. § 1841(a)(1)............................................................................................... 25

18 U.S.C. § 20(6) ....................................................................................................... 25

18 U.S.C. § 3293(2) ................................................................................... 2, 24, 25, 26

**Rules**

Fed. R. Crim. P. 11(f) ................................................................................................ 27

Fed. R. Evid. 403 ....................................................................................... 8, 9, 14, 15

Fed. R. Evid. 404(b).............................................................................................. 28, 29

Fed. R. Evid. 410 .................................................................................................... 2, 27

Fed. R. Evid. 701 ..................................................................................... 16, 18, 21, 22

Fed. R. Evid. 702 ....................................................................................................... 20

The superseding indictment in this case alleges that the defendants engaged in a conspiracy and scheme to defraud participants in the interest rate swaps market by making London Interbank Offered Rate (LIBOR) submissions that were calculated to favor their derivative positions (which were sensitive to LIBOR) rather than being a good faith estimate of the interest rate that Rabobank would pay if it chose to borrow money.[1]  Anthony Allen, Rabobank's former Global Head of Liquidity & Finance, and Anthony Conti, formerly a trader on Rabobank's cash desk in London, England, were responsible for sending to the British Bankers' Association (BBA) daily estimates of the interest rate at which they perceived Rabobank could borrow funds.  The conspiracy and wire fraud counts in the superseding indictment allege that the defendants submitted LIBOR rates designed to benefit the derivative trading positions of themselves and other Rabobank traders.

This filing presents for the Court's consideration six motions *in limine* seeking the following relief: First, because intent to deceive is the essence of a "scheme to defraud," the defendants should be precluded from arguing that the "reasonableness" of a biased submission is a defense to fraud.  A defendant who makes a LIBOR submission that was motivated, at least in part, by an impermissible consideration (such as a financial interest) has committed a scheme to defraud; it makes no difference whether or not this biased submission was similar to those of other panel banks or was otherwise within the "range" of what the defendant thought Rabobank's borrowing costs might have been.  Second, because the wire fraud statute does not require the government to prove reliance on a scheme to defraud, the Court should exclude evidence that some of Rabobank's counterparties were also attempting to manipulate the LIBOR rate.  Third,

---

[1] The British Bankers' Association, which was responsible for calculating LIBOR, instructed panel banks to submit "the rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size, just prior to 11.00 London time."

because materiality is an *objective* standard, the Court should permit traders from Rabobank's counterparties to give testimony about the importance of interest rate swap contracts which they did not book personally but of which they are knowledgeable.  Likewise, the law in the Second Circuit permits cooperating witnesses to offer testimony that puts in context and interprets the meaning of co-conspirator emails, chats, and phone calls to which the witnesses were not a party. Fourth, to establish that the defendants' conduct triggers the ten year statute of limitations under 18 U.S.C. § 3293(2) because it "affects a financial institution," the Court should receive into evidence a Deferred Prosecution Agreement (DPA) in which Rabobank paid $325 million to settle allegations that the defendants and their co-conspirators manipulated the LIBOR benchmark.  Fifth, the government should be permitted to introduce statements that Mr. Conti made during a proffer session for which he waived Fed. R. Evid. 410 protection to rebut any inconsistent evidence or argument that he or his counsel offer at trial.  Finally, the fact that, during conversations that predate the time period alleged in the indictment, Mr. Allen told a cooperating witness to manipulate the LIBOR rate is intrinsic evidence of the charged crimes.

I.     **BECAUSE A "SCHEME TO DEFRAUD" DOES NOT REQUIRE PROOF OF AN OBJECTIVELY "FALSE" STATEMENT, THE DEFENDANTS SHOULD BE PROHIBITED FROM ARGUING THAT THE "REASONABLENESS" OR "ACCURACY" OF BIASED LIBOR SUBMISSIONS IS A DEFENSE TO WIRE FRAUD.**

The defendants have asserted at oral argument and through the identification of expert witness testimony that they intend to argue that LIBOR submissions that were "reasonable" or within the "range" of the submissions made by other panel banks cannot give rise to liability under the wire fraud and bank fraud statutes because these submissions were not objectively "false."  Indeed, Mr. Allen has disclosed that his proposed expert, Dr. Marti Subrahmanyam, "will explain that there is no such thing as a single 'correct' LIBOR submission: at best, a Panel

Bank's LIBOR submission was an educated estimate within a range of reasonable answers."
Because material statements made for the purpose of deceiving another party establish a scheme
to defraud even where those statements, by luck or design, are factually defensible, the
defendants should be prohibited from arguing that the "reasonableness" of their LIBOR
submissions is a defense to fraud or otherwise suggesting that the government is required to
prove that the submissions were objectively "false" (*i.e.*, that Rabobank could not have borrowed
money at that rate).  Likewise, because a defendant acts with specific intent when an intention to
deceive is but one of several motives, the defendants should be precluded from arguing that they
did not act with the requisite scienter because their LIBOR submissions were partially motivated
by legitimate considerations.

The defendants' argument that a "reasonable" or defensible LIBOR submission insulates
them from criminal liability is based on the flawed legal premise that the wire fraud statute
requires the government to prove the objective falsity of statements calculated to deceive another
party.  Because 18 U.S.C. § 1343 penalizes a "scheme and artifice to defraud," the Second
Circuit has recognized that wire fraud does not require proof of *any* representation, much less a
*false* representation.[2]  Moreover, because fraudulent intent is the essence of a "scheme to

---

[2] *See United States v. Thomas*, 377 F.3d 232, 242-43 (2d Cir. 2004) (citing with approval a Fifth
Circuit case that involved no evidence of any false representation); *United States v. Trapilo*, 130
F.3d 547, 550 n.3 (2d Cir. 1997) (smuggling scheme that involved no false statements
constituted wire fraud); *United States v. Martin*, 411 F. Supp. 2d 370, 372-73 (S.D.N.Y. 2006)
(denying motion to dismiss indictment alleging that the defendant committed wire fraud by
fixing a horse race); *A. Terzi Productions, Inc. v. Theatrical Protective Union*, 2 F. Supp. 2d 485,
501 (S.D.N.Y. 1998) (Sotomayor, J.) ("[A] defendant, by his conduct alone, can intend to
deceive another and engage in a scheme to defraud, even though the defendant's statements
themselves contain no misrepresentations"); *cf. United States v. Royer*, 549 F.3d 886, 899-900
(2d Cir. 2008) (scheme and artifice under Rule 10b-5 accomplished through market
manipulation).  In any case, because the BBA's query sought to learn the interest rate at which
the contributor thought it could borrow cash, implicit in every LIBOR submission was the
representation that the number had been calculated according to the BBA's definition of LIBOR,
which, was definitely not the case.  *Cf. United States v. Morgenstern*, 933 F.2d 1108 (2d Cir.

defraud," the fraud statutes do not require the government to prove that the scheme was successful or that it caused any harm.  *See United States v. D'Amato*, 39 F.3d 1249, 1256 (2d Cir. 1994).  Working from these premises, appellate courts have held in four closely analogous contexts that criminal fraud liability attaches to any conduct intended to deceive another party, even when the statements uttered are defensible or even truthful.

First, when a judge accepts a payment to make a ruling, it is irrelevant that the ruling was a correct application of the law.  In affirming the conspiracy and fraud conviction of a former Second Circuit judge who accepted payments in exchange for promises of favorable rulings, the Second Circuit in *United States v. Manton* affirmed the trial court's refusal to charge the jury that they might consider the question of whether the defendant's rulings were correct.  107 F.2d 834, 845-46 (2d Cir. 1939).  In so doing, the panel held, "[a]nd for aught that now appears we may assume for present purposes that all of the cases in which Manton's action is alleged to have been corruptly secured were in fact rightly decided.  But the unlawfulness of the conspiracy here in question is in no degree dependent upon the indefensibility of the decisions which were rendered in consummating it."  *Id* at 846; *cf. United States v. Alfisi*, 308 F.3d 144, 150-52 (2d Cir. 2002) (applying *Manton*'s ruling to a bribery case).

Second, when a defendant conspires to rig a bid, it makes no difference that the price ultimately struck is "reasonable" or even favorable to the other party.  In *United States v. Md. & Va. Milk Producers Co-op. Ass'n, Inc.*, a Sherman Act case, the Fourth Circuit approved the district court's instruction that, if the defendant intended to enter into a price-fixing conspiracy, "[i]t is no defense to illegal bid rigging when found that the prices, cost or profits were reasonable, unreasonable, high, low, fair, or unfair."  1992 WL 224928 at *17 (4th Cir. Sept. 15,

---

1991) (implicit in the deposit of a negotiable instrument is the representation that the depositor has authority to make the transaction).

1992).  The panel's rationale was that "if the jury finds that a price-fixing conspiracy existed, the fact that the prices fixed were 'reasonable' is no defense."

Third, when a physician intends to bill Medicare for services he viewed as unnecessary, evidence that the tests were, in fact, medically necessary is irrelevant.  In *United States v. Vest*, for example, the Seventh Circuit upheld the mail fraud conviction of a doctor who ordered what he viewed as unnecessary tests and affirmed the district court's decision to prohibit the defendant from offering the patients' pre-visit and post-visit medical records (to which the defendant did not have access at the time of diagnosis) in support of the argument that the tests were (as it turned out) medically indicated.  116 F.3d 1179, 1183 (7th Cir. 1997).[3]  In ruling that the issue presented was whether the doctor intended to order unnecessary tests, not whether the tests were, in fact, medically necessary, the Seventh Circuit held "[i]f in hindsight it turns out that, considering the patients' pre-visit and post-visit records, the tests [the defendant] ordered *were* medically necessary, that is merely a fortuitous coincidence.  It does not rebut the inference that [the defendant] had a fraudulent intent when he ordered the tests with the data he had."  *Id.* at 1184; *see also United States v. Reicin*, 497 F.2d, 563, 571 (7th Cir. 1974) ("[t]his is not a personal injury action . . . the defendant's intent to defraud does not turn on whether some of the clients 'actually' needed such treatment; it is enough that the defendant thought at the time that they did not or that he made the decision . . . without regard to whether there was a need therefor").

Fourth, where a government contractor uses substandard parts to make a vehicle, it is irrelevant that the product ultimately delivered was up to specification.  *United States v. Dula*,

---

[3] The district court permitted defense counsel to cross-examine patients with the records to suggest that the patients may have forgotten the symptoms they reported to the defendant, but *not* to support the proposition that the tests were necessary.  116 F.3d at 1183.

for example, involved wire and mail fraud convictions arising from fraudulent substitutions of cheaper products for the ones actually ordered and false certificates of compliance with military specifications.  39 F.3d 591, 592-93 (5th Cir. 1994).  At trial, the defendants sought to introduce evidence that the products nevertheless complied with the specifications, but the district court ruled that such evidence was irrelevant.  *Id.* at 593 n.10.  The Court of Appeals upheld the ruling because "whether or not the products actually conformed to these specifications is a matter of happenstance and is essentially irrelevant, as the district court properly noted."  *Id.  Dula* thus supports the proposition that the existence of a scheme to defraud depends on intent, not output.

Applying these cases, if the evidence establishes that the defendants schemed to defraud counterparties to their interest rate swaps by attempting to manipulate the LIBOR rate to their financial advantage, it is irrelevant whether the rates that they submitted to the British Bankers' Association were "reasonable" or even an "accurate" reflection of Rabobank's borrowing costs. Hence, the defendants should be prohibited from arguing that they were permitted to allow financial motivations to impact their LIBOR submissions so long as the rates they ultimately submitted were within what they perceived as a "reasonable range" of what the bank's borrowing costs might have been or otherwise suggesting that the government is required to prove that their submissions were objectively "false."[4]

Nor should the defendants be permitted to argue or present evidence in support of the proposition that, although they considered trading positions as one of many factors in submitting LIBORs, they did not act with criminal intent because their decision was also motivated by other legitimate considerations.  This is because "a specific intent need not be the actor's sole, or even

---

[4] The government agrees that the level of a defendant's LIBOR submission may be probative of whether he made that submission with an intent to defraud.  But the law does not allow the defendants to argue that they were permitted to put their thumbs on the scale so long as they did not press too hard.

primary purpose." *United States v. Technodyne, LLC*, 753 F.3d 368, 385 (2d Cir. 2014) ("[i]t is commonplace that the law recognizes that there may be multiple motives for human behavior . . . a defendant accused of [a specific intent] crime may properly be convicted if his intent to commit the crime was any of his objectives") (citing *Spires v. United States*, 317 U.S. 492, 499 (1943) ("if the tax-evasion motive plays *any part* in [the defendant's] conduct the offense may be made out even though the conduct may also serve other purposes . . . .") and *United States v. Biaggi*, 909 F.2d 662, 683 (2d Cir. 1990) ("A valid purpose that partially motivates a transaction does not insulate participants in an unlawful transaction from criminal liability")).  Whether or not the defendants acted with a dual purpose is irrelevant; the defendants formed a specific intent to defraud if their LIBOR submissions were informed in any way by an improper financial consideration even if other legitimate factors also drove their decision.

Even if the "reasonableness" of the defendants' submissions was an absolute defense – which it is not – evidence or argument that the defendants' LIBOR submissions were in the same "range" as other panel banks notwithstanding an intent to deceive should be excluded under Fed. R. Evid. 403 as confusing the issues, misleading the jury, and undue delay.  As set forth above, proof of a scheme to defraud turns on the defendants' intent, and not the output of the conspiracy.  Allowing the defendants to present evidence on "reasonableness" and their mixed motives will distract the jury's attention from the real issue presented in this case – whether the defendants intended to trick or deceive another party.

## II. EVIDENCE THAT SOME OF RABOBANK'S SWAP COUNTERPARITES MANIPULATED LIBOR SHOULD BE EXCLUDED UNDER FED. R. EVID. 402 AND 403 BECAUSE RELIANCE IS NOT AN ELEMENT OF WIRE FRAUD.

This motion asks the Court to (1) exclude evidence that some of Rabobank's counterparties admitted to, or were investigated for, manipulating LIBOR and (2) prohibit any

argument that a counterparty's involvement in LIBOR manipulation rendered the defendants' conduct immaterial.  The defendants have indicated in pretrial argument and through their expert disclosures that they intend to present evidence that market participants and regulators were aware that several LIBOR panel banks had attempted to manipulate the LIBOR rate.  For example, defendant Allen's expert disclosure for Dr. Marti Subrahmanyam indicated that he intends to testify that "given the extensive coverage regarding the lack of veracity of LIBOR submissions, the likelihood that Panel Banks would submit LIBOR rates which reflected their own interests would not have been a significant piece of information to these large financial institutions, because these institutions engaged in similar misconduct."  As set forth below, evidence of counterparty manipulation should be excluded as irrelevant because reliance is not an element of fraud in a criminal case and, alternatively, should be excluded under Fed. R. Evid. 403 because such evidence will confuse the issues, unfairly prejudice the government, and create several mini-trials.

At trial, the United States will prove that, during the time period alleged in the indictment, an average of over $150 trillion dollars per year in interest rate swap contracts were tied to U.S. Dollar (USD) and Japanese Yen (JPY) LIBOR.  It is no surprise, then, that the defendants' conduct affected nearly every significant financial institution in the world, including the handful of other LIBOR panel banks who, like Rabobank, admitted to manipulating LIBOR. Although the defendants' conduct was designed to defraud scores of market participants (many of which were not even on the LIBOR panel), five financial institutions that admitted to manipulating LIBOR in DPAs with the Department of Justice had positions opposite Rabobank on some of the days at issue.  These institutions are: Barclays, Lloyds Banking Group, Royal Bank of Scotland, UBS, and Deutsche Bank (hereinafter "manipulating counterparties").

Additionally, several of Rabobank's counterparties were investigated for, but did not resolve, allegations of LIBOR manipulation. In response to defense requests, the government provided in discovery the statements of facts to which the manipulating counterparties admitted as well as significant – or "hot" – documents identified during the investigation of the "manipulating counterparties" as well as entities that were merely investigated. The United States does not intend to call at trial any witness from any of the "manipulating counterparties" and will not highlight these institutions as "victims."[5]

### A. Evidence that five of Rabobank's counterparties manipulated the LIBOR rate is irrelevant under Fed. R. Evid. 402 because reliance is not an element of wire fraud.

The presentation of evidence that some of Rabobank's counterparties were manipulating LIBOR would invite the jury to infer that the defendants' manipulation scheme was immaterial because a counterparty that itself manipulated LIBOR would have perceived the benchmark as rigged and would not have relied on the accuracy of the defendants' submissions. Evidence that Rabobank's counterparties, for whatever reason, assumed that the defendants were manipulating LIBOR and disregarded the accuracy of the benchmark is irrelevant because the federal fraud statutes do not require the United States to prove reliance on a defendant's conduct. Because the materiality standard requires the government to prove only that the scheme had a "natural tendency to influence, or was capable of influencing" a party's actions, *see Neder v. United*

---

[5] The government's case will, however, make passing references to "manipulating counterparties" in two contexts. First, the government intends to present evidence of how Rabobank's LIBOR submissions on the particular reset dates in question compared to the submissions of other LIBOR panel banks, including the five manipulating counterparties (all of whom were on the BBA's LIBOR panel). Second, the government will prove that cooperating witness Paul Robson, who was Rabobank's primary JPY LIBOR submitter, coordinated his LIBOR submissions with his counterpart at Lloyds in an effort to make Rabobank's submissions look less obvious and to achieve a LIBOR fix that would benefit derivative positions held by Rabobank, Lloyds, or both. Mr. Robson will also testify that Mr. Allen coordinated LIBOR submissions with Deutsche Bank.

*States*, 527 U.S. 1, 16 (1999), the government need not show actual reliance on a criminal

defendant's false or fraudulent statement. *United States v. Thomas*, 377 F.3d 232, 242 (2d Cir.

2004). "'Capable of influencing' is an objective test, which looks at 'the intrinsic capabilities of

the false statement itself, rather than the possibility of the actual attainment of its end.'" *United

States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008) (quoting *United States v. Facchini*, 832

F.2d 1159, 1162 (9th Cir. 1987)); accord *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir.

2013); Mem. Order at 5, Aug. 18, 2015, Dkt. No. 100 (noting that materiality is an objective

standard).

Because reliance is not an element of fraud in a criminal case, evidence that Rabobank's

counterparties suspected, or actually knew, that the defendants were rigging the LIBOR rate is

irrelevant. *See Corsey*, 723 F.3d at 373 n.3 ("the question is not whether victims might smell a

rotten deal before they hand over money. Instead, a misrepresentation is material if it is capable

of influencing the decisionmaker, no matter what the victim decides to do") (internal citation

omitted); *United States v. Allen*, 201 F.3d 163, 167 (2d Cir. 2000) (victim's negligence in

permitting a crime to take place does not excuse the defendant from culpability for her

substantive offense). Given that the materiality standard does not explore whether the false

statement actually achieved its intended objective, a statement may be material even when the

listener has actual knowledge of its falsity. *See, e.g. United States v. Johnson*, 139 F.3d 1359,

1364 (11th Cir. 1998) (affirming conviction under 18 U.S.C. § 1001 when recipient knew the

statement to be false); *United States v. Goldfine*, 538 F.2d 815, 820-21 (9th Cir. 1976)

(statements made to the Drug Enforcement Administration were material even though the agency

knew them to be false). Because the federal fraud statutes require the jury to evaluate only

whether a false statement was merely "capable of influencing," evidence that some of

Rabobank's counterparties, by virtue of their own misconduct, knew or assumed that Rabobank was manipulating LIBOR is wholly irrelevant.

The fact that the manipulating counterparties at issue admitted to acting with intent to defraud – as opposed to acting negligently or knowingly – makes no difference because 18 U.S.C. § 1343 requires the jury to assess the intent of the defendants, not the scienter of the victims.  This is so because the materiality element, which explores whether a statement is capable of influencing a person of "ordinary prudence," is "a tool the jury may utilize to gauge the defendant's intent" which "focuses on the violator, not the victim."  *Thomas*, 377 F.3d at 243.  "Thus, the ordinary prudence standard is not a shield which a defendant may use to avoid a conviction for a deliberately fraudulent scheme."  *Id*.  The only intent with which materiality is concerned is that of the defendant; a victim's scienter – be it negligent, knowing, or intentional – is irrelevant.

The appellate courts have regularly affirmed fraud convictions where the defrauded party not only knew, but actually participated in, the fraud scheme.  *See United States v. Molinaro*, 11 F.3d 853, 587 (9th Cir. 1993) (citing *United States v. Saks*, 964 F.2d 1514 (5th Cir. 1992) ("[i]t follows that bank customers who collude with bank officers to defraud banks may also be held criminally accountable either as principals or as aiders and abettors")); *cf. also United States v. Ojeikere*, 545 F.3d 220, 223 (2d Cir. 2008) (Restitution under the MVRA "may not be denied simply because the victim had greedy or dishonest motives, where those intentions were not *in pari material* with those of the defendant").  The logical extension of the argument that a counterparty's participation in a similar scam is a defense to fraud would yield the absurd result of frustrating prosecutions where, as here, defendants attempt to manipulate markets by colluding with other market participants.

All of the above remains true whether reliance evidence is offered through a fact witness or an expert witness.  In denying the defendants' motion to take the deposition of former BBA executive John Ewan – whom the defendants claimed put LIBOR panel banks on notice of manipulation – this Court rejected any link to materiality.  Mem. Order at 5, Aug. 18, 2015, Dkt. 100.  It appears from Mr. Allen's expert disclosures, however, that the defense is going to attempt to "back door" counterparty reliance evidence by suggesting that the BBA was aware of LIBOR manipulation.  The Court should not permit the defendants to circumvent its ruling in this manner.

**B.  Even if it were relevant, evidence that some of Rabobank's counterparties manipulated LIBOR should be excluded under Fed. R. Evid. 403 because its probative value is substantially outweighed by the danger of confusion of the issues, unfair prejudice, and waste of time.**

Under Fed. R. Evid. 403, "the court may exclude relevant evidence if its probative value is substantially outweighed by the danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence."  As set forth below, the probative value of evidence of counterparty manipulation is minimal and is far outweighed by the danger of unfair prejudice, confusing the issues, and wasting time.

The probative value of the fact that a small sub-set of Rabobank's counterparties manipulated the LIBOR rate is extremely low because the government is not required to prove that the counterparties relied on the false statements and fraudulent scheme alleged in the indictment.  The minimal – if any – probative value of evidence of counterparty manipulation is vastly outweighed by the danger that it will confuse the issue of whose intent matters in a fraud case by urging the jury to focus on the mental state of the victim, and not the violator.

In addition to confusing the jury, evidence of counterparty manipulation will suggest that all participants in the swaps market were unethical actors who deserved to be defrauded.  Such evidence will virtually invite the jury to render a verdict based on the improper consideration of animosity toward victims.  *See United States v. Figueroa*, 618 F.2d 934, 943 (2d Cir. 1980) ("Unfair prejudice" means "an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one").  Admission of evidence that five of Rabobank's counterparties manipulated LIBOR would also have an outsized effect at trial which would unfairly paint all swap market participants with a broad brush and encourage the jury to render a verdict based on the improper conclusion that all swap market participants are "dirty." *See United States v. Oldbear*, 568 F.3d 814, 819 (10th Cir. 2009) (rejecting the "everybody-is-doing-it defense").  A scheme to manipulate the most widely-referenced interest rate benchmark in the world will necessarily affect both honest market participants as well as the bad apples. The Court should not reward the defendants for executing a scheme with such staggering breadth by allowing them to focus attention on the least sympathetic of a large class of counterparties who were affected.

Permitting the defendants to undertake to prove the criminal conduct of Rabobank's counterparties would necessarily result in several mini-trials involving five different institutions. *See United States v. Stewart*, 433 F.3d 273, 313 (2d Cir. 2006) (Rule 403 is concerned with the avoidance of "mini-trials").  This is especially true because any effort to establish that the counterparties were trying to "out manipulate" Rabobank would require proof not only that the counterparties had positions opposite Rabobank on the re-set dates in question, but also that those positions were in the same currency and borrowing duration as Rabobank's positions.  And to demonstrate an effect on the defendants' mental state, the defense would not only have to

show that the counterparties were manipulating LIBOR for the same tenor and currency as one

of the allegations at issue, but also that the defendants *knew* that the counterparty was

manipulating the exact same rate that they rigged.

### III. FEDERAL RULE OF EVIDENCE 701 PERMITS THE UNITED STATES TO OFFER LAY OPINION TESTIMONY FROM (1) INTEREST RATE SWAPS TRADERS WHOSE EMPLOYERS TRADED WITH RABOBANK AND (2) COOPERATING WITNESSES WHO CAN EXPLAIN AND PUT IN CONTEXT CO-CONSPIRATOR STATEMENTS TO WHICH THEY WERE NOT PARTY.

The United States submits this motion *in limine* to advise the Court of its intention to

present opinion testimony from two categories of lay witnesses and to provide authority

supporting the admissibility of this evidence.  For the reasons set forth below, the testimony that

the United States intends to elicit from these witnesses is admissible under Fed. R. Evid. 701,

which permits non-experts to offer opinion testimony if the evidence is "(a) rationally based on

the witness's perception; (b) helpful to clearly understanding the witness's testimony or to

determining a fact in issue; and (c) not based on scientific, technical, or other specialized

knowledge within the scope of Rule 702."  *See United States v. Garcia*, 291 F.3d 127, 140 (2d

Cir. 2002).

The first category consists of two witnesses who worked as traders for two counterparties

that were trading swaps with Rabobank: "Counterparty-1" and "Counterparty-2."  The United

States anticipates that these witnesses will testify that LIBOR manipulation is material; that is,

LIBOR manipulation was capable of influencing a person of ordinary prudence.  These two

individuals will testify that they personally traded numerous swaps on behalf of their employers

and that, as a result of this experience, they have personal knowledge about what factors are

important to the decision of whether to enter into a swap.  The government intends to ask these

witnesses to testify about the materiality of a limited number of swaps which they did not

execute personally but of which they have knowledge gained through the performance of their employment duties.

For example, the government anticipates showing the former Counterparty-1 trader a number of interest rate swap contracts executed by Rabobank and Counterparty-1. This trader will testify that, although he cannot confirm the he personally executed these trades (mostly as a consequence of difficulty obtaining records from a company that is no longer a going concern), he traded hundreds of identical swaps and that, as a result of this experience, he is in a position to describe what factors were important to Counterparty-1. Indeed, the witness will testify that he may very well have executed the trades at issue but that he does not have access to the documents necessary to confirm as much. Similarly, the Counterparty-2 witness will testify about a swap between Counterparty-2 and Rabobank that he did not execute personally but which he administered on behalf of Counterparty-2 in his role as an Assistant Corporate Treasurer. In addition to administering this Rabobank swap, the witness executed similar swaps with other counterparties.

The second category of lay witness consists of three cooperating co-conspirators whom the United States would offer to provide insights on communications that they had with the defendants as well as communications between the defendants to which the witnesses were not party. Having participated in a scheme to manipulate LIBOR that included the defendants, the cooperating witnesses (all of whom are former Rabobank traders) are in a unique position to testify about the context, significance, and meaning of statements that the defendants and others made in furtherance of the scheme, including communications to which the cooperators were not a party. For example, if shown a copy of Exhibit 101K, which is a Bloomberg chat in which another Rabobank trader asked Mr. Conti "gonna need a frickin high 6 mth fix tomorrow if ok

with U . . . 5.42?", a cooperating witness could draw on his knowledge of the operation of the conspiracy to testify that the trader communicated that his trading position would benefit from an increase in the U.S. Dollar LIBOR for the six-month tenor and, accordingly, asked whether Mr. Conti would submit 5.42% for Rabobank's LIBOR submission in the six month tenor.

In another example, former Rabobank trader Paul Thompson, an Australian defendant who has not yet appeared in the United States, wrote to Mr. Conti "whats your call for 3 M USD LIBOR has have a big fix today (well $500 mio is big for me) im hearing its 23 offered at RBS and I pay 22.5," to which Mr. Conti responded "seems to be 23 the shout mate . . I can go lower if you like?"  A cooperating witness could explain that Mr. Thompson communicated that he had a large derivative position tied to the three-month tenor of U.S. Dollar LIBOR and that Mr. Conti indicated that, based on what brokers were offering, Mr. Conti anticipated making a LIBOR submission of 3.22% but that he was willing to make a lower submission to accommodate Mr. Thompson's position.  In addition to several written communications, the United States anticipates that the cooperating witnesses will be able to identify the defendants' voices in several recorded telephone calls on the topic of LIBOR manipulation.

For the reasons set forth below, both categories of witnesses are qualified to offer lay opinions under Fed. R. Evid. 701.

> **A. Because materiality is an objective standard, any derivative trader with knowledge of what considerations are capable of influencing a person of ordinary prudence should be permitted to offer testimony on this element.**

To establish the element of materiality, the United States must show that a false or fraudulent statement or scheme had a "tendency to influence" or was "capable of influencing" a person of ordinary prudence.  *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013).  In wire fraud cases, the courts have permitted the government to establish materiality by asking

victims hypothetical questions.  *See, e.g., United States v. Cuti*, 720 F.3d 453, 458 (2d Cir. 2013)

("'what-if-you-had-known' questions that present withheld facts to a witness are especially

useful to elicit testimony about the impact of fraud"); *United States v. Ranney*, 719 F.2d 1183,

1188-89 (1st Cir. 1988) (use of victim hypotheticals "was not only merely defensible but

eminently correct").

Materiality is an *objective* standard that is assessed from the perspective of "a person of

ordinary prudence," not a subjective test which explores whether the statement or conduct would

have caused the intended victim to act differently.  *United States v. Thomas*, 377 F.3d 232, 242-

43 (2d Cir. 2004); *see also United States v. Peterson*, 538 F.3d 1064, 1072 (9th Cir. 2008)

(quoting *United States v. Facchini*, 832 F.2d 1159, 1162 (9th Cir. 1987) ("'Capable of

influencing' is an objective test, which looks at 'the intrinsic capabilities of the false statement

itself, rather than the possibility of the actual attainment of its end'").  Because materiality is an

objective standard, this element may be proven through the testimony of any person with

sufficient knowledge of the subject, not just individuals who participated personally in the

transactions in question.  *See United States v. Rigas*, 490 F.3d 208, 222 (2d Cir. 2007) (corporate

representative who had no involvement in the transaction permitted to testify about the content of

his employer's books and records and how the fraudulent transaction should have been booked);

*United States v. Kerley*, 784 F.3d 327, 339-40 (6th Cir. 2015) (underwriting supervisor who did

not personally approve the loan in question permitted to testify, as a corporate representative,

about the materiality of a fraudulent loan application);[6] *United States v. Valencia*, 600 F.3d 389

---

[6] Just as a mortgage underwriter at a large lender is unlikely to remember a single loan among the
hundreds that she would approve over a career, a derivative trader at a larger dealer such as
Counterparty-1 would probably not remember a specific trade with Rabobank in 2007.  Given
that an institutional derivative trader would be unlikely to remember any specific trade, it is
unclear why his testimony would carry any more weight than that of a knowledgeable trader who
did not personally book the trade at issue.

(5th Cir. 2010) (corporate risk officer permitted to testify based on a review of documents undertaken after he left the company). These authorities make clear that the United States may establish materiality through witnesses who did not personally book the trade in question so long as the testimony offered meets the requirements of Fed. R. Evid. 702.

Through years of trading interest rate swap contracts, both the Counterparty-1 and Counterparty-2 witnesses have "personal knowledge" about what information is "capable of influencing" a decision about whether (and how) to execute a swap. *See Rigas*, 490 F.3d at 224 (witness with no personal involvement in the transaction gained sufficient personal knowledge through his employment at the company and through his examination of company records). The witnesses' testimony will be helpful to the jury because it will establish why their institutions traded interest rate swaps and articulate why LIBOR manipulation had a tendency to influence their decisions. In particular, the witnesses will testify that LIBOR manipulation put their institutions at a risk of loss and that the practice of rigging interest rates made it more difficult to make sound financial decisions.

Testimony that a trader cared about whether a counterparty was trying to rig the interest rates to which a swap was tied relies on common sense notions and is not based on specialized knowledge. That the witnesses' testimony will draw, to some extent, on their experience working on trading desks does not change this fact. "The Second Circuit has held that as long as opinions do 'not depend on the sort of specialized training that scientific witnesses or statisticians rely upon when interpreting the results of their own experiments or investigations,' some degree of specific, industry-related knowledge will not disqualify lay opinion testimony." *United States v. Rubin/Chambers Dunhill Insurance Services, et al*., 828 F. Supp. 2d 698, 704 (S.D.N.Y. 2011) (quoting *United States v. Yannotti*, 541 F.3d 112, 126 (2d Cir. 2007)); *United*

*States v. Ghavami*, 23 F.Supp. 3d 148, 171 (S.D.N.Y. 2014) (testimony about "complex" fixed

income securities admissible under Rule 701). "When the issue for the fact-finder's

determination is reduced to impact – whether a witness would have acted differently if he had

been aware of additional information – the witness so testifying is engaged in 'a process of

reasoning familiar in everyday life.'" *Cuti*, 720 F.3d at 460 (quoting Fed. R. Evid. 701).

Because the testimony offered by the counterparty traders will not draw upon scientific

experiments and investigations but will instead explore whether the scheme alleged in the

indictment is capable of influencing a person of ordinary prudence, it is not "based upon

specialized knowledge" and should be admitted under Rule 701.

### B. Cooperating witnesses who have knowledge of the operation of a conspiracy are qualified to provide testimony on co-conspirator statements to which the witnesses were not party.

The Second Circuit has interpreted Rule 701 as allowing a cooperating witness to give

testimony about co-conspirator communications to which he was not a party. *See Yannotti*, 541

F.3d at 126 (member of the Gambino Crime Family permitted to testify about the meaning of

recorded conversations between co-conspirators to which the testifying witness was not a party).

Applying *Yannotti*, the district court in *Ghavami* allowed a UBS trader, who pled guilty to

charges relating to a conspiracy to rig the bidding process for municipal bond instruments, to

testify about the meaning of communications made by co-defendants in furtherance of the

conspiracy notwithstanding that the witness was not a party to those conversations. 23 F. Supp.

3d at 170 ("under Second Circuit precedent, [the witness] was permitted to testify about [co-

conspirator] recordings even though he did not necessarily participate personally in the

communications or the specific transactions they concerned"). As was the case in *Ghavami*, co-

conspirator testimony that the United States intends to offer through cooperating witnesses Lee Stewart, Paul Robson, and Takayuki Yagami satisfies the elements of Fed. R. Evid. 701.

Messrs. Stewart, Robson, and Yagami are percipient witnesses because their testimony will be based on their participation in the conspiracy.  "Where the witness's participation in the charged conspiracy 'affords him particular perceptions of its methods of operation,' the personal knowledge requirement does not bar a witness from testifying as to actions of his co-conspirators that he did not witness directly.'"  *United States v. Rubin/Chambers Dunhill Insurance Services, et al*., 828 F. Supp. 2d 698, 704 (S.D.N.Y. 2011) (quoting *Yannotti*, 541 F.3d at 126 n.8).  The government will establish that the cooperating witnesses participated in a conspiracy with the defendants and their participation informs their perception of the defendants' co-conspirator statements.

The cooperating witnesses' testimony will assist the jury by providing context to co-conspirator statements, helping to de-code trading lingo, and making voice identifications on recorded telephone conversations.  *See Yannotti*, 541 F.3d at 125 (cooperating witness permitted to define "coded" language).  Recognizing that the cooperating witness's "decoding testimony was helpful to the jury, who could not have been expected to appreciate the meaning of ambiguous terms and phrases without context," the district court in *Ghavami* permitted a trader to testify as to the meaning of phrases like "give me your best indication," "confirm these levels," and "five beeps in for each one," all of which were used during conversations to which the witness was not a party.  23 F.Supp. 3d at 171.  Similarly, the government's proof will include the following chats and emails (and many more like them):

- "gonna need a frickin high 6 mth fix tomorrow if ok with U . . . 5.42?"

- "whats your call for 3 M USD LIBOR has have a big fix today (well $500 mio is big for me) im hearing its 23 offered at RBS and I pay 22.5?"

- "seems to be 23 the shout mate . . I can go lower if you like?"

The cooperating witnesses will be able to explain that, based on knowledge gained during their participation in the conspiracy and while working on the trading desk, all of the esoteric statements identified above pertain to LIBOR manipulation.  Moreover, in the case of emails, chats, and recorded telephone conversations, the cooperating witnesses, who had personal relationships with the defendants, will be able to identify the email addresses and voices of the declarants.  Because criminal defendants who will not testify are the only participants to many of the most important communications in this case, it is necessary to provide meaning and context through witnesses who were not party to the conversations.

For many of the same reasons identified above, a cooperating witness's interpretation of a co-conspirator statement is not based on specialized knowledge.  As the district court held in *Rubin/Chambers*:

> if the Government presents the opinion testimony at issue as the product of the witnesses' participation in the conspiracy rather than their experience in the financial industry more broadly, there is little danger that the jury would mistake the cooperating witnesses for experts.  That the witnesses' ability to decode the conversations at issue is obviously and unavoidably informed by their experience in the financial industry should not render the subject of their testimony the province of experts.

828 F. Supp. 2d at 704.  Because the United States is going to present the witnesses' testimony as insights provided by a co-conspirator, as opposed to opinion testimony provided by an industry expert, Rule 701 allows the government's cooperating witnesses to provide their interpretation of co-conspirator statements.

**IV.   EVIDENCE THAT RABOBANK PAID A $325 MILLION FINE TO SETTLE ALLEGATIONS OF LIBOR MANIPULATION SHOULD BE ADMITTED TO SHOW THAT THE DEFENDANTS' SCHEME "AFFECTED" RABOBANK, WHICH IS A "FINANCIAL INSTITUTION."**

To capture substantive counts of wire fraud dating back to 2005, the first indictment to charge defendants Allen and Conti (Dkt. 24), and all superseding indictments thereafter, alleged that the scheme "affects" a "financial institution" under 18 U.S.C. § 3293(2) (extending the statute of limitations from five years to ten years for offenses that "affect[]" a "financial institution").  The Second Circuit has indicated that whether a fraud affected a financial institution is a jury question, and the government is therefore required to present evidence of such an effect.  *See United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998) (charging the jury on the issue of affecting a financial institution).  A "financial institution" includes a "depository institution holding company," *see* 18 U.S.C. § 20(6), which is defined as "a bank holding company."  12 U.S.C. § 1813(w)(1).  The phrase "bank holding company" means "any company which has control over any bank."  18 U.S.C. § 1841(a)(1).  A company has "control" over a bank if (a) the company has the power to vote 25 per centum of any class of voting securities; (b) controls in any manner the directors or trustees of the bank; or (c) the company directly or indirectly exercises a controlling influence over the management or policies of the bank."  12 U.S.C. § 1841(a)(2).  An employee's fraud may "affect" the financial institution that employed her.  *See United States v. Countrywide Financial Corporation*, 961 F.Supp. 2d 598, 605 (S.D.N.Y. 2013) (applying FIRREA).  Where a financial institution enters into an agreement with the Department of Justice and there is proof that the agreement resulted from the conduct charged in the indictment, the conduct "affects" the financial institution for the purposes of Section 3293.  *See United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015).

In addition to demonstrating that the defendants' scheme resulted in the manipulation of a benchmark interest rate in which financial institutions throughout the world had an interest, the government intends to establish that, for the purposes of 18 U.S.C. § 3293(2), the defendants' conduct "affected" Rabobank as well.  Under 18 U.S.C. § 20(6), Rabobank, which is based in the Netherlands, is a "bank holding company" because it owns 99% of the shares of Rabobank National Association, an FDIC-insured retail bank established under the laws of California and operating in the United States.  To prove that the defendants' scheme "affected" Rabobank, the United States will offer a Deferred Prosecution Agreement (DPA) (marked as Exhibit 120) pursuant to which Rabobank agreed to pay the United States Department of Justice $325 million to resolve allegations that its employees rigged LIBOR.  *Accord Heinz*, 790 F.3d at 367 (government offered NPA to show that employees' scheme "affected" their employer).  The sheer size of the fine establishes that the defendants' conduct had more than a *de minimis* impact on Rabobank.  To establish that the defendants participated in the same scheme that was the subject of the DPA, the government will point to portions of the DPA's Statement of Facts, which cites email and chat communications sent by Messrs. Allen and Conti.

## V.  THE GOVERNMENT SHOULD BE PERMITTED TO INTRODUCE STATEMENTS THAT DEFENDANT CONTI MADE DURING A PROFFER SESSION FOR WHICH HE WAIVED FED. R. EVID. 410 PROTECTION TO REBUT ANY INCONSISTENT EVIDENCE OR ARGUMENT THAT HE OFFERS AT TRIAL.

The government seeks permission to offer evidence of statements that defendant Anthony Conti made under the terms of a proffer agreement (1) to rebut testimony, evidence, or arguments advanced by the defense at trial, depending on the facts asserted by the defense, and (2) to cross-examine Mr. Conti should he testify.

On January 17, 2013, Mr. Conti participated in a proffer session with his counsel as well as representatives of the Federal Bureau of Investigation and Department of Justice.  The proffer was conducted pursuant to the terms of the Fraud Section's stander proffer agreement, which provides that "in any proceeding, including sentencing, the government may use Client's statements and any information provided by Client during or in connection with the meeting to cross-examine Client, to rebut any evidence or arguments offered on Client's behalf, or to address any issues or questions raised by a court on its own initiative."  The agreement further provides that "neither this agreement nor the meeting constitutes a plea discussion" and that "Client knowingly and voluntarily waives any right Client might have under Fed. R. Evid. 410, Fed. R. Crim. P. 11(f), or otherwise, to prohibit the use against Client of statements made or information provided during the meeting."

During the proffer session, Mr. Conti made statements about his LIBOR setting practices and about specific electronic communications shown to him by investigators.  The law allows the United States to offer any proffer-protected statements made by Mr. Conti to rebut any argument or testimony that he offers at trial.  *See United States v. Velez*, 354 F.3d 190, 196 (2d Cir. 2004). A proffer agreement's waiver language does not require a "specific or direct contradiction" between the proffer statement and an assertion by counsel.  *United States v. Barrow*, 400 F.3d 109, 117, 121 (2d Cir. 2005).

## VI.  EVIDENCE THAT, IN CONVERSATIONS OCCURING BEFORE MAY 2006, MR. ALLEN ADVISED MR. ROBSON TO CONSIDER TRADING POSITIONS WHEN SUBMITTING LIBOR RATES IS INTRINSIC EVIDENCE OF THE SCHEME ALLEGED IN THE INDICTMENT.

The government anticipates that cooperating witness Paul Robson, who was Rabobank's JPY LIBOR setter, will testify that he engaged in a conspiracy to manipulate the Yen LIBOR rate by making submissions calculated to benefit traders' positions and that he began doing so

after he observed Mr. Allen and others manipulating other LIBOR currencies beginning in or around 2001.  During his time at Rabobank, Mr. Robson observed Messrs. Conti and Allen participating in "open outcry" meetings in which Rabobank's derivative traders advised the LIBOR setters of the direction in which they needed LIBOR to move.  According to Mr. Robson, his observation of Messrs. Conti and Allen's participation in the conspiracy sent the signal that he should do the same for the Yen currency.  Indeed, Mr. Robson will further testify that, during a series of conversations between 2001 and 2004, Mr. Allen encouraged Mr. Robson to consider traders' positions when submitting Rabobank's LIBOR number.  Cooperating witness Takayuki Yagami will testify to witnessing the same sort of "open outcry" meetings described by Mr. Robson during a trip to Rabobank's London office in the year 2000.

Because the indictment alleges that the conspiracy began "at least in or about May 2006," events that transpired from 2001 to 2004 do not, as a matter of law, constitute "uncharged conduct."  Even if, as a technical matter, the conspiracy and scheme alleged in the indictment began after these conversations occurred, they are nonetheless "intrinsic" evidence of the charged crimes – and not "other acts" evidence that must be analyzed under Fed. R. Evid. 404(b) – because this evidence is "inextricably intertwined with the evidence regarding the charged offense" and is necessary to "complete the story of the crime on trial." *See United States v. Carboni*, 204 F.3d 39, 44 (2d Cir. 2000) (quotation omitted).  Mr. Robson's early observations of LIBOR manipulation tell the story about how he joined the conspiracy alleged in the indictment and the fact that Mr. Robson took his cue from the defendants is highly probative of their intent and relative position in the conspiracy.  For this reason, this evidence is "inextricably intertwined" with the conspiracy and should be admitted without reference to the Rule 404(b) analysis.