

**U.S. Department of Justice**

Antitrust Division

*Liberty Square Building*

*450 5th Street, N.W.*
*Washington, DC 20001*



**VIA E-MAIL**                                   October 29, 2015

The Honorable Jed S. Rakoff
United States District Court
Southern District of New York
500 Pearl Street
New York, NY 10007

      Re:    United States v. Allen, S4 1:14-cr-00272-JSR

Dear Judge Rakoff:

    The government respectfully submits this letter, written at the Court's direction, in opposition to the defendants' request for a multiple conspiracies instruction; in support of the government's conscious avoidance instruction; and in support of striking any testimony and precluding any argument regarding Allen's waiver of extradition and his purported "consciousness of innocence."

## I.    The Court Should Not Give a Multiple Conspiracies Instruction

    The defendants have requested a multiple conspiracy charge instructing that the jury should acquit, unless it concludes that the government has proved the "single, overall conspiracy charged in the indictment." Such a charge is unwarranted for two reasons. First, based on basic principles of conspiracy law and the evidence introduced at trial, the Court was correct in observing that the evidence supports a finding that a single conspiracy existed, and the evidence does not create any risk that the jury would convict either defendant for participating in a conspiracy that is materially different than the one alleged. Second, the defendant's position is legally incorrect. If the jury finds that the defendants knowingly participated in a narrower conspiracy to manipulate either USD LIBOR or JPY LIBOR, so long as that conspiracy is encompassed within the overall conspiracy charged in Count One, the jury should convict and should not be instructed to do otherwise.

### A.    *The Evidence Supports A Single Conspiracy*

    The concern underlying multiple conspiracies instructions is to ensure that the jury convicts only for the conspiracy charged in the indictment and not for some other, uncharged conspiracy. *See United States v. Tramunti*, 513 F.2d 1087, 1107 (2d Cir. 1975); *United States v.*

*Toro*, 840 F.2d 1221, 1236 (5th Cir. 1988); *United States v. Wozniak*, 781 F.2d 95, 97 (7th Cir. 1985); *United States v. Baker*, 598 Fed. App'x 165, 170 (4th Cir. 2015). The danger sought to be prevented is the risk of convicting the defendant of something other than what is charged in the indictment. *See, e.g.*, *United States v. Toro*, 840 F.2d at 1236. Thus, "[i]n order to prove a single conspiracy, rather than multiple conspiracies, the government must show that each alleged member agreed to participate in what he knew to be a collective venture directed toward a common goal." *United States v. Eppolito*, 543 F.3d 25, 47 (2d Cir. 2008) (citations, internal quotation marks, and alteration omitted). The co-conspirators need agree only on the "essential nature of the plan," not the details of the conspiracy; "[n]or need the goals of all the participants be congruent for a single conspiracy to exist, so long as the participants agree on the essential nature of the enterprise and their goals are not at cross purposes." *Id.* (citation and internal quotation marks omitted). "Changes in membership, differences in time periods, and/or shifting emphases in the location of operations do not necessarily require a finding of more than one conspiracy." *United States v. Jones*, 482 F.3d 60, 72 (2d Cir. 2006). Moreover, "a single conspiracy is not transformed into multiple conspiracies merely by virtue of the fact that it may involve two or more phases or spheres of operation, so long as there is sufficient proof of mutual dependence and assistance." *United States v. Eppolito*, 542 F.3d at 47.

Here, as a preliminary matter, the main argument advanced in support of a multiple conspiracies instruction does not support such an instruction at all. At page 3 of Mr. Schachter's letter dated October 25, 2015, he expresses the defendants' concern that if the government "proved the existence of a conspiracy with respect to JPY LIBOR, Defendants must be found guilty, even though the jury may also reasonably conclude that Defendants were not involved in the conspiracy to manipulate JPY LIBOR." This concern is about the defendants' <u>participation</u> in the charged conspiracy, an element fully and correctly addressed in the Court's draft charge. It is not an issue of multiple conspiracies.

Even if that had hit the mark in articulating a basis for a multiple conspiracies instruction, no such instruction would be warranted here. As the Court correctly observed, the evidence supports a finding that a single conspiracy to manipulate both USD LIBOR and JPY LIBOR existed:

- The conspirators shared a **common goal** of increasing the bonus pool – and therefore their own bonuses – at Rabobank by maximizing the performance of the trading books. *See, e.g.*, Tr. at 1293:4-14 (Allen's supervisor telling him that "[s]queezing [the] maximum out of the various books is vital" and "bonuses . . . are key to the future"); GX 104 (Conti arguing for a larger bonus based on his book performance); Tr. at 256:4-11 (Stewart confirming that the size of the bonus pool "influence[s] . . . the size of the bonus that a trader gets"); Tr. at 407:8-12 (Robson explaining that "as long as the bank performed well, [it] would then set aside a sum of money to pay additional bonuses from, and that decision was left to Mr. Allen to decide how that sum of money was divided up between the team"); Tr. at 705:15-17 (Yagami's understanding that "traders' performance affect the bonus pool of trading desk as a whole, and this performance, overall performance makes the bonus performance of senior management").

- The conspirators knowingly engaged in a **collective venture**. *See, e.g.*, Tr. at 615:22-25 (Robson saying his co-conspirators were Butler, Robbins, Allen, Conti, Stewart, Thompson, Motomura, Yagami, and others); Tr. at 669:3-13 (Yagami defining the "LIBOR betting and trading position circle and culture" as including himself, Robson, Motomura, Thompson, Conti, Allen, Robbins, Butler, and Stewart).

- The conspirators acted with **mutual dependence and assistance**:

    o   *USD traders facilitated JPY requests and JPY traders facilitated USD requests. See, e.g.*, GX 115A (Yagami emailing a JPY request to USD traders Conti and Robbins); GX 115B (USD trader Robbins promising to ensure that Yagami's JPY request would be submitted); GX 101Q (Yagami emailing a JPY request USD traders Allen and Conti); GX 101AF (same); GX 111A (USD trader Conti telling Yagami to send his JPY requests to Beaard, the JPY submitter in Utrecht).

    o   *Paul Thompson, who traded JPY and USD swaps, made manipulation requests for both currencies. See, e.g.*, Tr. at 360:9-20 (Robson explaining that he would take JPY requests from Thompson and pass the phone to Conti for the purpose of taking USD requests from Thompson); GX 125B (Robson saying he would pass on Thompson's USD request because Ghosty (Allen) was not at the desk); GX 201A (before leaving on vacation, Robson telling Thompson to send JPY requests to Ghosty or Conti)

- The conspirators knew the **essential nature of the enterprise**, which was to manipulate USD LIBOR and JPY LIBOR to benefit trading positions. *See, e.g.*, Tr. 324:7-13 (Robson describing discussions involving Allen and Conti around 11:00 a.m. during which "all of the interested parties would gather and discuss their positions, what they needed, and what was going to be set in the various tenors to suit the positions").

Based on this record, the evidence simply does not create any risk that the jury would convict either defendant for participating in a conspiracy that is materially different than the one alleged.

      *B.     The Existence Of A Narrower Conspiracy Does Not Warrant A Multiple Conspiracies Instruction*

       Even if the jury finds that the defendants knowingly participated in a narrower conspiracy to manipulate either USD or JPY LIBOR, a multiple conspiracies charge is not warranted if the proven conspiracy is a constituent part of the single conspiracy charged in the indictment. *See United States v. Berger*, 224 F.3d 107, 113 (2d Cir. 2000); *Wozniak*, 781 F.2d at 97. Thus, to use an example drawn from the facts of *Berger* and *Wozniak*, where a defendant is charged with participating in a conspiracy to defraud two federal agencies, no multiple conspiracies instruction is warranted if the government proves that the defendant participated in a more limited conspiracy to defraud one of those two agencies. As the Seventh Circuit has recognized, this rule is similar to the "function of a lesser included offense instruction." *Wozniak*, 781 F.2d at 97. *See also United States v. Sir Kue Chin*, 543 F.2d 1032, 1035 & n.1 (2d Cir. 1976) (where the defendant argued that the evidence showed two separate conspiracies, because the indictment

alleged that he received drugs from two suppliers who did not know each other — and who
therefore may have conspired with the defendant, as "the "hub," but not with one another — "it
would have been improper under the circumstances for the judge to have instructed the jury that
they must acquit if they should find more than one conspiracy").

Under those legal principles, the conduct relating to JPY LIBOR, like the conduct
relating to USD LIBOR, forms a constituent part of the charged conspiracy to commit wire and
bank fraud alleged in Count One. Indeed, in such circumstances, the requested charge would
instruct the jury to acquit a defendant who was guilty of the crime charged, merely because that
defendant's guilt was based on some, rather than all, of the conduct alleged in the indictment.
Therefore, as long as the subset conspiracy is encompassed within the overall conspiracy charged
in Count One, the jury should convict and should not be instructed to do otherwise.[1]

The only case cited in support of the defendants' requested multiple conspiracies
instruction is *United States v. McDermott*, 245 F.3d 133 (2d Cir. 2001). *McDermott*, however,
addresses the sufficiency of the evidence supporting James McDermott's conviction for a single
insider-trading conspiracy, and does not speak to multiple conspiracies instructions. The Court
concluded that the evidence was insufficient to establish that McDermott had conspired to pass
inside information to his girlfriend (Gannon) with the understanding that she would share it with
someone named Pomponio. *Id.* at 138. Having concluded that the government had failed to
prove that McDermott conspired with Pomponio, the Court then further found that the variance
between the single conspiracy charged and the two conspiracies proven prejudiced McDermott.
*Id.* at 139. However, the Court later reached the opposite conclusion as to Pomponio, finding no
prejudicial variance even though the government had established a "limited conspiracy between
Pomponio and Gannon" but had "failed to prove a single conspiracy amongst all three co-
defendants." *United States v. McDermott*, 277 F.3d 240, 242 (2d Cir. 2002). Under the
erroneous theory that the defendants have advanced in support of their request for a multiple
conspiracies charge, Pomponio would be entitled to a judgment of acquittal; that outcome was
not warranted, however, because Pomponio remained guilty of the crime charged based on facts
— albeit not all the facts — alleged in the indictment and proven at trial.[2]

_____

[1] Even assuming that the government has proven the existence of two separate conspiracies to
manipulate USD LIBOR and Yen LIBOR, the remedy would be not the issuance of the requested
multiple conspiracies instruction, but instead a determination by the Court as to whether there
was a prejudicial variance between the indictment and the proof at trial. *See United States v.
Johansen*, 56 F.3d 347, 350-51 (2d Cir. 1995). There could be no such prejudice here, as all of
the evidence of LIBOR manipulation introduced in this trial would be admissible had each
defendant been charged in two separate conspiracy counts and even if each defendant had been
charged with a single, narrower conspiracy.

[2] Similarly, it is well-established that a defendant charged with a multiple-object conspiracy is
guilty of that crime so long as the jury agrees on at least one object. *See, e.g., Berger*, 224 F.3d at
113. Under the defendant's theory and proposed charge, the jury should be instructed to acquit
such a defendant if the other charged objectives were part of a different, smaller conspiracy.
Such a result would be contrary to law.

Here, as in the *McDermott* cases, the defendants will be free to contend, if they are convicted, that the government proved a more limited conspiracy than the one charged. And they will be able to further argue that there was a prejudicial variance between the single conspiracy charged and the more limited conspiracy they may contend was established at trial. They are not, however, entitled to their requested instruction that the jury must acquit unless it finds that the government has proved the single, overall conspiracy charged in the indictment.

## II.    The Court Should Instruct the Jury on Conscious Avoidance

The Court should instruct the jury on conscious avoidance, as there is a factual basis for the charge. The government does not seek such an instruction as to Allen's main argument, presented in his opening statement and through his own testimony, that he received and ignored requests from traders to make LIBOR submissions that would benefit their trading positions. A conscious avoidance instruction is appropriate, however, given Allen's claim that he was unaware that LIBOR submitters who sat in close proximity to him – namely, Conti, who sat next to him, and Robson, who sat nearby – accommodated such requests. The jury could properly conclude that if Allen did not know what was occurring around him on the trading desk, it was only because he purposefully contrived to avoid guilty knowledge.

"A conscious-avoidance charge is appropriate when (a) the element of knowledge is in dispute, and (b) the evidence would permit a rational juror to conclude beyond a reasonable doubt that the defendant was aware of a high probability of the fact in dispute and consciously avoided confirming that fact." *United States v. Cuti*, 720 F.3d 453, 463 (2d Cir. 2013) (citation and internal quotation marks omitted). A conscious avoidance instruction "is not inappropriate merely because the government has primarily attempted to prove that the defendant had actual knowledge, while urging in the alternative that if the defendant lacked such knowledge it was only because he had studiously sought to avoid knowing what was plain." *United States v. Hopkins*, 53 F.3d 533, 541 (2d Cir. 1995). "It will almost inevitably be the case that a prosecutor seeking a conscious avoidance charge will contend, in the alternative, that the defendant's culpable knowledge has been directly established." *United States v. Wong*, 884 F.2d 1537, 1542 (2d Cir. 1989).

"[T]he same evidence that will raise an inference that the defendant had actual knowledge of the illegal conduct ordinarily will also raise an inference that the defendant was subjectively aware of a high probability of the existence of illegal conduct." *United States v. Svoboda*, 347 F.3d 471, 480 (2d Cir. 2003) (citation and internal quotation marks omitted). Thus, "the second prong [of the conscious avoidance test] may be established where[] a defendant's involvement in the criminal offense may have been *so overwhelmingly suspicious* that the defendant's failure to question the suspicious circumstances establishes the defendant's purposeful contrivance to avoid guilty knowledge." *Id.* (citation and internal quotation marks omitted; emphasis in original); *Cuti*, 720 F.3d at 463; *United States v. Kozeny*, 667 F.3d 122, 133-34 (2d Cir. 2011).

Moreover, "[i]t is not uncommon for a finding of conscious avoidance to be supported primarily by circumstantial evidence," as "the very nature of conscious avoidance makes it unlikely that the record will contain directly incriminating statements." *Kozeny*, 667 F.3d at 134.

5

Thus, "[a] conscious-avoidance instruction is appropriate when a defendant claims to lack some specific aspect of knowledge necessary to conviction but where the evidence may be construed as deliberate ignorance." *United States v. Gabriel*, 125 F.3d 89, 98 (2d Cir. 1997) (citation and internal quotation marks omitted).

In considering whether a party who induces infringement of a patent must know that the induced acts constitute patent infringement, the Supreme Court in *Global-Tech* looked to the criminal context to determine the standard for ascertaining the existence of conscious avoidance (to which the Court referred as "willful blindness"). *Global-Tech Appliances, Inc. v. SEB S.A.*, 131 S. Ct. 2060, 2063, 2068 (2011). The Supreme Court explained that "[w]hile the Courts of Appeals articulate the doctrine of willful blindness in slightly different ways," they "all appear to agree on two basic requirements: (1) the defendant must subjectively believe that there is a high probability that a fact exists and (2) the defendant must take deliberate actions to avoid learning of that fact." *Id.* at 2070. The Supreme Court did not suggest that it intended its distillation of the "basic requirements" of conscious avoidance, *id.* at 2070, to supersede the range of formulations on which it relied.

Indeed, the Second Circuit has held that *Global-Tech* "did not alter the conscious avoidance standard." *United States v. Goffer*, 721 F.3d 113, 128 (2d Cir. 2013). The Second Circuit has further rejected the argument that *Global-Tech* required "deliberate actions" on a defendant's part to avoid learning of a culpable fact in order to justify a conscious avoidance or willful blindness instruction. *United States v. Fofanah*, 765 F.3d 141, 151 n.2 (2d Cir. 2014). In doing so, the Second Circuit pointed out that no "action on the part of the defendant" is required, and that the Supreme Court instead meant only that "'defendants cannot . . . deliberately shield[] themselves from clear evidence of critical facts that are strongly suggested by the circumstances.'" *Id.* (quoting *Global-Tech*, 131 S. Ct. at 2068-69; alterations in *Fofanah*).

The first prerequisite for a conscious avoidance instruction – that the defendant assert "the lack of some specific aspect of knowledge required for conviction" – is plainly satisfied on this record. *See United States v. Aina-Marshall*, 336 F.3d 167, 171 (2d Cir. 2003). In his testimony, Allen acknowledged that he supervised and sat next to both Robson and Conti (Tr. 1172-73, 1261, 1293), but claimed that he was unaware they actually accommodated requests. He denied knowledge of any LIBOR manipulation on Robson's part. (Tr. 1176.) He similarly denied awareness of any discussions between Robson and either Yagami or Thompson regarding LIBOR submissions. (Tr. 1175-76.) On cross-examination, the government confronted Allen with government Exhibit 125B, an electronic communication in which Thompson made a submission request relating to two-month U.S. dollar LIBOR and Robson agreed to pass the request on to the dollar submitter. (GX 125B; Tr. 1293-94.) Consistent with his testimony on direct examination, Allen denied knowledge as to whether Robson had passed the request on to his colleagues on the desk in London. (Tr. 1293.) As to Conti, on cross-examination, the government confronted Allen with Government Exhibits 124A and 124B, a recorded telephone conversation in which Conti (who sat immediately next to Allen on the desk) explained that he had made an inaccurately high one-month LIBOR submission because Lee Stewart had a fixing. (Tr. 1288-90.)

The second prerequisite for the instruction is also met. Allen's involvement in the charged scheme was so overwhelmingly suspicious that the jury could reasonably conclude that if Allen did not know that LIBOR submitters he supervised were making LIBOR submissions to benefit traders' positions, it was only because he purposely avoided confirming that fact. *See Cuti*, 720 F.3d at 463; *Svoboda*, 347 F.3d at 480; *Kozeny*, 667 F.3d at 134. As discussed, traders frequently made written and oral submission requests, the submitters sat in close proximity to Allen, and the submitters openly discussed accommodating the requests (with traders sitting on the desk, during phone calls with traders, and in emails Allen received). Based on this evidence, the jury could reasonably conclude not only that Allen was aware of a high probability that the submitters were skewing their submissions to benefit traders, but also that any lack of actual knowledge on Allen's part was due to his deliberate effort to avoid confirming that fact.

Because both conditions for a conscious avoidance instruction are satisfied here, the government requests that the Court give such an instruction.

### III.  The Court Should Strike Testimony and Preclude Any Argument that Allen's Decision Not to Fight Extradition is "Consciousness of Innocence" Evidence

Allen's claim that his decision not to fight extradition and to voluntarily stand trial in the United States constitutes "consciousness of innocence" evidence under *United States v. Biaggi*, 990 F.2d 662 (2d Cir. 1990), is unavailing. *Biaggi* is inapplicable here, as it involved the rejection of an offer of immunity, rather than a decision to forego an extradition fight that both would have been expensive and was destined to fail. Assuming that there is some extremely modest probative value to the evidence of Allen's extradition decision, any such probative value is vastly outweighed by the potential for confusion given the competing inferences to be drawn from the evidence and the fact that the jury has far less common experience to rely on in evaluating a decision not to fight extradition as compared to a rejection of immunity. As such, the Court should not permit Allen to argue in summation that his decision not to fight extradition is "consciousness of innocence" evidence.

*Biaggi* provides scant support for the claim that a defendant's decision to waive extradition and voluntarily face trial in the United States is admissible as "consciousness of innocence" evidence. *Biaggi* involved a defendant who had rejected an offer of immunity in exchange for providing the government with information. *United States v. Biaggi*, 909 F.2d at 690. In finding that the district court erred by excluding evidence of the rejected offer, the Second Circuit stated that "[w]hen a defendant rejects an offer of immunity on the ground that he is unaware of any wrongdoing about which he could testify, his action is probative of a state of mind devoid of guilty knowledge." *Id.* The Court further noted that "a jury is entitled to believe that most people would jump at the chance to obtain an assurance of immunity from prosecution and to infer from rejection of the offer that the accused lacks knowledge of wrongdoing." *Id.* The *Biaggi* Court "recognize[d] the latitude of a district judge in making Rule 403 determinations," but found that the district judge had "excluded the evidence primarily, if not entirely, on the ground that the evidence was not relevant." *Id.* at 691. The Court thus found that the district court had abused its discretion, and reversed the defendant's convictions on certain counts but not others. *Id.* at 692.

Courts have not allowed the admission of "consciousness of innocence" evidence outside the limited circumstances present in *Biaggi*. Indeed, *Biaggi* itself distinguished between the refusal of immunity and the "[r]ejection of an offer to plead guilty to reduced charges," a circumstance in which the Court stated that "the inference [of an innocent state of mind] is not nearly so strong as rejection of an opportunity to preclude all exposure to a conviction and its consequences." *Id.* at 691. As the Court noted, "[a] plea rejection might simply mean that the defendant prefers to take his chances on an acquittal by the jury, rather than accept the certainty of punishment after a guilty plea." *Id.*

Moreover, other courts have declined to admit proof, offered on a "consciousness of innocence" theory, that a defendant (1) refused to cooperate with law enforcement authorities, *United States v. Nguyen*, 507 Fed. App'x 64, 66 (2d Cir. Jan. 8, 2013) (summary order); (2) rejected a plea offer, *United States v. Greene*, 995 F.2d 793, 798-99 (8th Cir. 1993); *United States v. Goffer*, No. 10 Cr. 56 (RJS) (S.D.N.Y. May 13, 2011) (order denying defendant's motion *in limine*); *United States v. Del Carmen*, No. 01 Cr. 420 (LAK), 2002 U.S. Dist. LEXIS 14030, at *1-3 (S.D.N.Y. Aug. 1, 2002); (3) rejected a deferred prosecution agreement, *United States v. Geisen*, 612 F.3d 471, 495-97 (6th Cir. 2010); *United States v. Wilson*, No. 98 Cr. 640 (DLC), 1998 WL 770561, at *1-4 (S.D.N.Y. Nov. 4, 1998); (4) produced documents in response to a subpoena notwithstanding possible grounds to refuse to do so, *United States v. Grant*, 338 Fed. Appx. 19, 20-21 (2d Cir. 2009) (summary order); and (5) cooperated with a police investigation, *Torres v. Smith*, No. 03 Civ. 906 (WHP), 2005 WL 1580608, at *8 (S.D.N.Y. July 6, 2005).

To be sure, in *United States v. Rajaratnam*, 13 Cr. 211 (NRB), Judge Buchwald found admissible evidence that the defendant Rengan Rajaratnam had voluntarily returned to the United States from Brazil to stand trial. In doing so, however, Judge Buchwald emphasized that the offense with which the defendant had been charged was "not an extraditable offense" under Brazilian law. Going even further, the defendant argued that Brazil was "like the Swiss bank" when it comes to extradition, asserting that Brazil "is where fugitives go." Given the strong likelihood that the defendant could not (or would not) have been extradited had he remained in Brazil, Judge Buchwald found that "this is basically in the heartland of Biaggi."[3]

The circumstances here are wholly unlike those in *Rajaratnam*. The offenses with which Allen is charged are covered by the extradition treaty between the United Kingdom and the United States. Moreover, as discussed in greater detail below, Allen would almost certainly have been extradited had he contested extradition given that law enforcement authorities in the United Kingdom were prepared to support the government's extradition application, and the United Kingdom is certainly no haven for fugitives. Thus, Allen was not similarly situated to Rajaratnam. Accordingly, Judge Buchwald's ruling in that case has no application here.

Unlike where a defendant has rejected a stark "opportunity to preclude all exposure to a conviction and its consequences," *Biaggi*, 909 F.2d at 961, which provides a reasonably strong basis for an inference of innocence, Allen's extradition decision gives rise to competing inferences that are at least as strong – if not far stronger – than the inference Allen seeks.

---

[3] The relevant portion of the *Rajaratnam* transcript is provided as Attachment A.

Indeed, there are a multitude of reasons that Allen may have decided to forego fighting extradition. A protracted extradition battle would have been expensive, and Allen may well have preferred to preserve his financial resources for trial. Had Allen chosen to fight extradition, he faced the possibility of being detained either in the United Kingdom or the United States pending trial, a prospect that undoubtedly would have been unappealing to him. Perhaps most importantly, Allen likely realized that the legal fees and risk of detention were not justified given the extremely high likelihood that he would be extradited. As Allen doubtless understood when he made his decision, (1) there is an extradition treaty between the United Kingdom and the United States, (2) a primary factor under United Kingdom law in considering an extradition application is whether British law enforcement authorities support extradition rather than prosecution in the United Kingdom, and (3) British prosecutors supported Allen's extradition. Moreover, Allen's decision is particularly lacking in probative value given that all three of the government's cooperating witnesses made the very same decision as Allen, except that each of them chose to forego an extradition fight in favor of pleading guilty in the United States.

Additionally, while a jury could rely on common sense in drawing inferences from a defendant's rejection of a complete pass in the form of immunity, juries have little common experience to rely upon in considering the reasons why a defendant would choose to waive extradition. As discussed above, a full consideration of those reasons would require, among other things, an understanding of the extradition process and its cost. Thus, the minimal probative value of the evidence here is vastly outweighed by the potential for confusion. *See* Fed. R. Evid. 403.

While the Court has admitted limited testimony on this topic, the Court should not permit Allen to make any argument in summation that his extradition decision is evidence of his "consciousness of innocence." Given the Rule 403 balancing discussed above, the Court should exercise its "broad discretion" to limit closing arguments by precluding any such argument. *Herring v. New York*, 422 U.S. 853, 862 (1975) (district courts have "broad discretion" to "ensure that argument does not stray unduly from the mark, or otherwise impede the fair and orderly conduct of the trial").

––––––––––––––––

For the foregoing reasons, the Court (1) should not give a multiple conspiracies instruction, (2) should instruct the jury on conscious avoidance; and (3) should preclude any argument that Allen's decision to voluntarily appear in the United States to stand trial shows his "consciousness of innocence."

Sincerely,

_____/s/_____
MICHAEL T. KOENIG
Trial Attorney
Antitrust Division

cc:
Tor Ekland

9

Aaron Williamson
Tor Ekland, P.C.
(Attorneys for Defendant Conti)

Michael Schachter
Casey Donnelly
Willkie Farr & Gallagher LLP
(Attorneys for Defendant Allen)

# ATTACHMENT A

E5UURAJC

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x

UNITED STATES OF AMERICA

        v.                                    13 CR 211(NRB)

RENGAN RAJARATNAM,

            Defendant.

------------------------------------x

                              New York, N.Y.
                              May 30, 2014
                              11:20 a.m.


Before:

                NAOMI REICE BUCHWALD


                              District Judge


                    APPEARANCES

PREET BHARARA
     United States Attorney for the
     Southern District of New York
BY:  CHRISTOPHER D. FREY
     RANDALL W. JACKSON
     Assistant United States Attorneys

LANKLER SIFFERT & WOHL LLP
     Attorneys for Defendant
BY:  DANIEL M. GITNER
     MICHAEL D. LONGYEAR

ALSO PRESENT
     Sam Moon, Special Agent, FBI
     Ruby Hernandez, Paralegal Specialist, United States
      Attorney's Office

E5UURAJC

 1    there is more than one part of it.  And it is not clear from

 2    the tape what Raj is saying Rengan told Raj.

 3         My point is that Raj's statement might come in, but it

 4    shouldn't come in, but David's statement to Anil should not.

 5         THE COURT:  I think I am going to rule against you on

 6    that.

 7         So we just go to the government's motion.  There is

 8    one that I am still holding in abeyance, the Akamai motion

 9    which is the first motion.

10         The second motion is not being contested.  The

11    analyst's motion, you said you didn't contest.

12         MR. GITNER:  Not for that purpose.

13         THE COURT:  So we get, in a sense, to the third motion

14    and I think the only one in controversy or still in dispute is

15    the issue of whether the defendant can introduce as

16    consciousness of innocence evidence that, upon being indicted,

17    he returned voluntarily from Brazil.

18         I would like the government to support for me the

19    arguments that it makes at the second full paragraph on page 16

20    of its memorandum of law in support of its motion in limine.

21         MR. JACKSON:  Well, your Honor, I think the

22    fundamental question that is raised here is, how would this

23    information be introduced.  There are a number of ways, I

24    guess, it could be introduced.  It could be elicited,

25    presumably, if there was a government witness who had

 1  particular knowledge of it, they could elicit it.  Presumably,
 2  they could call one of the agents, or the defendant could
 3  testify about it himself.  I think that is probably the most
 4  likely way that it could be introduced, if we are actually
 5  getting towards information that speaks to the idea that the
 6  reason that he returned or that he had knowledge of the fact
 7  that what had transpired with his brother before he was coming
 8  back -- it is difficult to imagine how you would do that
 9  without having the defendant offer testimony on the subject.

10        In that situation, the cross-examination of the
11  government, whether it is a government witness who this is
12  being elicited from or it is the defendant who is testifying,
13  is going to go to the factors that go against the conclusion
14  that this is somehow probative of his consciousness of
15  innocence, for lack of a better term.  One of those factors is
16  the fact that we can get extradition from a number of different
17  countries.

18        THE COURT:  Have you checked the extradition treaty
19  with Brazil?

20        MR. JACKSON:  I personally, your Honor, have not.

21        THE COURT:  We did.  And unless I am wrong, it is not
22  an extraditable offense.  If, as he says, it is true that he
23  went to Brazil, established a residency there, had a business
24  there and a lady friend, he didn't have to come back if you
25  can't extradite him.

1          Listen.  I am not an expert on extradition law, and I

2    think that the reality is that this type of evidence normally

3    comes in through expert witnesses, but we read the list of

4    crimes and I don't see this falling within it.  If that's

5    accurate then, it is hard to say that this is not potentially

6    rather powerful evidence.

7          Putting it in full context, if it is true that, as

8    portrayed, he had some years before established a life in

9    Brazil, if, as we all know -- and certainly knew what happened

10   to his brother -- and if he couldn't be extradited, if that's

11   so, it is not -- as I said, taking all of those factors in

12   consideration, it is potentially rather powerful evidence that

13   he came back.

14          MR. JACKSON:  We understand that, your Honor.  For us,

15   the extradition is a complicated issues.  There are a number of

16   questions that would have to be answered in order to come to

17   any sort of determinant --

18          THE COURT:  You made a representation in this brief

19   that such talk about other incentives to return, such as his

20   desire almost certainly to avoid long-term detention in a

21   Brazilian prison while awaiting extradition -- well, I don't

22   know if that's the norm, that he would be imprisoned.

23          Secondly, after you get a provisional arrest warrant,

24   if you could, you have to proceed within 60 days to actually

25   get your extradition papers under this treaty.  So I don't know

E5UURAJC

1    that that is true, since I don't even know that it is true that

2    he could be extradited.

3           And, yes, I appreciate that leaving family and friends

4    is hard.  It is not something that I could personally do, but

5    it was obviously something that he had already done.  And he

6    could not be confused about the risks of coming back.  If in

7    fact my reading of the extradition is correct, then he couldn't

8    have been extradited.

9           So I am perfectly happy to receive some more

10   information on this.

11          MR. JACKSON:  Absolutely, your Honor.

12          I would just say briefly, we don't disagree with your

13   Honor that the general proposition that we understand that

14   there is an argument that could be made about this.

15          In terms of the facts, I will note that we did have a

16   provisional arrest warrant in place with regard to him.  And

17   while the extent to which he is extraditable I think is

18   complicated, that is a subject that generally ends up resulting

19   in complicated and lengthy litigation.  I have engaged in

20   litigation in countries over the question of whether or not a

21   person is extraditable that lasted, literally, for years.

22   Sometimes it is a question --

23          THE COURT:  Am I correct in believing that if he

24   fought extradition for years and, let's say, he lost, that

25   would not be information that you could introduce at trial,

1    correct?

2              MR. JACKSON:  I think that's correct.

3              THE COURT:  What is the risk?

4              I am not sure that it follows that for an extradition

5    related to insider trading that a country is going to keep

6    someone who has established residence in that country in

7    custody during that time?

8              MR. JACKSON:  Your Honor, we don't disagree with your

9    Honor's general view on how -- these are arguments that could

10   be made.  This is really, I think, a minor point for our

11   response in terms of, I guess, putting into context the host of

12   things that could come up in a cross-examination on the

13   subject, including the fact that he would have the potential to

14   have loss of property.  The defendant has had at different

15   points, assets.  There are a number of international financial

16   organizations.  We would have to explore what the potential

17   loss to him would be from a situation where he stayed overseas

18   and was failing to respond and had assets that could be lost.

19             So from our perspective, your Honor, these are just

20   contexts that we think go into the determination, but we

21   understand the Court's position.

22             MR. GITNER:  Judge, the fact is that, essentially,

23   immediately upon hearing of the indictment, he decided to

24   return.  And I will present several third party witnesses that

25   will establish that fact and establish the fact that the reason

1   he decided to return essentially immediately is because of his

2   consciousness of innocence, because he believes he is innocent.

3   That is enough.

4           All of this stuff about what could have happened under

5   Brazilian law or what might have happened, frankly, I agree

6   with your Honor, but it is irrelevant.  All that matters is

7   what in his head.  He knows he is in Brazil.  He knows Brazil

8   is like the Swiss bank for an extradition in lore.

9           THE COURT:  That's where I should go?

10          MR. GITNER:  Yes, that is where fugitives go.  I am

11  sure there is a whole Wikipedia page about it.

12          He has a business.  He has a girlfriend.  He has a

13  life there.  He has a visa -- Which is not easy to get in

14  Brazil.  He established residence there.  He literally goes to

15  the airport and misses a flight.  He tried to come back

16  earlier, but traffic prevented him from coming back earlier --

17  he misses the first flight and ends up coming back the next

18  day, knowing that because he is coming back on a Sunday, he is

19  going to have to spend a night in the MCC.  He comes back

20  immediately.

21          Frankly, there is no more powerful evidence of

22  consciousness of innocence.  This is exactly your Honor's

23  decision in Grant, you could have jumped at the chance to stay

24  in Brazil and fight.  Mr. Jackson admitted that it could take

25  years if not many, many years.  And who knows what could have

1  happened? But he came back immediately, immediately. That's

2  all that matters. Very powerful consciousness of innocence.

3  It is right on all fours with the Biaggi case. It should come

4  in.

5        THE COURT: As you can tell, my instinct, having done

6  a little bit of extra research, is that this is admissible.

7  And that, actually, having had not the identical, but had this

8  issue presented to me once before, having denied it in the

9  other case, I think that this is basically in the heartland of

10  Biaggi, particularly if I am right that this is not

11  extraditable.

12        I do think that Mr. Gitner's point which I was aware

13  of, that he came back so quickly, is also part of the mix of

14  facts because he could have, theoretically, played it both

15  ways -- stayed there just long enough to transfer some more

16  assets, do something, position himself and then come back

17  later. But I think the fact that he came back quickly is

18  relevant and admissible.

19        I think we are done.

20        MR. JACKSON: I think that is correct, your Honor.

21        I would just note on the last point, your Honor, to

22  the extent that your Honor is admitting that evidence, we may

23  submit to the Court some additional proffer of what we

24  anticipate -- some of the types of topics that we anticipate we

25  would put in, in response to that or we would seek to put in,

1  in response to that, including information about the

2  defendant's interactions with the authorities leading up to his

3  extradition that we think are probative of his not having a

4  consciousness of innocence or that being the only explanation

5  for his return.

6          THE COURT:  Sorry.  The government has one more motion

7  which is the motion to permit evidence of the defendant's

8  compensation at Galleon as proof of his motive to commit

9  securities fraud.

10          I believe the government should only be allowed to

11  introduce evidence of the defendant's compensation at Galleon

12  for the time period during which he would have profited from

13  the alleged unlawful trades in Clearwire and AMD.

14          The defendant doesn't object to the evidence of his

15  2008 compensation.

16          Thus, to the extent that the government's motion is

17  limited to 2008, it is granted.  But if they try to introduce

18  evidence of his compensation beyond 2008, the government must

19  demonstrate that such compensation was tied to the trades

20  mentioned in the indictment.  If the bonus comes in 2009 and it

21  is tied back to 2008 trades that is OK.  I understand the

22  compensation package can work that way.

23          MR. JACKSON:  So, your Honor, two things that we would

24  argue on that.

25          One, we are certainly not going to seek to introduce

1    evidence of his compensation after the time period of the

2    conspiracy.  But I think we were seeking to introduce evidence

3    of his Galleon compensation that predates the time period of

4    the conspiracy and is probative of what the defendant was

5    hoping to get.

6            And part of what is at play, in the defendant's

7    initial run at Galleon, he made $800,000 in his last year

8    there.  And that was tied to his role there.  Then he does a

9    bunch of ventures -- which we will not get into during the

10   course of trial, we are not getting into SEC, etc -- he comes

11   back, and in 2007 and 2008 we have evidence of his compensation

12   which we are still getting the complete picture of, but which

13   your Honor knows is lower.  And we think that the 2007 and the

14   earlier, just before the last time that he leaves compensation,

15   informs what was going on in his mind in terms of what his

16   motives were.

17           THE COURT:  There is only one motive for insider

18   trading -- making money.  It is not necessary to introduce

19   evidence of seven-figure salaries and six-figure salaries that

20   are not directly tied to these events.  It is just too

21   potentially prejudicial.  There are very few jurors who are

22   going to make that kind of money, and those are just numbers

23   that, unless they are directly relevant, should not come in.

24   And since we all know that there is a single motive, it is

25   making money -- that's the only reason that people commit

E5UURAJC

1   securities fraud, ever -- even the ones who have more than they

2   can know what to do with.

3           MR. GITNER:  Judge, I would ask if your Honor is done,

4   that we be able, with the government -- not ex parte -- in the

5   robing room, discuss item 3C on the government's motion at page

6   18 with the table of contents.

7           THE COURT:  I thought that there was no debate about

8   that.

9           MR. GITNER:  There isn't any debate, but I think that

10  it has to do with management of the trial.

11          THE COURT:  Sure.

12          MR. GITNER:  That's all.

13          THE COURT:  There is no need to have that on the

14  record, is there?

15          MR. GITNER:  No, not in my book.

16          MR. JACKSON:  Your Honor, we had a couple of brief

17  things that we wanted to make a record of and one question.  We

18  have four items.

19          The first question, your Honor, is it your

20  anticipation that we sit on Fridays?

21          THE COURT:  Yes.  I sit from 9 to 2:15.

22          MR. JACKSON:  Excellent, your Honor.

23          THE COURT:  I will tell you that on Friday, June 20th,

24  I have to participate in a conference call at 1 o'clock, so we

25  will just end at 1 that day, not having everybody hang around

1     so that we might get another half hour of testimony.

2              MR. JACKSON:  Thank you, your Honor.

3              We also wanted to just make two records related to the

4     communications between parties.

5              One, I discussed this with Mr. Gitner.  We don't need

6     to detail anything here, but the government did extend a plea

7     offer to Mr. Rajaratnam in advance of the trial which I am

8     informed by Mr. Gitner, and he can confirm, that the defendant

9     rejected.  That is the one that we wanted to make a record of

10    on that, your Honor.

11             Second, your Honor, the defendant had requested

12    information regarding any Giglio in the government's possession

13    related to non-testifying co-conspirators, so the government

14    has endeavored to provide information regarding non-testifying

15    co-conspirators including the plea -- I'm sorry -- post arrest

16    statements that were made by Mr. Raj Rajaratnam and Ms. Chiesi

17    to the defendant.

18             We have also provided some recorded phone calls made

19    by Mr. Rajaratnam.

20             Moreover, we have given the defendant notice of the

21    fact that Mr. Raj Rajaratnam and Ms. Chiesi were both convicted

22    of securities fraud.

23             We have asked if there are other areas that the

24    defense is particularly concerned about.  So at this point we

25    are not aware of any other areas that the defense will be

E5UURAJC

 1   particularly concerned about, but we have received that notice

 2   and we have provided that, all in an abundance of caution.  We

 3   don't believe that any of it constitutes Giglio, but that is

 4   our broadest attempt to respond to the defense request on that.

 5            THE COURT:  Mr. Gitner, just confirm that you received

 6   the plea offer?

 7            MR. GITNER:  Yes.

 8            THE COURT:  And reviewed it with your client?

 9            MR. GITNER:  Yes.  Confirmed.

10            THE COURT:  Let's talk about one other thing about

11   trial length.  My memory was that this was about two weeks?

12            MR. JACKSON:  That is accurate, your Honor.

13            THE COURT:  And, obviously, the Akamai issue may have

14   an impact there.

15            MR. FREY:  May I just ask your Honor for

16   clarification.  We will endeavor to put together that

17   additional information about Akamai.  When would the Court --

18            THE COURT:  The sooner you get it to me, the sooner I

19   can react to it.

20            MR. FREY:  Absolutely, your Honor.

21            THE COURT:  So if counsel want to come back.

22            (Discussion off the record)

23

24                              o   0   o

25