**UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF NEW YORK**

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

UNITED STATES OF AMERICA,  :
                                                                              :
    v.                                                         :
                                                                              :  Case No. S4 14-CR-272 (JSR)
ANTHONY ALLEN,                                             :
PAUL THOMPSON,                                            :
TETSUYA MOTOMURA, and                           :
ANTHONY CONTI,                                            :
                                                                              :
        Defendants.                       :

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - x

**MEMORANDUM OF LAW IN SUPPORT OF
DEFENDANTS' POST-TRIAL MOTION FOR A
<u>JUDGMENT OF ACQUITTAL OR NEW TRIAL</u>**

**WILLKIE FARR & GALLAGHER LLP**

Michael S. Schachter
Casey E. Donnelly
787 Seventh Avenue
New York, New York 10019
(212) 728-8000

*Attorneys for Defendant Anthony Allen*

**TOR EKELAND, P.C.**

Tor Ekeland
Aaron Williamson
195 Plymouth Street, 5th Floor
Brooklyn, New York 11201-1133
(718) 737-7264

*Attorneys for Defendant Anthony Conti*

1

# TABLE OF CONTENTS

Page

LEGAL STANDARD..................................................................................................1

ARGUMENT ...........................................................................................................1

I.  NO RATIONAL JUROR COULD FIND THE EXISTENCE OF A SCHEME
    TO DEFRAUD BY MEANS OF FALSE OR FRAUDULENT
    REPRESENTATIONS BECAUSE DEFENDANTS' LIBOR SUBMISSIONS
    ARE NOT ACTIONABLE MISSTATEMENTS UNDER THE WIRE FRAUD
    STATUTE. ......................................................................................................1

    A.  The Government Failed to Prove that Defendants' LIBOR Submissions
        Were False or Fraudulent. ...................................................................1

    B.  The Government Failed to Prove Materiality. ....................................10

II. NO RATIONAL JUROR COULD FIND THE EXISTENCE OF A SCHEME
    TO OBTAIN MONEY OR PROPERTY FROM RABOBANK'S
    COUNTERPARTIES BY MEANS OF FALSE OR FRAUDULENT
    REPRESENTATIONS BECAUSE DEFENDANTS MADE NO
    REPRESENTATIONS TO RABOBANK'S COUNTERPARTIES. ............................12

    A.  The Government Failed to Present Any Evidence that Defendants'
        LIBOR Submissions Induced Rabobank's Counterparties to Action. ................12

    B.  The Government Failed to Present Any Evidence that Defendants'
        LIBOR Submissions Caused Harm to the BBA. ................................13

III. NO RATIONAL JUROR COULD FIND THAT DEFENDANTS INTENDED
     ACTUAL HARM BECAUSE THE EVIDENCE AT TRIAL DID NOT
     ESTABLISH A CONTEMPLATED HARM ACTIONABLE UNDER THE
     WIRE FRAUD STATUTE. ............................................................................14

IV.  NO RATIONAL JUROR COULD FIND THAT THE INTERSTATE WIRES
     ALLEGED IN COUNTS 6-19 WERE TRANSMITTED FOR THE PURPOSE
     OF FURTHERING THE ALLEGED SCHEME............................................................17

V.   NO RATIONAL JUROR COULD FIND THAT THE EVIDENCE AT TRIAL
     ESTABLISHED THAT A FINANCIAL INSTITUTION WAS DIRECTLY
     AFFECTED AND THEREFORE THE CHARGES AGAINST DEFENDANTS
     ARE TIME BARRED...................................................................................19

VI.  DEFENDANTS' PROSECUTION IN THE UNITED STATES IS A
     VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE. ............28

i

A.    Defendants Lack a Constitutionally Sufficient Nexus to the United States.........28

B.    Defendants Did Not Receive Sufficient Notice for Purposes of the Due
      Process Clause That Their Alleged Conduct Was Criminal. ..............................30

CONCLUSION ....................................................................................................................32

# TABLE OF AUTHORITIES

**Cases**                                                                              **Page(s)**

*Benzon v. Morgan Stanley Distributors, Inc.*
    420 F.3d 598 (6th Cir. 2005) ......................................................................7

*Fait v. Regions Financial Corporation,*
    655 F. 3d 105 (2d Cir. 2011)......................................................................7

*In re Hijazi,*
    589 F. 3d 401 (7th Cir. 2009) ..................................................................29

*Jackson v. Virginia,*
    443 U.S. 307 (1979)...................................................................................1

*Neder v. United States,*
    527 U.S. 1 (1999)................................................................................10, 11

*Parr v. United States,*
    363 U.S. 370 (1960)..................................................................................18

*In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.,*
    No. 06 Civ. 643 (GEL), 2007 WL 2694469 (S.D.N.Y. Sept. 13, 2007)...........................11

*Skilling v. United States,*
    561 U.S. 358 (2010)....................................................................................9

*United States v. Agne,*
    214 F.3d 47 (1st Cir. 2000).......................................................................20

*United States v. Al Kassar,*
    660 F. 3d 108 (2d Cir. 2011)..........................................................28, 29, 30

*United States v. Autuori,*
    212 F.3d 105 (2d Cir. 2000)..........................................................1, 2, 3, 4

*United States v. Bank of New York Mellon,*
    941 F. Supp. 2d 438 (S.D.N.Y. 2013).......................................................21

*United States v. Binday,*
    Nos. 14-2809-cr; 14-2832-cr; 14-2873-cr, 2015 U.S. App. LEXIS
    18671 (2d Cir. 2015)..........................................................................15, 16

*United States v. Bouyea,*
    152 F.3d 192 (2d Cir. 1998)......................................................................20

*United States v. Brennan,*
    938 F. Supp. 1111 (E.D.N.Y. 1996) .........................................................13

*United States v. Carollo*,
    No. 10 CR. 654 (HB), 2011 U.S. Dist. LEXIS 95356 (S.D.N.Y. 2011) ....................19, 20

*United States. v. Cochran*,
    109 F.3d 660 (10th Cir. 1997) ...........................................................................5

*United States v. D'Amato*,
    39 F.3d 1249 (2d Cir. 1994)..............................................................................22

*United States v. DeSantis*,
    134 F.3d 760 (6th Cir. 1998).............................................................................13

*United States v. Dupre*,
    462 F.3d 131 (2d Cir. 2006)................................................................................4

*United States v. Evans*,
    844 F.2d 36 (2d Cir. 1988)................................................................................14

*United States v. Finnerty*,
    474 F. Supp. 2d 530 (S.D.N.Y. 2007) *aff'd, United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008)...........................................................................5, 6

*United States v. Gallant*,
    570 F. Supp. 303 (S.D.N.Y. 1983)......................................................................3

*United States v. Ghavami*,
    No. 10 cr. 1217 (KMW), 2012 U.S. Dist. LEXIS 97931 (S.D.N.Y. July 12, 2012) ........21

*United States v. Grass*,
    274 F. Supp. 2d 648 (M.D. Pa. 2003) .................................................................20

*United States v. Hunt*,
    No. 05 cr. 395 (DAB), 2006 U.S. Dist. LEXIS 64887 (S.D.N.Y. Sept. 6, 2006)...............6

*United States v. Lake*,
    472 F.3d 1247 (10th Cir. 2007) ........................................................................17

*United States v. Lew*,
    875 F.2d 219 (9th Cir. 1989) ........................................................................13, 14

*United States v. Lewis*,
    67 F. 3d 225 (9th Cir. 1995) .............................................................................15

*United States v. McGraw-Hill Companies*,
    No. CV 13-779-DOC (JCGx), 2014 U.S. Dist. LEXIS 59408 (C.D. Cal. Apr. 15, 2014) ..9

*United States v. Mittelstaedt*,
    31 F.3d 1208 (2d Cir. 1994).............................................................................15

iv

*United States v. Mollica,*
    849 F.2d 723 (2d Cir. 1988)....................................................................4

*United States v. Morris,*
    80 F.3d 1151 (7th Cir. 1996) ................................................................8

*United States v. Mostafa,*
    965 F. Supp. 2d 451 (S.D.N.Y. 2013)................................................29

*United States v. Novak,*
    443 F.3d 150 (2d Cir. 2006)................................................................14

*United States v. Ohle,*
    678 F. Supp. 2d 215 (S.D.N.Y. 2010)........................................19, 21

*United States v. Regent Office Supply Co.,*
    421 F.2d 1174 (2d Cir. 1970)..............................................................13

*United States v. Rodriquez,*
    140 F.3d 163 (2d Cir. 1998)..................................................................1

*United States v. Shellef,*
    507 F.3d 82 (2d Cir. 2007)..................................................................15

*United States v. Skelly,*
    442 F.3d 94 (2d Cir. 2006)...............................................................6, 7

*United States v. Starr,*
    816 F.2d 94 (2d Cir. 1987)............................................................12, 14

*United States v. Townley,*
    665 F.2d 579, 585 (5th Cir. 1982) .......................................................2

*United States v. Ubakanma,*
    215 F.3d 421 (4th Cir. 2000) ..............................................................20

*United States v. Umeh,*
    527 F. App'x 57 (2d Cir. 2013) ..........................................................29

*United States v. Wells Fargo Bank, N.A.,*
    972 F. Supp. 2d 593 (S.D.N.Y. 2013)................................................21

*Virginia Bankshares, Inc. v. Sandberg,*
    501 U.S. 1083 (1991)............................................................................7

Defendants Anthony Allen and Anthony Conti respectfully submit this memorandum of law in support of their motion pursuant to Federal Rule of Criminal Procedure 29(c) for a judgment of acquittal on all Counts contained in the Superseding Indictment, or, in the alternative, pursuant to Rule 33(a) to grant Defendants a new trial.

## LEGAL STANDARD

Pursuant to Rule 29(a), a court shall enter a judgment of acquittal as to "any offense for which the evidence is insufficient to sustain a conviction."  The standard under Rule 29 is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).  Rule 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires."

## ARGUMENT

I.   **NO RATIONAL JUROR COULD FIND THE EXISTENCE OF A SCHEME TO DEFRAUD BY MEANS OF FALSE OR FRAUDULENT REPRESENTATIONS BECAUSE DEFENDANTS' LIBOR SUBMISSIONS ARE NOT ACTIONABLE MISSTATEMENTS UNDER THE WIRE FRAUD STATUTE.**

### A. The Government Failed to Prove that Defendants' LIBOR Submissions Were False or Fraudulent.

The "fraud statutes are violated by affirmative misrepresentations or by omissions of material information that the defendant has a duty to disclose."  *United States v. Autuori*, 212 F.3d 105, 118 (2d Cir. 2000); *United States v. Rodriguez*, 140 F.3d 163, 168 (2d Cir. 1998) (reversing bank fraud conviction because Government had not proven that defendant had made "false or fraudulent pretenses or representations" and therefore, had failed to prove that she was guilty of any "deceptive course of conduct").  The wire fraud statute also prohibits the making of

deceptive "half-truths," statements that omit "facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading." *Autuori*, 212 F.3d at 118 (quoting *United States v. Townley*, 665 F.2d 579, 585 (5th Cir. 1982).)

The Indictment alleges that Defendants participated in a "scheme to obtain money and property by making false and fraudulent USD and Yen LIBOR submissions to the BBA." (Ind. at ¶28.) The Indictment describes the scheme as one in which "Rabobank LIBOR submitters," including Defendants, made "USD and Yen LIBOR submissions that were intended to benefit Rabobank's traders rather than making submissions that reflected the perceived rate at which Rabobank could borrow unsecured funds." (*Id*. at ¶29(b).) Thus, the Government was required to prove at trial that Defendants' LIBOR submissions were "false or fraudulent" statements, *i.e.*, that Defendants' submissions did not "reflect the perceived rate at which Rabobank could borrow unsecured funds" but were instead fabricated to benefit the bank.[1]

Even under a deferential review of the evidence, no rational fact-finder could find that the Government proved that Defendants' LIBOR submissions were actionable misrepresentations under the wire fraud statute. The Government offered no evidence at trial regarding Mr. Allen's or Mr. Conti's perception of the "rate at which Rabobank could borrow unsecured funds" on the days in which it alleged that Rabobank's LIBOR submissions were false or fraudulent. As such, the Government failed to prove that Defendants' LIBOR submissions were "false," under the terms described in the Indictment *i.e.*, that the LIBOR submissions did not reflect Defendants' perception of Rabobank's borrowing costs. (*Compare* Ind. at ¶29(b), *with* Tr. (Gov. Closing) 1590:4-10 ("The Government is not suggesting that the actual

---

[1] Specifically, the BBA asked LIBOR submitters to answer to the following question: "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11am?" (GX116A-G.)

submissions make or break the government's case.  The Government is not suggesting it because they do not.  We are not here asking you to determine if the actual submission, the actual number after the fact was right or wrong.  That's not what this case is about.").)

Instead, the Government's presentation at trial was based on the theory that although Defendants' LIBOR submissions may have been accurate estimates of Rabobank's borrowing costs—that is, Defendants accurately answered the question the BBA asked them— their submissions nonetheless constituted "fraudulent pretenses" because Defendants were implicitly "saying to the world, this is my estimate on where I think Rabobank could borrow money if it chose to do so…[and]…were not saying, this is the number I submitted to help my traders."  (Tr. (Gov. Closing) 1476:1-13.)  In other words, the Government's theory at trial was that Defendants committed fraud because they failed to disclose the influences *behind* their accurate LIBOR estimates.  (*Id*. at 1609:13-17 ("[D]efendants have been charged with basing their LIBOR submissions, at least in part, on trading positions in order to make money.  That's what the government is charging.  That's the crime alleged.")

The success of the Government's prosecution therefore depends on a finding that Defendants violated a duty to disclose such information.  *Autuori*, 212 F.3d at 118 ("an omission can violate the fraud statute only in the context of a duty to disclose."); *United States v. Gallant*, 570 F. Supp. 303, 309 (S.D.N.Y. 1983) ("In order to successfully maintain a mail fraud prosecution under the Second Circuit rule, in the absence of proof of affirmative misrepresentation, the government must prove that the defendant breached a duty to disclose separate from the commission of an otherwise criminal act.")

The Government, however, failed to prove the existence of a duty that obligated Defendants to disclose what informed their LIBOR submissions.  It is undisputed that

Defendants did not hold a fiduciary or statutory duty to disclose such information.  (Tr. 1387:14-1388:4.)  And while a "duty to disclose can also arise in a situation where a defendant makes partial or ambiguous statements that require further disclosure in order to avoid being misleading," *Autuori*, 212 F.3d 118-120, the record here is devoid of any evidence demonstrating that Defendants' LIBOR submissions were "partial or ambiguous" statements.

In fact, because the BBA did not allow LIBOR submitters to report the various factors they considered, but instead restricted their response to numerical answers to the question asked—the entry of "5.37" or "5.42" or "3.97," as the case might be (Tr. 1165:1-11)—Defendants' submissions were both complete and unambiguous:  they represented that Rabobank could "borrow funds" at the rate submitted.  (Tr. 500:11-14 (Mr. Smith of Dean Foods testifying that he understood the LIBOR rate to be "basically a rate in which banks can borrow" but did not know "the ins and outs" of what the British Bankers Association asked Panel Banks to submit.)  The Government presented no evidence demonstrating that Rabobank could not borrow funds at the rates submitted, so there was nothing misleading about Defendants' representations.

Instead, the Government argued that Rabobank's counterparties were misled because those counterparties expected that Rabobank's LIBOR estimates were "arrived at in accordance with the norms applicable to LIBOR," when, in fact, those estimates were "influenced by" Rabobank's trading positions.[2]  (Tr. 1353:1-19.)  That theory is unsupported by

---

[2]     The Government's argument at trial that Defendants' LIBOR submissions were misleading "half-truths" is not described in the Indictment and therefore constituted a constructive amendment of the Indictment.  For that reason alone, Defendants are entitled to a new trial.  *United States v. Dupre*, 462 F.3d 131, 140 (2d Cir. 2006) (a constructive amendment of an indictment "constitutes a *per se* violation of the Grand Jury Clause of the Fifth Amendment" and does not require that a defendant demonstrate prejudice to merit a reversal of conviction); *United States v. Mollica*, 849 F.2d 723, 729 (2d Cir. 1988) ("[i]n order to avoid amending an indictment in violation of the Fifth Amendment, the government in fraud cases should 'think through the nature of the crime it wishes to allege and then spell out the offense in

the record.  The Government presented testimony from three counterparty witnesses—Mr. James

Smith of Dean Foods, Ms. Tracy Twomey of SuperStore Industries, and Mr. Michael DiTore,

formerly of Lehman Brothers—but none testified that Defendants' LIBOR submissions caused

them to believe that Defendants were considering certain factors, but not others, when arriving at

their estimates.  Indeed, there was no testimony from any of these witnesses regarding what

factors they "expected" were being considered by Mr. Allen and Mr. Conti in making their

submissions. "[W]ithout evidence of what the [counterparties] expected, no rational juror could

conclude" that Defendants' LIBOR submissions "had a tendency to deceive or the power to

mislead." *United States v. Finnerty*, 474 F. Supp. 2d 530, 540 (S.D.N.Y. 2007), *aff'd by United*

*States v. Finnerty*, 533 F.3d 143, 148-149 (2d Cir. 2008).  A fact-finder "would only be able to

reach that conclusion by speculating—impermissibly—as to what [the counterparties] expected."

*Id*; *see also United States v. Cochran*, 109 F.3d 660, 666-667 (10th Cir. 1997) (wire fraud

convictions reversed where Government witnesses did not present a consensus view about what

would have constituted proper disclosure).

   Moreover, even if the Government *had* elicited evidence from the counterparties

demonstrating that they had certain expectations about what factors Defendants were considering

in making LIBOR submissions, that evidence would be insufficient to prove Defendants had

made a "partial or ambiguous" statement that required additional disclosure.  As in *United States*

*v. Finnerty*, the Government in this case "seeks to impose criminal liability based on a

background assumption of compliance with [BBA] rules."  533 F.3d at 149-151.  There, the

Second Circuit explicitly rejected the argument that criminal liability under the federal fraud

statutes attaches where a defendant's conduct violates an industry rule, except in those instances

a carefully drafted indictment, instead of confronting the defendant with its theory of criminality
for the first time at trial.'")*(citations omitted).

where the victim's expectation that the conduct was not occurring was "based on the [defendant's] articulated statement."  *Id.* (also holding that a "violation of an NYSE rule does not establish securities fraud in the civil context, let alone in a criminal prosecution.") (internal citations omitted.); *see also United States v. Hunt*, No. 05 cr 395 (DAB), 2006 U.S. Dist. LEXIS 64887, at *19-20 (S.D.N.Y. Sept. 6, 2006) (dismissing fraud charge because it is not fraud to "fai[l] to disclose that he or she is not complying with certain rules.")

The record contains no evidence that the counterparties were duped into believing that Defendants were considering certain factors, but not others, in making their LIBOR submissions, based on "partial or ambiguous" statements Defendants themselves made.  Indeed, there is no evidence that Defendants ever communicated anything to Rabobank's counterparties, or that the counterparties were even aware of Rabobank's submissions on the days at issue. Because the Government failed to present any evidence establishing that Defendants' LIBOR submissions were partial or ambiguous statements that required additional disclosure, Defendants' failure to disclose what influenced their LIBOR submissions does not constitute fraud.

This conclusion is consistent with the holding of the numerous courts, including the Supreme Court and the Second Circuit, which have considered the implications of a failure to disclose the incentives behind otherwise accurate opinions.  For example, in *United States v. Skelly*, 442 F.3d 94 (2d Cir. 2006), the Second Circuit considered whether a broker's failure to disclose that he was receiving a commission for recommending a certain stock constituted fraud. The Second Circuit concluded that the non-disclosure would be fraudulent, but only where the broker had assumed a fiduciary duty to the customer.  *Id.* at 97-99.  The broker's failure to disclose the financial incentives underlying his recommendation did not constitute fraud where

he had not assumed a fiduciary duty to speak: "Because a registered representative is under no inherent duty to reveal his compensation, otherwise truthful statements made by him about the merits of a particular investment are not transformed into misleading 'half-truths' simply by the broker's failure to reveal that he is receiving added compensation for promoting a particular investment." *Id.; see also Benzon v. Morgan Stanley Distributors, Inc.* 420 F.3d 598, 611-612 (6th Cir. 2005) (broker's failure to disclose compensation does not constitute violation of federal securities law).

The Supreme Court's holding in *Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991), is also instructive and has been applied in the criminal wire fraud context. In *Virginia Bankshares*, a civil plaintiff brought a lawsuit alleging, in part, that corporate directors had made a misrepresentation when they offered shareholders a favorable opinion about the offering price for certain minority stocks, but had failed to disclose their self-interested motivation for offering that opinion. *Id.* at 1095-96 (internal citations omitted). The Supreme Court held that "undisclosed motivation, standing alone, [is] insufficient to satisfy the element of fact that must be established under §14(a)." *Id.* The Court explained: "to recognize liability on mere disbelief or undisclosed motive without any demonstration that the proxy statement was false or misleading about its subject would authorize §14(a) litigation confined solely to…the impurities of a director's unclean heart." *Id.* (internal citations omitted.) After *Virginia Bankshares*, the test for liability, with respect to statements of opinion or belief, "lies only to the extent that the statement was both objectively false *and* disbelieved by the defendant at the time it was expressed." *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) (*citing Virginia Bankshares Inc.*, 501 U.S. at 1095-96.)

The Seventh Circuit applied the *Virginia Bankshares* test in a mail and wire fraud criminal prosecution that closely resembles the case at bar.  In *United States v. Morris*, 80 F.3d 1151 (7th Cir. 1996),  two bank executives, were convicted of mail and wire fraud for certain estimates included in a bank circular to investors.  The Government alleged that the defendants' estimate that the bank had "adequate provision for losses" was fraudulent.  *Id.* at 1161.  At trial, the Government had established that certain, contrary information had been omitted from the circular at the insistence of a majority shareholder who wished the bank to show a profit that quarter, thus suggesting that there was an improper motivation behind the estimate.  *Id.*  On appeal, the Seventh Circuit noted that the case was guided by the Supreme Court's holding in *Virginia Bankshares*.  *Id.* at 1162-63.  Similar to the LIBOR estimates at issue here, court noted that "the estimation of probable losses in a large loan portfolio…is more an art than a science" and held that the Government could not sustain its fraud convictions unless it proved "that bank management did not truly believe in the adequacy of [the bank's] loss reserves and that its statement to the contrary was not supported by available facts."  *Id.* at 1164-65.

In other words, the motivation behind the omission was irrelevant:  the wire and mail fraud conviction depended on the Government's ability to prove that the proffered opinion was factually inaccurate.  And while the defendants' convictions were ultimately upheld, that was because the Government had offered proof at trial concerning certain information that the defendants had not only known about, but also agreed with, at the time, which "indicated that the offering circular's characterization of the adequacy of the reserves was without a legitimate factual basis." *Id.* (an "allegedly fraudulent statement could be proven untrue or misleading when made by pointing to inconsistent contemporaneous statements or information (such as internal reports) which were made by or available to the defendants.") (internal citations omitted.); *see*

*also United States v. McGraw-Hill Companies*, No. cv 13-779-DOC (JCGX), 2014 U.S. Dist.

LEXIS 59408, at *12-13 (C.D. Cal. 2014) (where Department of Justice sought civil penalties

for Standard and Poor's alleged violation of the mail and wire statutes on the basis that S&P

"misrepresented the integrity of its ratings, in order to further its own financial interests," the

court noted that the question the jury would need to answer was "did S&P make representations

regarding its independence and objectivity, and were those representations false?")

   Here, as in *Skelly*, *Virginia Bankshares*, and *Morris*, the issue is whether

Defendants' accurate estimates of Rabobank's borrowing costs are rendered "fraudulent"

because Defendants did not disclose the financial incentives behind those truthful statements.

The answer to that question is controlled by the Second Circuit's and the Supreme Court's

conclusion that accurate statements of opinion are not converted into fraudulent

misrepresentations simply because a defendant fails to disclose the incentives that lie behind the

true statement.  Indeed, even in the context of "honest-services" fraud, the Supreme Court

expressly warned against the imposition of any contrary rule:

> If Congress were to take up the enterprise of criminalizing
> undisclosed self-dealing by a public official or private employee, it
> would have to employ standards of sufficient definiteness and
> specificity to overcome due process concerns…How direct or
> significant does the conflicting financial interest have to be?  To
> what extent does the official action have to further that interest in
> order to amount to fraud?  To whom should the disclosure be
> made, and what information should it convey?  These questions
> and others call for particular care in attempting to formulate an
> adequate criminal prohibition in this context.

*Skilling v. United States*, 561 U.S. 358, 411 (2010).  Because the Government failed to prove that

Defendants made any misrepresentations that violate the wire fraud statute, the Court should

enter a judgment of acquittal.

### B.  The Government Failed to Prove Materiality.

The Supreme Court in *Neder v. United States* held that "materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes."  527 U.S. 1, 25 (1999) (emphasis added).  A false statement is material if it has a "natural tendency to influence, or is capable of influencing, the decision of the decision-making body to which it was addressed."  *Id.* at 16.  The Government's theory at trial was that Defendants' LIBOR submissions were fraudulent pretenses because the submissions, while accurate estimates of Rabobank's borrowing costs, were nonetheless partial or ambiguous statements that misled the counterparties into believing they had been arrived at via "legitimate considerations," when, in fact, they'd been arrived at, in part, via "illegitimate considerations."  (Tr. 1373:18-24.)  The Government therefore needed to prove at trial that Defendants' partial and ambiguous statements were capable of "influencing the decision of the decision-making body to which it was addressed."  *Neder*, 527 U.S. at 16.

The Government did not make the required showing.  First, Defendants' LIBOR submissions were "addressed" to the BBA, and the Government offered no evidence that Defendants' submissions were "capable of influencing" any BBA decision.  Rather, the Government asked its three counterparty witnesses, Mr. Smith, Ms. Twomey, and Mr. DiTore, whether they would have "considered acting differently" had they been aware, at the time that they entered into the swap with Rabobank, that Defendants were "manipulat[ing] the LIBOR rate" and, in response, each witness agreed they would have.  (Tr. 499:12-500:10, 827:18-828:2, 836:23-838:1)

This testimony is insufficient to satisfy the Government's burden of proving materiality.  First, although the Government elicited testimony about the counterparties' decisions to enter into swap contracts with Rabobank, many of those decisions were made

several years prior to the LIBOR submissions at issue, and therefore, could not have been "affected" by Defendants' "fraudulent pretenses." (*See e.g.*, GX112A (swap with Dean Foods, dated May 6, 2004); GX112D (swap with Superstore Industries, dated September 15, 2005).) Additionally, even in those instances where Rabobank's swap with the counterparty was executed in the same years as the LIBOR submissions at issue, the counterparties did not identify which of the LIBOR submissions at issue had "affected" their decision to enter into the swap.[3] (*See e.g.* GX202 (swap with Lehman Brothers, dated June 23, 2006).) As such, it is impossible to conclude based on the evidence presented at trial that Defendants' LIBOR submissions constituted the type of ambiguous or partial statements that "influence[d] or [were] capable of influencing, the decision of the decision-making body to which it was addressed." *Neder*, 527 U.S. at 16.

Moreover, the testimony elicited by the Government was irrelevant to its theory of the case. The Government did not define "manipulation" when it asked the counterparty witnesses whether they would have "considered acting differently" had they been aware that Defendants were "manipulat[ing] the LIBOR rate," but manipulation is a term of art, meaning "actions [which] convey to investors, via the market (which absent manipulation, would produce a price that fairly reflects the value of securities), a false sense of a security's value." *In re Refco Capital Markets, Ltd. Brokerage Customer Sec. Litig.*, No. 06 Civ. 643 (GEL), 2007 WL 2694469, at *7 (S.D.N.Y. Sept. 13, 2007). In other words, the only evidence the Government presented at trial was that Rabobank's counterparties would have wanted to know that LIBOR was "false" and did not "fairly reflect" what it was supposed to, namely, the estimated interest

---

[3] In fact, the swap contracts at issue explicitly confirm that the counterparty "is not relying on the other party in connection with its decision to enter into [the swap]…regardless of whether the other party provides it with market information or its views." *See e.g.* GX202, GX302A, GX302B, GX302C, GX402, GX502B, GX602A, GX602G, GX902.

rates at which Panel Banks could borrow from one another.  (Tr. 138:11-24 (Government expert, Dr. Harris, confirming that "LIBOR represents interest rates that are the rates at which banks can borrow from each other.").)

The Government, however, did not argue—or present any evidence—showing that LIBOR was "false," or that the rate was inconsistent with borrowing costs of the Panel Banks.  Instead, under the theory the Government put forward at trial, Defendants' crime was their failure to disclose the factors considered in reaching their accurate estimates.  The Government offered no testimony, from any witness, establishing that the factors considered by Mr. Allen and Mr. Conti in making their LIBOR submissions was material information; that question was not even asked.  As such, no rational fact-finder could find that Defendants' LIBOR submissions were "material" half-truths for purposes of the wire fraud statute and the Court should enter a judgment of acquittal.

## II.   NO RATIONAL JUROR COULD FIND THE EXISTENCE OF A SCHEME TO OBTAIN MONEY OR PROPERTY FROM RABOBANK'S COUNTERPARTIES BY MEANS OF FALSE OR FRAUDULENT REPRESENTATIONS BECAUSE DEFENDANTS MADE NO REPRESENTATIONS TO RABOBANK'S COUNTERPARTIES.

### A.  The Government Failed to Present Any Evidence that Defendants' LIBOR Submissions Induced Rabobank's Counterparties to Action.

A scheme to obtain money or property by means of false and fraudulent pretenses, representations, and promises is apparent where "there exists a discrepancy between benefits reasonably anticipated *because of* the misleading representations and the actual benefits which the defendant delivered, or intended to deliver." *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987) (emphasis added).  For this reason, the Government must satisfy the "difficult hurdle" of "proving that the [defendant's] false representations were reasonably calculated to induce

[victims] of ordinary prudence to buy their wares." *United States v. Regent Office Supply Co.*, 421 F.2d 1174, 1181-82 (2d Cir. 1970).

Accordingly, in order to sustain its prosecution against Mr. Allen and Mr. Conti, the Government had to prove that Defendants' LIBOR submissions "induced" a Rabobank counterparty to "part with property or undertake some action that he would not otherwise do, absent the misrepresentation or omission." *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir. 1998). The Government failed to meet this burden. There is no evidence in the record demonstrating that a counterparty, exposed to Defendants' LIBOR submissions on the days at issue, was induced to take certain action, or persuaded to part with property, that it would not otherwise have done, absent the exposure to Defendants' LIBOR submissions. In fact, there is no evidence in the record that any counterparty was even *aware* of Defendants' LIBOR submissions on the days at issue, much less that those submissions induced it to act in ways that it otherwise would not have. For this reason, Defendants are entitled to acquittal.

### B. The Government Failed to Present Any Evidence that Defendants' LIBOR Submissions Caused Harm to the BBA.

Under the "convergence" theory of mail and wire fraud, "the parties to whom the misrepresentations were made must be identical to the alleged victims" and where that is not the case, the Indictment can be dismissed. *United States v. Brennan*, 938 F. Supp. 1111, 1128 (E.D.N.Y. 1996) (finding the convergence theory to be satisfied where "defendants ma[de] fraudulent misrepresentation directly to at least some of the injured parties"). For example, in *United States v. Lew*, 875 F.2d 219 (9th Cir. 1989), the district court instructed the jury that the defendant's mail fraud scheme involved the making of false statements to the United States for the purpose of obtaining money from his clients. *Id*. at 221. The Ninth Circuit recognized that under these instructions, the jury could have convicted the defendant, even though it had not

found that he had made misrepresentations directly to his clients, the entities from whom he obtained money. *Id.* The mail fraud conviction was accordingly reversed. *Id.* And while the Second Circuit has not expressly adopted the convergence theory, in *United States v. Evans*, 844 F.2d 36 (2d Cir. 1988), it indicated in dicta that the theory had merit:  "[A]s we read *McNally*, the Supreme Court did not focus on whether the person deceived also had to lose money or property. Nonetheless, this may be the correct view of the statute. If a scheme to defraud must involve the deceptive obtaining of property, the conclusion seems logical that the deceived party must lose some money or property." *Id.* at 39.

Here, the record reflects that Defendants did not have any communications with Rabobank's counterparties.  (Tr. 509:2-7.)  Instead, Defendants communicated with the BBA. Even the Indictment describes the alleged scheme as one to "obtain money and property by making false and fraudulent USD and Yen LIBOR submissions *to the BBA* for inclusion in the calculation of USD and Yen LIBOR."  (Ind. at ¶28.) (emphasis added.)  Because the Government did not present any evidence that the BBA—the party to whom Defendants' communicated their LIBOR submissions—lost any "money or property" as the result of those submissions, the Government's claims fail under the "convergence theory" and Defendants should be acquitted.

### III.   NO RATIONAL JUROR COULD FIND THAT DEFENDANTS INTENDED ACTUAL HARM BECAUSE THE EVIDENCE AT TRIAL DID NOT ESTABLISH A CONTEMPLATED HARM ACTIONABLE UNDER THE WIRE FRAUD STATUTE.

To convict under the wire fraud statute, the Government "must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims." *United States v. Novak*, 443 F.3d 150, 156 (2d Cir. 2006) (citing *United States v. Starr*, 816 F.2d 94, 98 (2d Cir. 1987).)  In evaluating whether a defendant intended harm, the Second Circuit draws a "'line

between schemes that do no more than cause their victims to enter into transactions they would otherwise avoid—which do not violate the mail or wire fraud statutes—and schemes that depend for their completion on a misrepresentation of an essential element of the bargain—which do violate the mail and wire fraud statutes.'" *United States v. Binday*, Nos. 14-2809-cr; 14-2832-cr; 14-2873-cr, 2015 U.S. App. LEXIS 18671, at *18-19 (2d Cir. 2015) (citing *United States v. Shellef*, 507 F.3d 82, 108 (2d Cir. 2007) (vacating conviction where Government alleged only that the defendant's misrepresentation induced contractual partner to "enter into a transaction it would otherwise have avoided.").)  A defendant cannot be convicted where the Government has shown only that the alleged victim, had it known "the truth, 'would have refused to deal with [defendant] on general principles.'"  *Id.* (citing *United States v. Mittelstaedt*, 31 F.3d 1208, 1218 (2d Cir. 1994) (reversing conviction where the court's instructions allowed the jury to convict on the basis that victims were "disinclin[ed]" on "general principles to deal with an insider who had abused his fiduciary position."); *United States v. Lewis*, 67 F.3d 225 (9th Cir. 1995) (the right to make an informed business decision is not protected under the wire fraud statute).

        Here, each of the Government's counterparty witnesses testified that had they known Defendants "manipulated the LIBOR rate," they would have "considered acting differently" because, as Mr. Smith of Dean Foods explained, such conduct "speaks to [the] integrity and the sanctity of the market that you are dealing with."  (Tr. 499:12-500:10.)  Ms. Twomey testified that Superstore Industries "wouldn't have wanted to be involved in [the swap with Rabobank]" if it had known that "there was a potential for Rabobank to manipulate the interest rate."  (Tr. 827:18-828:2.)  Finally, Mr. DiTore stated that he "would have wanted to know whether someone was manipulating" LIBOR because he "would be less inclined to trade with someone that had more information than me."  (Tr. 836:23-838:1.)  Consistent with this

testimony, the jury was instructed that it could find that Mr. Allen and Mr. Conti possessed specific intent if they intended to "deprive one or more of the counterparties of material information," that is "information that a reasonably prudent person would consider important in making a decision to part with money or property."  (Tr. 1632:7-9, 1634:6-12.)

Thus, based on the counterparty witnesses' testimony and the instructions, the jury could have convicted Mr. Allen and Mr. Conti on the theory that they engaged in a scheme to deprive Rabobank's counterparties of "important" information that those counterparties would have "wanted to know" in order to avoid transacting with Rabobank.  However, under controlling Second Circuit authority, "it is not sufficient" for purposes of specific intent, to find "merely that the victim would not have entered into a discretionary economic transaction but for the defendant's representations" and the possibility that the jury may have convicted on this basis necessitates a reversal of Defendants' convictions and a judgment of acquittal.[4]  *Binday*, 2015 U.S. App. LEXIS 18671, at *17-18.

---

[4]      Although the Government presented evidence of certain swap transactions between Rabobank and its counterparties, GX103E (summary chart of swap contracts), presumably to demonstrate that Rabobank's counterparties could have been economically harmed by the alleged scheme, that evidence does not negate the need for reversal of Defendants' convictions. First, because the jury could have convicted on the basis that a victim would have refused to deal with Rabobank on "general principles," the convictions must be reversed, regardless of whether the Government presented evidence sufficient to convict under an appropriate theory of harm. *Shellef*, 507 F.3d at 109 (conviction reversed where court could not "rule out th[e] possibility" that the jury may have convicted on a legally invalid theory.)  Second, evidence that Rabobank's swap transactions with certain counterparties reset on the dates at issue is not sufficient to establish "contemplated harm" under any theory.  To "convict, the government had to establish that the omission caused (or was intended to cause) actual harm to the purchaser of a pecuniary nature *or* that the purchaser could have negotiated a better deal for itself had it not been deceived." *Binday*, 2015 U.S. App. LEXIS 18671, at *17-18, n.10.  Here, the "omission" at issue is Defendants' failure to disclose the factors considered when calculating their LIBOR submissions.  The counterparties' risk of "pecuniary harm," however, arises out of the actual rates submitted by Defendants, which were averaged into the overall LIBOR published by the BBA and Thompson Reuters.  As noted above, the Government did not prove that those rates were false.  Knowledge about the factors Defendants considered when estimating Rabobank's

### IV. NO RATIONAL JUROR COULD FIND THAT THE INTERSTATE WIRES ALLEGED IN COUNTS 6-19 WERE TRANSMITTED FOR THE PURPOSE OF FURTHERING THE ALLEGED SCHEME.

Each of the eighteen substantive counts contained in the Indictment is based on a separate wire communication that the Government alleges was used to further the criminal scheme. In Counts 6-19, the wires that the Government alleges violated the wire fraud statute are transmissions, by Thomson Reuters to data centers in New York and elsewhere, of the "overall LIBOR rates" for that day. The threshold question is whether "the wire communications [were] transmitted for the purpose of executing the scheme." *United States v. Lake*, 472 F.3d 1247, 1255 (10th Cir. 2007). No rational fact-finder could have so found.

*United States v. Lake* is instructive. In *Lake*, the Tenth Circuit set aside the wire fraud convictions of two corporate executives, whom the Government alleged had committed wire fraud by failing to disclose to the SEC their personal use of corporate aircraft, and by filing certain annual reports filed that were "misleading" because they failed to disclose the great value to the defendants (about $1 million each) of their personal use of the aircraft. *Id*. at 1258-59. But, as the Tenth Circuit pointed out, the "government did not show at trial that disclosure was required." *Id*. In fact, the "government made no effort to inform the jury of what was specifically required [to be disclosed] by SEC regulations, contending that the regulations were irrelevant," and focusing instead on occasions where the defendants had "directed non-disclosure." *Id*. at 1253.

The Tenth Circuit overturned the convictions, finding that the SEC's regulations had not required the defendants to disclose the omitted information, and therefore that there was

borrowing costs, or the incentives behind those rates, would have zero "pecuniary" effect. Because the evidence presented by the Government does not support a finding that Defendants contemplated the type of "harm" actionable under the wire fraud statutes, the Court should enter a judgment of acquittal.

nothing "false, fraudulent, or even misleading" about the filings.  *Id.* at 1257-60 (holding that the falsity of a report "depends on what is required to be reported" and rejecting the Government's argument that a report can be "misleading" where it contains all the information required, but fails to disclose other information that "the public would have expected" disclosed.)  As such, the Tenth Circuit concluded that it was impossible for a reasonable juror to find that the wires at issue "advanced the alleged fraudulent scheme" or that the "purpose in filing them was to advance the scheme."  *Id.* at 1255-56, 1260.

As in *Lake*, the wires alleged in Counts 6-19 were sent "because they had to be, not because of any unlawful scheme."  *Id.* at 1255-56. While the Government contends that the wires were in "furtherance of the conspiracy and the scheme because if you don't know what the LIBOR rate is, you don't know how much you owe or how much you are entitled to," (Tr. 1475: 11-21), the fact remains that Thompson Reuters was compelled, under contract with the BBA, to publish the overall LIBOR each day.  (GX137.)  Although a wire that was required to be transmitted might still "be used to further a scheme if it was itself false or fraudulent," the Government made no such showing.  *Lake*, 472 F.3d at 1255-56.  The record is devoid of any evidence demonstrating that the information transmitted by Thompson Reuters was false or fraudulent, *i.e.,* that the interest rate published was something other than a trimmed average of the Panel Banks' estimated borrowing costs.  *Id.* at 1257-60.  Therefore, it cannot be said the wires alleged in Counts 6-19 "advanced the alleged fraudulent scheme" or that the "purpose in filing them was to advance the scheme" and the Court should enter a judgment of acquittal on those Counts.  *Id.* at 1255-56, 1260; *see also Parr v. United States*, 363 U.S. 370, 390 (1960) (no case holds that "the mailing of a thing which the law required to be mailed may be regarded as mailed for the purpose of executing a plot or scheme to defraud.")

**V.    NO RATIONAL JUROR COULD FIND THAT THE EVIDENCE AT TRIAL ESTABLISHED THAT A FINANCIAL INSTITUTION WAS DIRECTLY AFFECTED AND THEREFORE THE CHARGES AGAINST DEFENDANTS ARE TIME BARRED.**

The statute of limitations for wire fraud and conspiracy may only be extended from five years to ten years "if the offense affects a financial institution," within the meaning of 18 U.S.C. §§ 20 and 3292(2).  The Government must prove, beyond a reasonable doubt as to each count, that a financial institution insured by the Federal Deposit Insurance Corporation was "directly affected" by the alleged scheme, meaning that the institution sustained a loss, or was exposed to a substantial "risk of loss."  *United States v. Carollo*, No. 10 cr. 6154 (HB), 2011 U.S. Dist. LEXIS 95356, at *5-6 (S.D.N.Y. August 25, 2011); *United States v. Ohle*, 678 F. Supp. 2d 215, 229 (S.D.N.Y. 2010) (finding financial institution was "affected" where it was "not only exposed to substantial risk but experienced actual losses.")

Here, the jury was instructed that it could find an FDIC-insured financial institution was "affected" if it determined the "investment decisions of that bank would have been different if the bank had known of the fraud."  (Tr. 1635:23-1636:9.)  Defendants objected to this instruction, (Tr. 1404:7–1409:13), because they are unaware of any court that has held that a financial institution is "affected"—thereby doubling the statute of limitations—where the Government has not proven loss, or even a risk of loss, but has proven only that the institution would have made a different "investment decision" had it "known" of the alleged fraud.[5]

---

[5]  Even if an "investment decision" effect is sufficient under FIRREA, Defendants are entitled to a new trial because the Court precluded Defendants from presenting evidence that the financial institutions purportedly affected "did, in fact, know" of the alleged fraud but "continued to engage in LIBOR-related swaps" with Rabobank anyway:  a defense which, if proven, would squarely refute one of the bases of the charges.  (Tr. 4:3-6 (precluding Defendants from offering evidence that Rabobank's counterparties were "attempting to manipulate" LIBOR, despite Defendants' argument that such evidence would establish "that these entities did, in fact, know that LIBOR was being submitted pursuant to Panel Banks' self-interests. . .yet, these entities

*Carollo*, 2011 U.S. Dist. LEXIS 95356, at *7 (It is "less clear . . .whether illegal activity that

caused a financial institution to simply be susceptible to risk of loss but where no loss was

caused falls within the scope of the language affects a financial institution") (internal citations

omitted); *United States v. Grass*, 274 F. Supp. 2d 648, 654 (M.D. Pa. 2003) (rejecting idea that a

financial institution can be deemed affected "without a showing that the financial institution

suffered a loss or was exposed to some tangible, realistic risk" and noting that "no court has

extended its interpretation to include the type of losses banks ordinarily incur in conducting

completely legitimate transactions.")

      While the Second Circuit has noted, in dicta, that FIRREA "broadly applies" to

acts that "effect a financial institution," *United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir.

1998), a showing that an FDIC-insured financial institution—which may very well make

thousands of investments a day—would make a "different" investment decision is a harm of a

much lesser degree than the exposure courts have otherwise considered sufficient.  For example,

in *United States v. Agne*, the First Circuit held that "even assuming, without deciding, that being

exposed to a risk of loss is sufficient to 'affect' a bank ... we cannot agree with the district court

that this defendant created such a risk" because the only alleged loss was reputational.  214 F.3d

47, 52 (1st Cir. 2000); *see also United States v. Ubakanma*, 215 F.3d 421, 426 (4th Cir. 2000)

(district court "correctly concluded" that 10 year statute of limitations applied only where the

financial institution "were victimized by the fraud.").  In almost all circumstances in which

courts have upheld the ten-year statute of limitations despite a lack of evidence of actual loss, the

financial institutions pointed to potential losses arising out of legal liability that resulted from a

---

continued to engage in LIBOR-related swaps with Panel Banks." (*citing from* Def. Opp. to Gov.
MIL, 9-10, ECF No. 127).)

defendant's conduct.  *Ohle*, 678 F. Supp. 2d at 230; *United States v. Wells Fargo Bank, N.A.*, 972

F. Supp. 2d 593, 63-31 (S.D.N.Y. 2013); *United States v. Bank of New York Mellon*, 941 F.

Supp. 2d 438 (S.D.N.Y. 2013); *United States v. Ghavami*, No. 10 cr. 1217 (KMW) 2012 U.S.

Dist. LEXIS 97931, at *31 (S.D.N.Y. July 12, 2012).

        In any event, no reasonable juror could find, on the basis of the Government's

evidence, that a financial institution was affected, regardless of whether the standard is actual

loss, risk of loss, or even hindsight regret regarding an investment decision.  The Government's

theory at trial was that Defendants' LIBOR submissions were fraudulent pretenses because the

submissions, while accurate estimates of Rabobank's borrowing costs, nonetheless constituted

"half-truths," statements that mislead by being partial or ambiguous.  The Government therefore

needed to prove at trial that this "ambiguity" affected a financial institution.

        Although the Government presented evidence that Rabobank had swap contracts

with certain financial institutions, *see* GX103E (summary chart of swap contracts), the

Government did not prove—and in fact, did not even address—how the value of those swap

contracts was "affected" by the "ambiguity" allegedly conveyed by Defendants' LIBOR

submissions.  The Government did not argue, as it could not, that the funds exchanged pursuant

to the swaps depended on whether Defendants disclosed the various factors they considered

when submitting Rabobank's LIBOR submissions.  The Government, however, offered no other

theory of "loss," actual or hypothetical, that would explain how Defendants' failure to disclose

"affected" a FDIC-insured financial institution.

        Similarly, the Government did not establish that any FDIC-insured institution

would have made a "different" investment decision had it known the factors behind Defendants'

LIBOR submissions.  The three counterparty witnesses who testified at trial did not work for

FDIC-insured financial institutions.  The Government's burden to prove that a financial

institution was "affected" is not based on "objective" standard, in which the jury is asked to

determine whether a "reasonable" financial institution would have made a different investment

decision:  the Government had to present evidence demonstrating, beyond a reasonable doubt,

that the financial institutions it argued were affected would have invested differently.  No such

evidence was presented at trial.  Because a "conviction based on speculation and surmise alone

cannot stand," the Court should enter a judgment of acquittal.  *United States v. D'Amato*, 39 F.

3d 1249, 1256 (2d Cir. 1994).

Finally, even if the Court disagrees with Defendants' arguments that the

Government failed to establish that the alleged scheme affected a financial institution, as

described above, the Court should nonetheless grant Defendants a judgment of acquittal on the

following Counts, for the reasons described.

A judgment of acquittal should be entered on Count 1 because the Government

argued that US Bank, N.A. was affected by Rabobank's "pre-textual" 1M USD LIBOR

submission on November 29, 2006. *See* GX103E (identifying swap contracts at GX112F-H as

affected); GX112F-H (swaps with US Bank, N.A.).  However, the Government did not prove

that Rabobank's 1M USD LIBOR submission on November 29, 2006 was "based on trading

positions in order to make money" because the Government did not present any evidence

concerning Rabobank's 1M USD LIBOR submission on November 29, 2006 or what trading

positions Rabobank had tied to the 1M USD LIBOR on that date.  Because the Government did

not prove Rabobank's November 29, 2006 1M USD submission was fraudulent, no rational juror

could find that US Bank, N.A. was affected.  The Government also argued that the following

institutions were affected, *see* GX103E, but did not prove they were FDIC-insured:  Dean Foods

(GX112A-B); RDO Equipment (GX112C); Superstore Industries (GX112D); Natural Selection Foods (GX112E); Potpourri Group (GX112I); PNC Bank, Pittsburgh (GX112J); Morgan Stanley Capital Services, Inc. (GX112K).  For these reasons, no rational juror could find that a FDIC-insured financial institution was affected.

   A judgment of acquittal should be entered on Count 2 because the Government argued Lehman Brothers was affected by Rabobank's 6M JPY LIBOR submission on December 14, 2006, but did not prove it was FDIC-insured. *See* GX103D (identifying swap contract at GX202 as affected); GX202 (swap with Lehman Brothers).  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

   A judgment of acquittal should be entered on Count 3 because the Government argued JP Morgan Chase, N.A. was affected by Rabobank's "pre-textual" 6M JPY LIBOR submission on February 27, 2008.  *See* GX103E (identifying swap at GX302C); GX302C (swap with JP Morgan Chase, N.A.).  However, the Government did not prove that Rabobank's 6M JPY LIBOR submission on February 27, 2008 was "based on trading positions in order to make money" because the parties stipulated that Mr. Yagami did not have any trading positions tied to 6M JPY LIBOR on February 27, 2008, *see* DX288, at 14, despite his suggestion of a 6M JPY rate (GX301).   Because the Government did not prove Rabobank's February 27, 2008 6M JPY submission was fraudulent, no rational juror could find that JP Morgan Chase, N.A. was affected.  The Government also argued Lehman Brothers was affected by Rabobank's 1M JPY LIBOR submission on February 27, 2008, but did not prove it was FDIC-insured. *See* GX103D (identifying swap contracts at GX302A and GX302B as affected); GX302A and GX302B (swaps with Lehman Brothers). Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 6 because the Government argued that JP Morgan Chase, N.A., was affected by Rabobank's "pre-textual" 6M JPY LIBOR submission on March 19, 2008.  *See* GX103E (identifying swap contracts at GX602A-I as affected).  JP Morgan Chase N.A., however, could not have suffered any loss or risk of loss because the two swap contracts admitted, GX602A and GX602B, demonstrate a perfect "hedge" with no risk tied to LIBOR.  The other JP Morgan swaps introduced by the Government did not reset on March 19, 2008 and therefore could not have been affected by Rabobank's 6M JPY submission on that date. (GX602C-F.)  The Government also argued that Citigroup Global Markets Limited was affected by Rabobank's 6M JPY LIBOR submission on March 19, 2008, but did not prove that entity was FDIC-insured. *See* GX103D (identifying swap contracts at GX602G-H as affected); GX602G-H (swap with Citigroup Global Markets Limited).  Finally, the Government argued that Bank of America, N.A., was affected by Rabobank's 6M JPY LIBOR submission on March 19, 2008, but the evidence it offered in support of that argument— GX602I—is an internal swap between Rabobank Utrecht and Rabobank Singapore and the Government did not explain how Bank of America was involved or affected by the reset dates of that swap.  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 7 because the Government argued that JP Morgan Chase, N.A., was affected by Rabobank's "pre-textual" 3M USD LIBOR submission on September 5, 2005.  *See* GX103E (identifying swap contract at GX702 as affected); GX702 (swap with JP Morgan Chase, N.A.).  However, the Government did not prove that Rabobank's 3M USD LIBOR submission was "based on trading positions in order to make money" because the Government did not identify any trading positions that were tied to 3M USD

LIBOR on September 5, 2005.  Because the Government did not prove the submission was fraudulent, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 8 because the Government argued that Bank of America, National Trust and Savings Association, was affected by Rabobank's 3M USD LIBOR submission on September 6, 2005, but did not prove that entity was FDIC-insured. *See* GX103D (identifying swap contracts at GX802A,C as affected); GX802A,C (swaps with Bank of America, National Trust and Savings Association).  The Government also argued that Bank of America, N.A., was affected by Rabobank's "pretense" 3M USD LIBOR submission on September 6, 2005.  *See* GX103E (identifying swap contract at GX802B as affected); GX802B (swap with Bank of America, N.A.).  However, the Government did not prove that Rabobank's 3M USD LIBOR submission on September 6, 2005 was "based on trading positions in order to make money" because the Government did not identify any trading positions that were tied to 3M USD LIBOR on September 6, 2005.  Indeed, even if the Government had proven that Rabobank's 3M USD submission was a pretense, no rational juror could find that Bank of America, N.A. sustained any loss, or even risk of loss, as a result because Bank of America, N.A. held the fixed arm of the swap and benefitted from the alleged fraud.  For these reasons, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 9 because the Government argued Standard Chartered was affected by Rabobank's 6M JPY LIBOR submission on May 10, 2006, but did not prove it was FDIC-insured.  *See* GX103E (identifying swap contract at GX902 as affected); GX902 (swap with Standard Chartered).  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 12 because the Government argued that JP Morgan Chase, N.A., was affected by Rabobank's "pre-textual" 1M JPY LIBOR submission on December 18, 2006.  *See* GX103E (identifying swap contract at GX1202 as affected); GX1202 (swap with JP Morgan Chase, N.A.).  However, the Government did not prove that Rabobank's 1M JPY LIBOR submission on December 18, 2006 was "based on trading positions in order to make money" because the Government did not identify any Rabobank trading positions tied to 1M JPY LIBOR on December 18, 2006.  Because the Government did not prove the submission was fraudulent, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 13 because the Government argued that Wachovia, N.A., was affected by Rabobank's "pre-textual" 3M USD LIBOR submission on April 10, 2007.  *See* GX103E (identifying swap contracts at GX1302A-B as affected); GX1302A-B (swap contracts with Wachovia N.A.).  Wachovia, N.A., however, could not have suffered any loss or risk of loss because the two Wachovia, N.A. swap contracts admitted, GX1302A and GX1302B, demonstrate a perfect "hedge" with no risk tied to LIBOR. The Government also argued that Lehman Brothers was affected by Rabobank's 3M USD LIBOR submission on April 10, 2008, but did not prove it was FDIC-insured.  *See* GX103E (identifying swap contracts at GX1302C as affected); GX1302C (swap contract with Lehman Brothers.)  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 14 because the Government did not argue that any FDIC-insured financial institution was affected by Rabobank's LIBOR

submissions on August 9, 2007.  *See* GX103E.  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 15 because the Government did not argue that any FDIC-insured financial institution was affected by Rabobank's LIBOR submissions on September 19, 2007.  *See* GX103E.  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 16 because the Government argued BNP Paribas was affected by Rabobank's 6M JPY LIBOR submission on October 17, 2007, but did not prove it was FDIC-insured.  *See* GX103E (identifying swap contracts at GX1602A-C as affected); GX1602A-C (swaps with BNP Paribas).  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 17 because the Government argued Lehman Brothers was affected by Rabobank's 6M JPY LIBOR submission on October 30, 2007, but did not prove it was FDIC-insured.  *See* GX103E (identifying swap contracts at GX1702 as affected); GX1702 (swap with Lehman Brothers).  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 18 because the Government argued Goldman Sachs was affected by Rabobank's 6M JPY LIBOR submission on July 24, 2008, but did not prove it was FDIC-insured.  *See* GX103E (identifying swap contract at GX1802 as affected); GX1802 (swap with Goldman Sachs).  Moreover, the Goldman Sachs swap (GX1802) was tied to the *3M USD* LIBOR, so couldn't have been affected by Rabobank's 6M JPY LIBOR submission anyway.  Thus, no rational juror could find that a FDIC-insured financial institution was affected.

A judgment of acquittal should be entered on Count 19 because the Government argued that JP Morgan Chase, N.A. was affected by Rabobank's "pre-textual" 3M USD LIBOR submission on July 10, 2008.  *See* GX103E (identifying swap contract at GX1902 as affected); GX1902 (swap with JP Morgan Chase, N.A.).  However, the Government did not prove that Rabobank's 3M USD LIBOR submission on July 10, 2008 was "based on trading positions in order to make money."  The Government's basis for Count 19 is an audio file, entered into evidence as GX1901A, but the parties stipulated that the date of that communication was October 7, 2008.  (GX135.)  Moreover, the Government admitted that the trader recorded on the audio file, Mr. Thompson, gave no indication of a LIBOR currency or tenor that he wanted "manipulated."  (Tr. 902:3-905:12.)  As such, no rational juror could find that Rabobank's 3M USD LIBOR on July 10, 2006 was fraudulent and consequently, JP Morgan Chase, N.A. could not have been "affected."

## VI.  DEFENDANTS' PROSECUTION IN THE UNITED STATES IS A VIOLATION OF THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE.

The Government's case against Defendants is barred by the Due Process Clause of the Fifth Amendment, which requires the Government to 1) prove a "sufficient nexus" between Defendants' conduct and the United States and 2) establish that Defendants received fair notice that their conduct was criminal.  The Government has not made either showing.

### A.  Defendants Lack a Constitutionally Sufficient Nexus to the United States.

"In order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States."  *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011).  As British citizens whose alleged criminal conduct occurred "entirely abroad," the Government must show that the aim of Defendants' conduct was "to cause harm inside the United States or to U.S. citizens or

interests." *Id*.  To establish a sufficient nexus, the conduct's effect on the United States must be "substantial, direct and foreseeable." *In re Hijazi*, 589 F.3d 401, 412 (7th Cir. 2009) (internal citations omitted).

Here, the "effect" of Defendants' conduct on the United States was neither substantial, direct, nor foreseeable.  First, the Government did not prove that any "harm" was caused by Defendants' "fraudulent pretenses."  As described above, the Government has not demonstrated that entities in the United States suffered any loss, or risk of loss, because of Defendants' failure to disclose the factors they considered when calculating Rabobank's LIBOR estimates.  Second, because it is undisputed that there was no requirement—statutory, fiduciary or otherwise—for Defendants to disclose the factors behind their LIBOR submissions, it was not "foreseeable" that the failure to disclose would cause "direct" harm to the United States.

The Department of Justice has been investigating this matter for over five years.  Yet, at trial, the most powerful evidence it presented regarding an effect on the United States was the testimony of Michael DiTore, formerly a junior trader at Lehman Brothers, who stated he "would be less inclined to trade with someone that had more information than [him]."  (Tr. 836:23-838:1.)  The idea that Mr. Allen and Mr. Conti can be criminally prosecuted in the United States on a showing by the Government that a trader at an investment bank would be "less inclined" to trade is inconsistent with the Fifth Amendment's promise of due process. *Compare with Al Kassar*, 660 F.3d at 118 (nexus established where arms dealer sold weapons with understanding Americans would be killed); *United States v. Umeh*, 527 F. App'x 57, 63 (2d Cir. 2013) (nexus established where conspiracy was to ship illegal drugs to the United States); *United States v. Mostafa*, 965 F. Supp. 2d 451 (S.D.N.Y. 2013) (nexus established where defendant helped take Americans hostage).

**B.   Defendants Did Not Receive Sufficient Notice for Purposes of the Due Process Clause That Their Alleged Conduct Was Criminal.**

In addition to requiring a "sufficient nexus" between the defendant and the United States, the Due Process Clause of the Fifth Amendment also requires that foreign defendants receive fair warning that their conduct could expose them to criminal liability.  "The idea of fair warning is that no man shall be held criminally responsible for conduct which he could not reasonably understand to be proscribed." *Al Kassar*, 660 F.3d at 119 (internal citations omitted.)

Here, Mr. Allen and Mr. Conti did not have notice that it was a crime to fail to disclose the incentives behind their accurate estimates of Rabobank's borrowing costs.  As argued above, such conduct is not a crime in the United States, much less a crime so self-evident that two citizens of the United Kingdom would understand that it was illegal behavior. Moreover, at all times relevant to the charges, Defendants were subject to British laws and regulations, none of which required Mr. Allen and Mr. Conti to disclose the information they are now being criminally prosecuted for withholding.  Likewise, no British laws or regulations described the factors that Mr. Allen and Mr. Conti were permitted to, or forbidden from, considering when calculating their LIBOR estimates.  To the contrary, even the limited record developed on this issue at trial demonstrates that there were no rules governing LIBOR.  The Government's cooperating witness, Lee Stewart, explained that "it wasn't considered inappropriate" at Rabobank for traders to share their LIBOR preferences with the LIBOR setter. (Tr. 259:12-262:8.)  Paul Robson, another cooperating witness, called the BBA in 2006 to complain that banks were "manipulat[ing]" LIBOR, *see* DX31R, and the BBA told him not to "worry about it because inaccurate rates get dropped out of the LIBOR rates and so they have no impact."  (Tr. 540:19- 543:18; *see also* 721:12-17 (Mr. Yagami testifying that he understood that Mr. Robson had called the BBA to complain but the BBA "wasn't going to do anything about

it.").)  Mr. Robson also testified that the BBA would  instruct Panel Banks to change their

submitted rates, to ensure the sixteen submissions aligned.  (Tr. 553:11-555:18.)  This anything-

goes approach is reflected in a conversation Mr. Allen had with Mr. Ewan, the BBA's LIBOR

Manager, in which Mr. Ewan told Mr. Allen that LIBOR was "just a line in the sand.  What's it

based on?  Nothing."  (GX110B.)

        The message from the United States was no clearer.  Regulators at the Federal

Reserve Bank in New York asked Mr. Allen in May 2008 whether it "would be helpful for there

to be more specific guidance on how to set LIBOR, how to contribute LIBOR quotes," *see*

DX001CT, and Mr. Allen agreed that some guidance would be a relief, as various banks were

using different criteria, including "setting LIBOR according to their swap positions."  (Tr.

1249:15-1253:18 (Mr. Allen conveyed to the Federal Reserve that "banks were not basing their

LIBORs on cash but basing them on what their swap derivative resources were.").)  The Federal

Reserve had no discernible reaction to learning that banks were calculating LIBOR with an eye

towards their own interests:  Mr. Allen was not told that such conduct was improper, much less

illegal.[6]  Yet, Defendants are now being prosecuted for basing their submissions, "in part" on the

"wrong" factors.   This violates the Due Process Clause's mandate that a defendant have

constitutionally sufficient notice before a criminal prosecution can be brought against him.

---

[6]        In fact, after speaking with Mr. Allen, the regulators prepared a report for the Federal
Reserve regarding "LIBOR's Credibility."  The Court did not allow this report, DX16, into
evidence, (Tr. 1243:5-18), but the report suggests that the Federal Reserve did not consider the
conduct Mr. Allen reported to be criminal.  (DX16 at 2 (noting that "many market participants"
had raised concerns about LIBOR's "credibility" including concerns that "panel banks may have
incentives to misreport in order to manipulate the level of the LIBOR fixing, and thereby
influence their funding or derivative positions" but saying nothing about any criminal issues
implicated in those concerns).)

## CONCLUSION

Accordingly, this Court should order a judgment of acquittal to Defendants on all

Counts contained in the Superseding Indictment, or, in the alternative, order a new trial.


Dated: New York, New York
         November 23, 2015

**WILLKIE FARR & GALLAGHER LLP**             **TOR EKELAND, P.C.**

By: /s/ Michael S. Schachter_____       By: /s/ Tor Ekeland_____
                                              (electronic signature w/permission)
Michael S. Schachter                          Tor Ekeland
Casey E. Donnelly                             Aaron Williamson
787 Seventh Avenue                            195 Plymouth Street, 5th Floor
New York, New York 10019                      Brooklyn, New York 11201-1133
Phone: (212) 728-8000                         Phone: (718) 737-7264
*Attorneys for Defendant Anthony Allen*       *Attorneys for Defendant Anthony Conti*