UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | S4:14-cr-00272-JSR |
| | : | |
| | : | |
| ANTHONY ALLEN, et al | : | |
| | : | |
| Defendants. | : | |
| | : | |

## **MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT OF ACQUITTAL**

ANDREW WEISSMANN
Chief, Fraud Section
CAROL SIPPERLY
Senior Litigation Counsel
BRIAN R. YOUNG
Assistant Chief
U.S. Department of Justice
Criminal Division
1400 New York Ave., NW
Washington, D.C. 20005
(202) 616-3114

JEFFREY D. MARTINO
Chief, New York Office
MICAHEL T. KOENIG
Trial Attorney
U.S. Department of Justice
Antitrust Division
450 5th Street, N.W.
Washington, D.C., 20001
(202) 616-2165

# TABLE OF CONTENTS

I.      A RATIONAL TRIER OF FACT COULD HAVE CONCLUDED
        THAT THE DEFENDANTS PARTICIPATED IN A SCHEME TO
        DEFRAUD RABOBANK'S COUNTERPARTIES BY MAKING
        LIBOR SUBMISSIONS THAT WERE CALCULATED TO BENEFIT
        THE BANK'S DERIVATIVE POSITIONS, RATHER THAN BEING
        A GOOD FAITH ESTIMATE OF ITS BORROWING COSTS .............1

II.     THE JURY HEARD SUFFICIENT EVIDENCE TO CONCLUDE
        THAT THE DEFENDANTS ACTED WITH INTENT BY MAKING
        LIBOR SUBMISSIONS THAT WERE CALCULATED TO HARM
        RABOBANK'S COUNTERPARTIES ..................................................7

III.    TESTIMONY FROM THE CONSPIRATORS AND THE
        COUNTERPARTIES, AS WELL AS EVIDENCE ESTABLISHING
        THAT THE LIBOR RATE EFFECTED THE PROFITABILITY OF
        INTEREST RATE SWAPS, ESTABLISHED THE MATERIALITY
        OF THE SCHEME ...............................................................................9

IV.     WIRE TRANSMISSIONS WHICH PUBLISHED THE LIBOR RATE,
        THEREBY ADVISING RABOBANK'S COUNTERPARTIES OF
        HOW MUCH MONEY THEY OWED UNDER THE SWAPS, WERE
        "IN FURTHERANCE" OF THE SCHEME REGARDLESS OF
        WHETHER THE WIRES THEMSELVES CONTAINED FALSE
        INFORMATION....................................................................................15

V.      A SCHEME THAT INFLUENCES A FINANCIAL INSTITUTION
        TO MAKE DIFFERENT INVESTING DECISIONS NECESSARILY
        AND DIRECTLY "AFFECTS" THAT INSTITUTION, THEREBY
        SATISFYING THE LOW BAR SET FORTH IN THE STATUTE OF
        LIMIATIONS ......................................................................................16

VI.     THE DEFENDANTS' PROSECUTION IN THE UNITED STATES
        DOES NOT VIOLATE THE FIFTH AMENDMENT'S DUE
        PROCESS CLAUSE ...........................................................................20

        A. Defendants' Arguments Are Misplaced Because Their
           Prosecution Does Not Involve an Extraterritorial Application of
           18 U.S.C. § 1343.....................................................................20

        B.  A Sufficient Nexus Exists Between Defendants and the United States..........22

        C.  Defendants Had Sufficient Notice That Their Conduct Was Criminal ..........25

## TABLE OF AUTHORITIES

**Cases**                                                                                      **Page(s)**

*Amgen Inc v. Connecticut Retirement Plans and Trust Funds*,
    133 S. Ct. 1184 (2013) ................................................................................... 14

*In re Hijazi*,
    589 F.3d 401 (7th Cir. 2009) ........................................................................ 24

*Pasquantino v. United States*,
    544 U.S. 349 (2005)....................................................................................... 21

*Schmuck v. United States*,
    489 U.S. 705 (1989)....................................................................................... 15

*Trautz v. Weisman*,
    819 F.Supp. 282 (S.D.N.Y. 1993) .................................................................. 6

*United States v. Al Kassar*,
    660 F.3d 108 (2d Cir. 2011)............................................................... 21, 23, 25

*United States v. Alfisi*,
    308 F.3d 144 (2d Cir. 2002)
        (quoting *United States v. Manton*, 107 F.3d 834 (2d Cir. 1939) .............................. 4

*United States v. Altman*,
    48 F.3d 96 (2d Cir. 1995)............................................................................... 25

*United States v. Autuori*,
    212 F.3d 105 (2d Cir. 2000)
        (quoting *United States v. Amrep Corp.*, 560 F.2d 539 (2d Cir. 1977)...................... 3

*United States v. Binday*,
    804 F.3d 558 (2d Cir. 2015).............................................................................. 1

*United States v. Bouyea*,
    152 F.3d 192 (2d Cir. 1998)........................................................................... 17

*United States v. Caicedo*,
    47 F.3d 370 (9th Cir. 1995) ........................................................................... 23

*United States v. Cardales*,
    168 F.3d 548 (1st Cir. 1999)........................................................................... 23

*United States v. Carpenter*,
    791 F.2d 1024 (2d Cir. 1986)..................................................................... 7, 16

*United States v. Chalmers*,
    474 F.Supp. 2d 555 (S.D.N.Y. 2007) ........................................................................ 6

*United States v. Christopher*,
    142 F.3d 46 (1st Cir. 1998) ...................................................................................... 6

*United States v. Corsey*,
    723 F.3d 366 (2d Cir. 2013) .................................................................................... 13

*United States v. Eisen*,
    974 F.2d 246 (2d Cir. 1992) ...................................................................................... 6

*United States v. Finnerty*,
    533 F.3d 143 (2d Cir. 2008) ...................................................................................... 5

*United States v. Hayes*, __ F. Supp. 3d __,
    2015 WL 4620254 (S.D.N.Y. Aug. 3, 2015) ..................................................... 22, 25

*United States v. Heinz*,
    790 F.3d 365 (2d Cir. 2015)
    (quoting *United States v. SKW Metals & Alloys, Inc.*,
        195 F.3d 83 (2d Cir. 1999)) ............................................................................ 17

*United States v. Helmsley*,
    941 F.2d 71 (2d Cir. 1991) ................................................................................... 4, 15

*United States v. Hijazi*,
    845 F. Supp. 2d 874 (C.D. Ill. 2011) ...................................................................... 24

*United States v. Kennedy*,
    64 F.3d 1465 (10th Cir. 1995) ................................................................................. 6

*United States v. Kim*,
    246 F.3d 186 (2d Cir. 2001) .................................................................................... 21

*United States v. Litvak*,
    __ F.3d __, 2015 WL 8123714 (2d Cir. 2015) ........................................................ 4

*United States v. Martin*,
    411 F.Supp. 2d 370 (S.D.N.Y. 2006) ...................................................................... 19

*United States v. Martinez*,
    No. 98-1438, 1999 WL 38842 (2d Cir. 1999) ........................................................ 19

*United States v. McMillan*,

600 F.3d 434 (5th Cir. 2010) ........................................................................... 6

*United States v. Morgenstern*,
933 F.2d 1108 (2d Cir. 1991)......................................................................... 5

*United States v. Mullins*,
613 F.3d 1273 (10th Cir. 2010 ...................................................................... 17

*United States v. Perez-Oviedo*,
281 F.3d 400 (3d Cir. 2002)........................................................................... 23

*United States v. Perlaza*,
439 F.3d 1149 (9th Cir. 2006) ....................................................................... 23

*United States v. Rubin/Chambers*,
831 F. Supp. 2d 779 (S.D.N.Y. Dec. 14, 2011) ........................................... 20

*United States v. Seidling*,
737 F.3d 1155 (7th Cir. 2013) ......................................................................... 6

*United States v. Serpico*,
320 F.3d 691 (7th Cir. 2003) ........................................................................ 17

*United States v. Suerte*,
291 F.3d 366 (5th Cir. 2002) ........................................................................ 23

*United States v. Thomas*,
377 F.3d 232 (2d Cir. 2004).......................................................................... 13

*United States v. Tocco*,
135 F.3d 116 (2d Cir. 1998).......................................................................... 15

*United States v. Trapilo*,
130 F.3d 547 (2d Cir. 1997)..................................................................... 13, 21

*United States v. Umeh*,
527 Fed. Appx. 57 (2d Cir. 2013) ................................................................ 21

*United States v. Velasquez*,
271 F.3d 364 (2d Cir. 2001)............................................................................ 1

*United States v. Vest*,
116 F.3d 1179 (7th Cir. 1997) ........................................................................ 4

*United States v. Whitfield*,
590 F.3d 325 (5th Cir. 2009) ........................................................................ 15

*United States v. Yousef*,
    327 F. 3d 56 (2d Cir. 2003)
    (quoting *United States v. Davis*,
        905 F.2d 245 (9th Cir. 1990) ................................................................. 22

*United States v. Yousef*,
    No. S3 08 Cr. 1213 (JFK), 2010 WL 3377499 (S.D.N.Y. Aug. 23, 2010) .................... 23

*United v. Blixt*,
    548 F.3d 882 (9th Cir. 2008) ......................................................................... 13

*Virginia Bankshares, Inc. v. Sandberg*,
    501 U.S. 1083 (1991) ........................................................................................ 3

**Other Authorities**                                       **Page(s)**

Restatement (Third) of Foreign Relations § 403(2)(a) (ALI 1987) ............................................. 24

A defendant challenging the sufficiency of the evidence faces a "heavy burden" because the Court must be "exceedingly deferential" to the jury's verdict.  *United States v. Binday*, 804 F.3d 558, 572 (2d Cir. 2015).  The sufficiency of the evidence is analyzed "in the light most favorable to the government, crediting every inference that could have been drawn in the government's favor, and deferring to the jury's assessment of witness credibility and its assessment of the weight of the evidence."  *Id.* (internal quotation marks omitted).  The conviction must be upheld "if any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *Id.* (internal quotation marks omitted).  The Court may look to Mr. Allen's testimony in evaluating the sufficiency of the evidence.  *See United States v. Velasquez*, 271 F.3d 364, 371 (2d Cir. 2001).

I.   **A RATIONAL TRIER OF FACT COULD HAVE CONCLUDED THAT THE DEFENDANTS PARTICIPATED IN A SCHEME TO DEFRAUD RABOBANK'S COUNTERPARTIES BY MAKING LIBOR SUBMISSIONS THAT WERE CALCULATED TO BENEFIT THE BANK'S DERIVATIVE POSITIONS, RATHER THAN BEING A GOOD FAITH ESTIMATE OF ITS BORROWING COSTS.**

The United States presented more than sufficient evidence to show that the defendants participated in a "scheme to defraud," which the Court defined as "a plan or design to obtain money or property by means of 'false or fraudulent pretenses, representations, or promises.'" Dkt. 146 at 16.  The government first proved that Rabobank, the defendants' employer, participated in a process in which they agreed to submit to the British Bankers' Association "the rate at which an individual Contributor Panel bank could borrow funds, were it to do so by asking for and then accepting inter-bank offers in reasonable market size just prior to 1100."  *See* GX 116G and GX 108D.

The government then introduced substantial evidence showing coordination between the defendants and Rabobank swap traders to manipulate LIBOR to the traders' benefit.  For

example, the government introduced numerous exhibits in which a trader at Rabobank made submission requests for the explicit or implicit purpose of benefitting his trading positions.[1]  The jury saw reams of emails in which both Mr. Allen and Mr. Conti received and responded to manipulation requests.[2]  In addition, Messrs. Yagami, Stewart, and Robson testified uniformly and unequivocally that they and other traders made verbal and written submission requests to benefit trading positions.[3]  Government witness Paul Robson summarized the scheme when he admitted that the conspirators were taking "what was supposed to be an impartial market tool, and we were biasing our numbers . . . to help the traders and that was wrong."  (Tr. 342:10-14.).

The defendants' argument that "the Government's theory at trial was that Defendants committed fraud because they failed to disclose the influences *behind* their accurate LIBOR estimates" relies on the faulty premise that the government's case proceeded on an omissions theory.  Def. br. at 3.  Upon a defense motion and with the government's agreement,[4] however,

---

[1] *See, e.g.*, GX 101AA (Schluep to Allen & Conti); GX 101AD (Schluep to Conti); GX 101AF (Yagami to Allen, Conti & Paul Butler); GX 101AJ (Schluep to Allen); GX 101AM (Sliney to Allen); GX 101C (Schluep to Allen); GX 101E (Schluep to Allen); GX 101G (Schluep to Allen); GX 101I (Schluep to Conti); GX 101J (Schluep to Conti); GX 101L (Schluep to Conti); GX 101Q (Yagami to Allen & Conti); GX 101X (Schluep to Conti); GX 101Y (Schluep to Allen); GX 106B (Schluep to Conti); GX 115A (Yagami to Conti); GX 126 (Thompson to Allen); GX 128 (Yagami to Conti & Jeroen Beaard); GX 134 (Yagami to Conti, Robson, Butler & Damon Robbins); GX 152 (Schluep to Conti); GX 201A (Thompson to Robson); GX 701 (Stewart to Conti); GX 1001 (Schluep to Conti); GX 1601 (Stewart to Conti).

[2] *See, e.g.*, GX 101AA (Schluep to Allen & Conti); GX 101AF (Yagami to Allen, Conti & Paul Butler); GX 101AJ (Schluep to Allen); GX 101AM (Sliney to Allen); GX 101C (Schluep to Allen); GX 101E (Schluep to Allen); GX 101G (Schluep to Allen); GX101I (Schleup to Conti); GX 101Q (Yagami to Allen & Conti); GX 101Y (Schluep to Allen); GX 126 (Thompson to Allen).

[3] Stewart testimony: Tr. 186:17-19; 188:15-18; 191:9-11 189:14 – 190:9; 191:5-11; 192:1-15; 234:17 – 235:8; 283:9-11.  Robson testimony: Tr. 323:11-16; 324:2-24.  Yagami testimony: Tr. 688:17 – 689:5; 689:6 – 690:3; 702:9-12; 785:21-23.

[4] Tr. 1381:3-5 (Mr. Schachter: "[a]side from their recitation of the statutory language, this is not an omission case"); Tr. 1388:5 (striking the word "omission" from the jury charge).

the Court struck the word "omissions" from the jury charge defining "scheme to defraud" and instead instructed the jury only on "false or fraudulent pretenses, representations, or promises." Dkt. 146 at 16.   Rather than proceeding on an omission theory, the government alleged and proved that the defendants' LIBOR submissions contained both factual misrepresentations and implicit false statements.  As set forth below, the conspirators' LIBOR submissions were factual misrepresentations because they were not good faith estimates of Rabobank's borrowing costs. Moreover, each LIBOR submission made the implicit statement that the number submitted was calculated according to the British Bankers' Association's (BBA) definition; in fact, the evidence showed that the submissions reflected what Rabobank's traders needed to make money at the expense of another party.

The indictment alleged that the defendants' LIBOR submissions were false and fraudulent statements because they were not a good faith estimate of Rabobank's borrowing costs.  "The expression of an opinion not honestly entertained is a factual misrepresentation." *United States v. Autuori*, 212 F.3d 105, 119 (2d Cir. 2000) (quoting *United States v. Amrep Corp.*, 560 F.2d 539, 544 (2d Cir. 1977); *see also Virginia Bankshares, Inc. v. Sandberg*, 501 U.S. 1083 (1991) ("[a] statement of belief may be open to objection . . . as a misstatement of the psychological fact of the speaker's belief in what he says").  The jury saw a mound of evidence establishing that Rabobank's LIBOR submitters altered their submissions to suit traders' preferences.[5]  The defendants' assertion that the evidence did not show that their LIBOR

---

[5] Tr. 342:10-14 (Mr. Robson: we were taking "what was supposed to be an impartial market tool, and we were biasing our numbers . . . to help the traders and that was wrong"); GX 124B (Mr. Conti: "Today's LIBORs were on the high side from where they should've been, shall we say . . .today's was on the high side probably not specifically correctly . . . Yeah, even though I was five twenty as well just because Lee had a fixing. . . ."); GX 101A1 (Mr. Robson:"will be setting an obscenely high 1m again today"); GX 101AC (Mr. Allen: "we have some fixes and are going for 58, i think it could come in at 60"); GX 101AG (Mr. Conti: "I am low because ambass has

submissions were "factually inaccurate" is not a defense to this theory of liability because

opinions are not scientifically right or wrong – they are either honestly held or they are not.

Where the evidence proves that a defendant offered an opinion that was motivated by a

fraudulent or corrupt motive, the courts have excluded evidence offered to show that the

defendant's statement was defensible or even truthful.[6]  Hence, the question for the jury was

whether the defendants made LIBOR submissions that were not good faith estimates of

Rabobank's borrowing costs.  The jury saw evidence that the defendants changed their LIBOR

submissions in response to a trader's request and they were free to infer from this evidence that

the defendants LIBOR submissions were *not* accurate borrowing cost estimates, but rather that

they were manipulated numbers meant to accommodate Rabobank's derivative positions.[7]

---

fixing . . I go higher tomorrow"); GX 101M (Mr. Allen: "42, I think that's what Christian
needs"); GX 101N (Mr. Robson indicating that he would submit .090% rather than 0.88%
because "there's bigger crooks in the market than us guys!"); GX 101O (Mr. Conti: "the ambass
has big fixing so we help him today"); GX 106B (Mr. Conti agreeing that he would "drop the
ones a bunch" and indicating that "Damon and I are winking at each other because we've got
quite a lot in there…"); GX 111B (Mr. Conti: "so if it suits you for us to go a bit higher or a bit
lower, I'm sure that's uh, not a problem at all"); GX 401 (Mr. Conti: "seems to be 23 the shout
mate . . I can go lower if you like?"); GX 601A (Mr. Robson:"no prob mate – I can set it that
high. it will be quite funny to see the reaction!")

[6] *See United States v. Alfisi*, 308 F.3d 144, 150-52 (2d Cir. 2002) (quoting *United States v.
Manton*, 107 F.3d 834, 845-46 (2d Cir. 1939) (affirming the exclusion of evidence that a judicial
opinion authored by a corrupt judge was "in fact rightly decided")); *United States v. Vest*, 116
F.3d 1179, 1184 (7th Cir. 1997) ("[i]f in hindsight it turns out that, considering the patients' pre-
visit and post-visit records, the tests [the defendant] ordered *were* medically necessary, that is
merely a fortuitous coincidence.  It does not rebut the inference that [the defendant] had a
fraudulent intent when he ordered the tests with the data he had"); *see also United States v.
Helmsley*, 941 F.2d 71, 94 (2d Cir. 1991) (upholding mail fraud conviction where evidence
demonstrated that the defendant *intended* to defraud the State of New York of tax revenue, but
failed to prove that any taxes were actually due); *and cf. United States v. Litvak*, __ F.3d __,
2015 WL 8123714 at *16 (2d Cir. 2015) ("[w]hether the prices were 'fair' was not an element of
any of the crimes" charged).

[7] The fact that the government presented sufficient evidence to conclude that the defendants'
estimates of Rabobank's borrowing costs, as expressed through their LIBOR submissions, were
not honestly held distinguishes this case from *United States v. Finnerty*, in which the Second

In addition to being bad faith estimates, the defendants' LIBOR submissions made the implicit false statement that their numbers were responsive to the BBA's query, which called on Rabobank to estimate the rate at which it could borrow funds were it to do so.  As this Court stated, "[i]t's not the number per se that is the representation.  It is the freight that number carries.  And it is an implied representation that this number was arrived at according to the prescribed considerations."  Tr.1383:8-11; *see also United States v. Morgenstern*, 933 F.2d 1108, 1113 (2d Cir. 1991) (recognizing that fraud liability may attach to implicit statements).  The implicit statements that came with the defendants' LIBOR submissions were false because the numbers they submitted were not calculated according to the prescribed considerations, but were instead numbers that would help the bank make money.  For much the same reason, the evidence demonstrated that the defendants' scheme amounted to the perpetration of a false pretense. Rabobank enjoyed a privileged position on the BBA's LIBOR panel and with that privilege came the responsibility to answer the BBA's query honestly.  By making statements in response to the BBA's questions, the defendants held Rabobank out as a panel member that participated in the process in good faith.  This façade amounted to a false pretense because the defendants communicated to the financial markets that their LIBOR submissions were their perception of Rabobank's borrowing costs when in fact they were numbers that a trader wanted.

---

Circuit overturned the conviction of a stock specialist who engaged in the practice of "interpositioning." 533 F.3d 143, 150 (2d Cir. 2008).  The panel affirmed the district court's dismissal of the charges because the evidence showed only that Finnerty's trading may have violated a customer's unilaterally formed and privately held expectation that Finnerty would abide by the exchange's rules but did not establish "manipulation or a false statement."  *Id*. Unlike *Finnerty*, Messrs. Allen and Conti engaged in a scheme to manipulate an interest rate benchmark to which swaps were tied by making false statements about their view of Rabobank's borrowing costs.  Further unlike *Finnerty*, Messrs. Allen and Conti understood that their scheme, if successful, would have caused a loss to a counterparty.  Whereas Finnerty obtained stocks at the client's bid price – the client wanted a stock for $X and Finnerty provided it for $X – Allen and Conti understood that their scheme would allow them to profit at others' expense.

The defendants' argument that wire fraud requires the government to prove "convergence" – that is, the defendant made fraudulent misrepresentations directly to the injured party – fails as a matter of law because the plain language of a "scheme to defraud" does not require this showing and because, even if it did, the government proved convergence.  The Second Circuit has declined to adopt the "convergence" theory, *United States v. Eisen*, 974 F.2d 246, 253 (2d Cir. 1992), and courts in this district and elsewhere have rejected it.[8]  As the Fifth Circuit observed in *Christopher*, "[n]othing in the mail and wire fraud statutes requires that the party deprived of money or property be the same party who was actually deceived.  The phrase 'scheme or artifice . . . for obtaining money or property by means of false or fraudulent pretenses, representations, or promises' is broad enough to include a wide variety of deceptions intended to deprive another of money or property."  142 F.3d 46, 54 (1st Cir. 1998) (internal citation omitted).

Even if the text of 18 U.S.C. § 1343 required "convergence," viewing the evidence in a light most favorable to the government, a rational juror was free to infer that Thomson Reuters, the benchmark's publisher,[9] transmitted the rigged LIBOR rates to Rabobank's counterparties.  This is because the evidence established that market participants paid careful attention to LIBOR and because Rabobank's counterparties in particular made or received payments depending on

---

[8] *United States v. Chalmers*, 474 F.Supp. 2d 555, 563 n. 3 (S.D.N.Y. 2007); *Trautz v. Weisman*, 819 F.Supp. 282, 286 (S.D.N.Y. 1993); *United States v. Seidling*, 737 F.3d 1155, 1161 (7th Cir. 2013); *United States v. McMillan*, 600 F.3d 434, 441 (5th Cir. 2010); *United States v. Kennedy*, 64 F.3d 1465, 1476 (10th Cir. 1995); *United States v. Christopher*, 142 F.3d 46, 54 (1st Cir. 1998).

[9] Tr. 821-822 (stipulation that Thomson Reuters published the LIBOR rates internationally); *see also* GX 108D (a document viewed by both defendants which establishes at page 2 that LIBOR was calculated by Thomson Reuters and that it is "by far the most widely referenced interest rate index in the world").

where LIBOR set.  The fact that the defendants caused the rates to be published through

Thomson Reuters rather than transmitting them directly to Rabobank's counterparties makes no

difference for the purposes of assessing liability for participation in a scheme to defraud.  *Cf.*

*United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986) ("[c]ertainly appellants

understood that the interstate mailings and wirings associated with the publication and

distribution of the Wall Street Journal was 'a normal and customary part' of that business").  The

distinction between transmitting rigged LIBOR rates directly to a counterparty and making

submissions to a financial publisher is as hollow as the difference between yelling "fire" in a

crowded theater and yelling "fire" over the public address system of a crowded theater.

II.     **THE JURY HEARD SUFFICIENT EVIDENCE TO CONCLUDE THAT THE
        DEFENDANTS ACTED WITH INTENT BY MAKING LIBOR SUBMISSIONS
        THAT WERE CALCULATED TO HARM RABOBANK'S COUNTERPARTIES.**

        Messrs. Allen and Conti acted with an intent to defraud because they both understood

that Rabobank's counterparties would necessarily lose money if their scheme to manipulate the

LIBOR rate was successful.  When asked the question "and you understood that if the individual

on one side of an interest rate swap was manipulating LIBOR, the other side would lose

money?" Mr. Allen responded "Yes."  Tr. 1265:3-6.  And when confronted with the "LIBOR

bitch" email (GX 101E), Mr. Allen acknowledged that the document demonstrated that Christian

Schleup was attempting to manipulate LIBOR and opined that "I don't think that what

[Schleup's] doing is right, and therefore just leave it."  Tr. 1224:8-9.  Likewise, the evidence was

overwhelming that Mr. Conti made LIBOR submissions intended to help himself and his fellow

traders at the expense of others.[10]   All three cooperating witnesses testified that because swap

---

[10] *See, e.g.*., GX 1501 ("today I have fixing so am low on the 3 mth"); GX 1401 ("I'm higher
because we are long the fixing"). GX 101I (Schleup to Conti: "gotta make money somehow!");
GX 101AM ("6m high as possible.  Large reset here in NY").

trading is a zero-sum game in which their gain was somebody else's loss, they understood that LIBOR submissions calculated to improve Rabobank's trading positions constituted an unfair advantage.[11]  Because Messrs. Allen and Conti had the same information as Messrs. Robson, Yagami, and Stewart about the zero-sum nature of interest rate swaps, a rational juror was free to conclude that Mr. Allen and Mr. Conti came to the same realization as the cooperating witnesses: influencing LIBOR to help derivative positions gave Rabobank an unfair advantage that harmed other market participants.

There was also no dispute that both defendants understood that LIBOR was supposed to be an impartial estimate of Rabobank's borrowing costs and that a trader's preference had no place in this analysis.  Mr. Allen stated repeatedly on direct examination that a trader's position was "not relevant" to the calculation of LIBOR[12] and wrote in an email to Paul Thompson that "the definition states where you think you could get cash, not actually where it is offered."  GX 101P.  In two separate telephone calls, Mr. Allen told a representative of the BBA that Rabobank's LIBOR submissions reflected the bank's perception of where it could borrow cash; that Mr. Allen chose not to elaborate that Rabobank was making submissions calculated to benefit trading positions – which is what Rabobank was doing – was powerful evidence that he understood this practice to be wrongful.  GX 109B and 110B.

Similarly, Mr. Conti confirmed his understanding of the definition of LIBOR when he stated on a telephone call (GX 108B) that LIBOR is "a benchmark where those sixteen banks

---

[11] Tr. 341:23-25 (Mr. Robson: "[b]ecause of this we were helping the traders with their positions and, obviously, there was somebody on the other side of this and it would be to the detriment of them"); Tr. 252: 20-25 (Mr. Stewart: "[t]he counterparty would have the opposite position so it would help me hinder them. . . I suppose we were [trying to trick Rabobank's counterparties], yeah"); Tr. 697:18-19 (Mr. Yagami: "it was unfair advantage.  And if I make money by manipulating LIBOR, that means the other party lost money").

[12] *See, e.g.* Tr. 1204:19-22; 1206:13-14; 1208:22; 1303:12-13; 1303:22-23.

perceive they can be funded . . . It's not a rate where everyone can get funded.  It's a rate where

they perceive they can get funded."  Notably, during this call Mr. Conti described as "a good

piece" a BBA publication (GX 108D) which clearly articulated the definition of LIBOR and

expressed no surprise that the BBA re-affirmed that LIBOR was supposed to represent a good

faith estimate of borrowing costs.

III.    **TESTIMONY FROM THE CONSPIRATORS AND THE
COUNTERPARTIES, AS WELL AS EVIDENCE ESTABLISHING THAT
THE LIBOR RATE EFFECTED THE PROFITABILITY OF INTEREST
RATE SWAPS, ESTABLISHED THE MATERIALITY OF THE SCHEME.**

Testimony offered by Rabobank's counterparties establishes that the defendants' explicit

and implicit misrepresentations and half-truths related to a material fact, "that is, information that

a reasonably prudent person would consider important in making a decision to part with money

or property."  Dkt. 146.  Timothy Smith, the Treasurer of Dean Foods, provided particularly

compelling testimony:

> **Q.** Mr. Smith, there is an allegation that defendants in this case manipulated the
> LIBOR rate.  . . .  If this allegation were proven to be true, would that have been
> information that you would want to have known at the time you were doing these
> swaps?
> **A.** Yes.
> **Q.** Why?
> **A.** Because it speaks to integrity and the sanctity of the market that you are
> dealing with.
> **Q.** Do you perceive an advantage or a disadvantage if a party to a swap has the
> capability of moving the LIBOR rate?
> **A.** I would say an advantage to that party.
> **Q.** If you had known about this allegation if it were true, would you have
> considered acting differently at the time you did these swaps?
> **A.** Yes.
> **Q.** What would you have considered doing?
> **A.** Depending on the severity of the situation, you have alternative forms of
> financing outside of this type of financing and protecting your interest rate
> exposure through different means.

Tr. 499:12 – 500:12.  Tracey Twomey, the Treasurer of Superstore Industries, also provided the jury with powerful evidence: "[i]f there was a potential for Rabobank to manipulate the interest rate, then we probably wouldn't have entered into [the swap with Rabobank] because if the interest rate could have been manipulated higher or lower, we wouldn't have wanted to be involved in it."  Tr. 827:24 – 828:2.  Likewise, Michael DiTore, a former senior swaps trader at Lehman Brothers, explained to the jury that a counterparty's ability to manipulate LIBOR would put him at an informational disadvantage and, as a result, he would be less likely to enter into a trade with such a counterparty.  Tr. 837:25 – 838:1.

Testimony provided by former Rabobank traders also establishes the materiality of the scheme.  Mr. Allen, for example, acknowledged that knowledge of the scheme likely would have caused counterparties to act differently:

> **Q.** Counterparties would not have entered into interest rate swaps with Rabobank if they knew that there were traders trying to manipulate the rate, the LIBOR setting rate?
> **[Court:]** Was that your understanding?
> **Q.** Was that your understanding?
> **A.** Yes.
> **Q.** And that would include financial institutions? They wouldn't want to enter into these interest rate swaps, is that right?
> **A.** I presume not.
> **Q.** Because they would feel they are at an unfair advantage?
> **A.** That's correct.

Tr. 1278:12-23.  Messrs. Stewart, Robson, and Yagami also provided testimony that they hid the scheme from their counterparties.  Tr. 253:1-5 (Stewart did not advise counterparties that he attempted to influence LIBOR); Tr. 414:16-17 (Robson did not advise counterparties of the manipulation "because they would have been aggrieved about it.  They wouldn't have been very happy about it"); Tr. 697:10-19 (Yagami did not advise counterparties of the manipulation

"because it was an unfair advantage.  And if I make money by manipulating LIBOR, that means the other party lost the money").

The defendants' materiality challenges have two fatal flaws.  <u>First</u>, their challenges to materiality are based entirely on the testimony of the counterparty witnesses, which is a problem for the defendants because on this record there was sufficient evidence to support the jury's verdict on materiality even without reference to the counterparties' testimony.  This is because the testimony of the former Rabobank traders (especially including Mr. Allen) in conjunction with the undisputed evidence that movements in LIBOR necessarily and inherently affected the profitability of the swaps, without more, established the materiality of the scheme.

The defendants' <u>second</u> problem is that their argument that the scheme did not start until after the counterparty witnesses executed their swaps is factually inaccurate.  The jury saw evidence that the scam was in full swing before Superstore Industries executed its swap on September 16, 2005 (GX 112D); Dean Foods executed its swap on May 9, 2007 (GX 12B); and Lehman Brothers executed a series of its swaps (GX 202 – June 23, 2006; GX 302A – March 4, 2008; and GX 502B – February 29, 2008).[13]  Regardless of when the swaps were executed, the "fixing dates" determined how much money changed hands, and as the following table demonstrates, the jury saw evidence that the defendants schemed to manipulate LIBOR for the pertinent currencies and tenors while the counterparties' contracts were in effect.

---

[13] *See, e.g.* GX 101AM (chat between Allen, Conti, and Stewart dated August 2, 2005); GX 701 (chat between Stewart and Conti dated September 2, 2005); GX 1001 (chat between Conti and Schleup dated October 31, 2006); GX 1101A (chat between Robson and Thompson dated November 9, 2006)

| Counterparty | Swap Exhibit | Fixing Date | Incriminating Communication | Tenor | Counterparty Pays or Receives LIBOR |
|---|---|---|---|---|---|
| Superstore Industries | 112D | 11/29/2006 | 101AJ | 1-month | Receives LIBOR |
| Lehman Brothers | 202 | 12/14/2006 | 201A-C | 6-month | Receives LIBOR |
| Lehman Brothers | 302A | 2/27/2008 | 301 | 1-month | Pays LIBOR |
| Lehman Brothers | 502B | 4/23/2008 | 501 | 1-month | Pays LIBOR |

At any rate, while the counterparty representatives did not say expressly that they would have attempted to exit the swap had they known of the fraud, construing the evidence in a light most favorable to the government, the jury could have fairly inferred as much from the witnesses' testimony that they would not have done the swaps had they known of the scheme. This inference is especially strong with regard to Ms. Twomey, who testified that she "probably wouldn't have entered into [the swap] because if the interest rate could have been manipulated higher or lower, we wouldn't have wanted to be involved with it." Tr. 827-828. Ms. Twomey also testified that, given the losses that Superstore Industries sustained in connection to the transaction, she elected to buy out of the swap in 2012 by paying Rabobank $4.5 million and the jury could have reasonably inferred that Ms. Twomey would not have made this decision had she known of the crime. Tr. 827:11-17. The defendants' argument also mistakenly assumes that the counterparties were looking at any one trade in isolation. The jury was free to infer from the counterparties' testimony that, had they known of the defendants' scheme to manipulate LIBOR, they would have adjusted both future and past trades. Tr. 837:25 (DiTtore: "I would be less inclined to trade with someone that had more information than me"); Tr. 500:7-10 (Smith:

"[d]epending on the severity of the situation, you have alternative forms of financing outside of this type of financing and protecting your interest rate exposure through different means").

Even if the evidence established that the scheme began after the counterparties executed the swaps – which it did not – this fact would be of no consequence because materiality does not require a showing that the victims would have acted differently if she had known of the fraud. Indeed, the Second Circuit has held that "a misrepresentation is material if it is capable of influencing the decisionmaker, no matter what the victim decides to do." *United States v. Corsey*, 723 F.3d 366, 373 n.3 (2d Cir. 2013). The Second Circuit has also observed that the requirement that the scheme be calculated to deceive a person of ordinary prudence "focuses on the violator, not the victim," and that the role of this element is to "assure that the defendant's conduct was calculated to deceive. . . ." *See United States v. Thomas*, 377 F.3d 232, 243 (2d Cir. 2004); *see also United States v. Trapilo*, 130 F.3d 547, 552 (2d Cir. 1997) ("the identity and location of the victim, and the success of the scheme, are irrelevant").

Because the role of the materiality element is to ensure that the defendant *intended* to deceive the victim about something important, whether or not the counterparties were in a position to void the swaps is not important. *See United v. Blixt*, 548 F.3d 882, 889 (9th Cir. 2008) ("a misrepresentation may be material without inducing any actual reliance. What is important is the intent of the person making the statement that it be in furtherance of some fraudulent purpose") (internal quotation omitted). In any event, testimony from any Rabobank counterparty – even those counterparties who executed the swaps before the scheme began – is probative of materiality, which is an *objective* standard that is assessed from the perspective of a *reasonably prudent* counterparty, not just *particular* counterparties who were in a position to do something different. *Cf. Amgen Inc v. Connecticut Retirement Plans and Trust Funds*, 133 S. Ct.

1184, 1189 (2013) ("because materiality is judged according to an objective standard, it can be proved through evidence common to the class").

Finally, the defendants' argument that the counterparties' testimony was "irrelevant to [the government's] theory of the case" because the government did not define "manipulation" when examining the materiality witnesses is not well taken because it is clear from the record that the witnesses understood the questions put to them.  A review of the transcript makes clear that the government articulated the meaning of "manipulate" in the premise of its questions  by using phrases such as "to [Rabobank's] advantage" (Tr. 827); "to benefit trading positions" (Tr. 836); and "moving the LIBOR rate" (Tr. 499).  Not one of the three counterparty witness asked the prosecutor for clarification as to the meaning of the word "manipulation" and the answers they gave in response made clear that they understood the questions put.  *See* Tr. 827-28 (Ms. Twomey); Tr. 499-500 (Mr. Smith); Tr. 836-37 (DiTore).  Not even Mr. Allen was confused by the word "manipulation."  When asked to agree that "counterparties would not have entered into interest rate swaps with Rabobank if they knew that there were traders trying to manipulate the rate," Mr. Allen did not ask for clarification but instead responded "yes."  Tr. 1278:12-17.

During the cross-examination of Mr. DiTore, counsel for Mr. Conti explained to the Court at sidebar that he intended to elicit testimony regarding how the witness defined "manipulation," to which the Court replied, "you can ask him what do you understand manipulation to be in this context.  That would be fine."  Tr. 841:17-18.  After the conclusion of the side bar, defense counsel elected not to explore the witness's understanding of the word "manipulation," but decided instead to ask a wildly objectionable question about why Lehman Brothers collapsed in 2008.  Tr. 842:16.  Defense counsel made a tactical decision not to explore

the witness's understanding of "manipulation" because it was clear from the testimony that every

witness understood that the word described making submissions to assist trading positions.

IV.   **WIRE TRANSMISSIONS WHICH PUBLISHED THE LIBOR RATE, THEREBY ADVISING RABOBANK'S COUNTERPARTIES OF HOW MUCH MONEY THEY OWED UNDER THE SWAPS, WERE "IN FURTHERANCE" OF THE SCHEME REGARDLESS OF WHETHER THE WIRES THEMSELVES CONTAINED FALSE INFORMATION.**

Every business day, Thomson Reuters, a media company under contract with the BBA to

calculate the LIBOR benchmarks, published the LIBOR "fixing" by transmitting the information

from London, England to users in New York, New York.  Tr. 821-822 (explaining the process

through which Thomson Reuters published the LIBOR fix).  These wires, which form the basis

of counts six through nineteen, were done "in furtherance" of a scheme to rig the rate because,

without publication, Rabobank's counterparties would not of known whether, or how much

money, to pay under the swaps.[14]  The defendants' argument that there was no "evidence

demonstrating that the information transmitted by Thompson [sic] Reuters was false or

fraudulent," even if it were true, is not a defense to wire fraud because, for liability to attach

under a federal fraud statute, the mailing or the wire need only have been "a step in the plot,"

*Schmuck v. United States*, 489 U.S. 705, 710-11 (1989), and need not contain fraudulent

information.  *See United States v. Tocco*, 135 F.3d 116, 125 (2d Cir. 1998).

Nor is the defendants' observation that Thomson Reuters "was compelled, under contract

with the BBA, to publish the overall LIBOR each day" of any moment because mailings and

wires required by law may still establish the jurisdictional element of a federal fraud prosecution.

*United States v. Helmsley*, 941 F.2d 71, 95 (2d Cir. 1991) (mailing of a tax return); *United States

v. Whitfield*, 590 F.3d 325, 355 (5th Cir. 2009) (mailing of summons and complaint by clerk of

---

[14] The defense does not dispute that the wires underlying counts two through five, in which Rabobank received or paid money to its counterparties, were made in furtherance of the scheme.

court).  That every former Rabobank trader to testify understood that Rabobank traded with American counterparties who had an interest in LIBOR proves that the transmission of these wires was foreseeable.  *Cf. United States v. Carpenter*, 791 F.2d 1024, 1035 (2d Cir. 1986) ("[c]ertainly appellants understood that the interstate mailings and wirings association with the publication and distribution of the *Wall Street Journal* was 'a normal and customary part' of that business.  Although the mailings and wirings did not result from the fraud itself, we agree . . . that their foreseeability and centrality to the scheme were sufficient predicates . . . .") (internal citations omitted).

V.     **A SCHEME THAT INFLUENCES A FINANCIAL INSTITUTION TO MAKE DIFFERENT INVESTING DECISIONS NECESSARILY AND DIRECTLY "AFFECTS" THAT INSTITUTION, THEREBY SATISFYING THE LOW BAR SET FORTH IN THE STATUTE OF LIMIATIONS.**

The defendants' scheme "affected" several financial institutions for the purposes of 18 U.S.C. § 3293 by manipulating the LIBOR rate in a direction that would have caused a loss to Bank of America, Citibank, JP Morgan Chase, Morgan Stanley, PNC Bank, U.S. Bank, and Wachovia.  *See* Tr. 815 (stipulating to insured status).  The Court instructed the jury that a financial institution – for convenience referred to as a "bank" – was directly affected for purposes of § 3293 if the scheme "created an increased risk of loss for that bank or that the investment decisions of that bank would have been different if the bank had known of the fraud."  Dkt. 146 at 20-21.  Evidence of the impact that the scheme had on counterparties across the country is too voluminous to recreate here, but the table below shows examples of instances in which Rabobank traders schemed to manipulate LIBOR in a manner that would have required a federally-insured counterparty to pay more money to (or receive less money from) Rabobank.  The "fixing dates" were set forth in a stipulation marked as GX 103E.

| Counterparty | Swap Exhibit | Fixing Date | Tenor | Rabobank's Position | Pertinent Scheming Communication |
|---|---|---|---|---|---|
| Citibank | GX 402 | 1/24/2008 | 1m USD | Paying LIBOR | GX 401 ("I can go lower if you like") |
| U.S. Bank | GX 112F | 11/29/2006 | 1m USD | Paying LIBOR | GX 101AJ ("low 1s high 3s please") |
| J.P. Morgan | GX 602F | 3/19/2008 | 6m JPY | Receiving LIBOR | GX 601A ("moto man would like 6m to be higher today") |

Notwithstanding evidence showing that the conspirators intended to defraud a number of federally-insured institutions with which Rabobank had contractual privity, the defendants assert that it was error for the district court to instruct the jury that a financial institution is affected if its investment decisions would have been different if it had known of the fraud.  Def. br. at 20.  The Second Circuit has noted that FIRREA "broadly applies" to actions that "effect a financial institution," *see United States v. Bouyea*, 152 F.3d 192, 195 (2d Cir. 1998), and has held that "the verb 'to affect' expresses a broad and open-ended range of *influences*."  *United States v. Heinz*, 790 F.3d 365, 367 (2d Cir. 2015) (emphasis added) (quoting *United States v. SKW Metals & Alloys, Inc.*, 195 F.3d 83, 90 (2d Cir. 1999)).  "While Congress certainly could have extended the limitations period only when wire fraud 'causes a loss' to a financial institution, it chose instead to use the considerably broader term 'affects.'  And that means simply to 'make a material impression on; to act upon, *influence*, move, touch, or have an effect on,' I Oxford English Dictionary 211 (2d ed. 1989) . . . ."  *United States v. Mullins*, 613 F.3d 1273, 1278 (10th Cir. 2010) (emphasis added).

The Court's instruction also advanced the legislative purpose of the section 3293, which "is to protect financial institutions, a goal it tries to accomplish in large part by deterring would-be criminals from including financial institutions in their schemes."  *United States v. Serpico*, 320 F.3d 691, 694 (7th Cir. 2003).  It stands to reason that this legislative goal is served by

deterring fraud schemes that would cause a bank to act differently.  Accordingly, there was no error in the Court's instructions to the jury.

The defendants' alternative argument that there was insufficient evidence to conclude that Rabobank's federally-insured counterparties would have made different investment decisions had they known of the fraud overlooks the fact that the jury saw evidence that the conspirators schemed to move LIBOR in a direction that would have caused federally-insured financial institutions to pay more money to (or receive less money from) Rabobank.  From this fact alone, the jury could have inferred that the federally-insured institutions on the other end of Rabobank's swaps would have made different decisions had they known of the scheme.  The defendants' criticism that "[t]he three counterparty witnesses who testified at trial did not work for FDIC-insured financial institutions," def. br. at 21-22, draws a distinction without a difference because all of Rabobank's counterparties – FDIC-insured and otherwise – were similarly situated by virtue of the fact that they all traded precisely the same kind of "plain vanilla" interest rate swaps.[15]  Hence, the jury was free to infer that the testimony provided by the non-insured counterparty witnesses called by the government was probative of whether a similarly-situated FDIC-insured entity would have made a different investment decision.

The defendants' argument that the United States failed to prove an effect on a financial institution because it did not present testimony from a representative of an FDIC-insured entity violates an agreement that the parties reached on October 21, 2015 (five days before the government rested).  In an effort to conserve the Court's resources, the parties spent a significant amount of energy negotiating stipulations pertaining to undisputed issues.  In that spirit, the

---

[15] Indeed, all of the swap contracts at issue used the same form and referenced the same stock International Swaps and Derivatives Association (ISDA) language.  *Compare* GX 112D (Superstore Industries swap contract) *with* GX 402 (Citibank swap contract).

government advised defense counsel in an email exchange that occurred on October 21, 2015, that it was considering removing from its witness list representatives of Citibank, N.A., J.P Morgan Chase Bank, N.A., and Bank of America, N.A., all of which are federally-insured entities.  As the email exchange attached hereto as Exhibit A confirms, the parties struck the following bargain: the United States would forego calling these witnesses if defense counsel agreed not to cite the absence of this testimony in support of an argument that the government failed to prove materiality and effect on a financial institution.  In making this argument, defense counsel appears to have overlooked this email exchange, but to the extent that the argument was not an oversight, the government should not be penalized for conserving judicial resources after receiving assurances from the defense.

The defendants' fallback argument that a number of substantive counts should be dismissed because the evidence did not show that a federally-insured financial institution had a LIBOR-based position on the particular day that the conspirators manipulated the benchmark ignores the fact that 18 U.S.C. § 3293(2) requires proof that the "offense" – not a specific act or wire – affected a financial institution.  The "offense" proscribed by 18 U.S.C. § 1343 is a "scheme to defraud."  *United States v. Martin*, 411 F.Supp. 2d 370, 372-73 (S.D.N.Y. 2006) (scheme to rig a horse raise constitutes wire fraud).  For this reason, each of the 18 counts of wire fraud alleged against the defendants were simply different wire communications made in furtherance of the same scheme and not 18 stand-alone crimes.  The ten-year statute of limitations applies to each individual count, even if a financial institution was not affected by the facts underlying that count, as long as the scheme as a whole affected a financial institution.  *United States v. Martinez*, No. 98-1438, 1999 WL 38842, at *2 (2d Cir. 1999) ("[T]he extended statute of limitations provision requires only that the 'offense' – meaning the

entire scheme – affect the financial institution, not that individual mailings do so."); *United States v. Rubin/Chambers*, 831 F. Supp. 2d 779, 783 (S.D.N.Y. Dec. 14, 2011) ("[T]he only necessary evidence is that evidence sufficient to connect the purported effect to the fraudulent scheme as a whole rather than to particular overt acts.").  Because the scheme affected several financial institutions, as shown above, the defendants' back-up argument should be rejected.

## VI.  THE DEFENDANTS' PROSECUTION IN THE UNITED STATES DOES NOT VIOLATE THE FIFTH AMENDMENT'S DUE PROCESS CLAUSE.

Defendants argue for the first time that their prosecution is "barred" by the Fifth Amendment's Due Process Clause because the Government's supposedly "extraterritorial" application of the wire fraud statute against them failed to establish (1) a "sufficient nexus" between their conduct and the United States, or (2) that they "received fair notice" of their conduct's criminal nature.  Defs. br. at 28.  These tardy arguments are meritless.

### A.  Defendants' Arguments Are Misplaced Because Their Prosecution Does Not Involve an Extraterritorial Application of 18 U.S.C. § 1343.

The defendants' due process arguments hinge on an underlying assertion that their prosecution involves an "extraterritorial" application of "a federal criminal statute," namely 18 U.S.C. § 1343.  *Id.*  But there is no extraterritoriality in this case.  The indictment against the defendants alleged, and the jury found, that their manipulation scheme harmed counterparties in the Southern District of New York —a *domestic* criminal violation based on the defendants' use of U.S. wires to further their fraudulent scheme.[16]

---

[16] The Government presented ample evidence of the defendants' use of U.S. wires, including wires used to settle payments under the swap contracts, which traveled in and out of New York, Tr. 819:4-7, and wires used to publish the LIBOR rate to subscribers in New York.  Tr. 822:1-3.  The indictment alleged that these wires originated or terminated in New York, New York.  Dkt. 62 at para. 148, 150, 152, 154, 156.

It is well established that application of the wire fraud statute to foreign fraudulent conduct involving the use of U.S. wires "does not give [the statute] 'extraterritorial effect.'" *Pasquantino v. United States*, 544 U.S. 349, 371 (2005). The "domestic element" of foreign fraudsters' use of U.S. wires is "what the Government is punishing" in pursuing wire fraud charges. *Id.*; *see also United States v. Kim*, 246 F.3d 186, 191 (2d Cir. 2001) (noting that Congress's legislative concern in enacting the wire fraud statute was "to prevent the use of [U.S. wires] in furtherance of fraudulent enterprises"); *United States v. Trapilo,* 130 F.3d 547, 552 (2d Cir.1997) ("[W]hat is proscribed is use of the telecommunications systems of the United States in furtherance of a scheme.").[17]

For this reason, the Second Circuit consistently has rejected foreign defendants' attempts to evade prosecution under Section 1343 on the basis of arguments alleging the statute's improper "extraterritorial" application. *See, e.g.*, *Kim*, 246 F.3d at 189-90 (affirming wire fraud conviction of defendant who executed foreign fraud on foreign victim in which innocent parties sent and received wires); *United States v. Gilboe,* 684 F.2d 235, 236-37 (2d Cir.1982) (holding that wire communications to New York in furtherance foreign fraud with "no detrimental effects" in the United States were "clearly sufficient to sustain jurisdiction on th[e] offense," because "jurisdiction under § 1343 is satisfied by defendant's use of the wires to obtain the proceeds of his fraudulent scheme").

---

[17] In requiring the use of U.S. wires—and thus incorporating an expressly domestic element—Section 1343 stands in contrast to other criminal statutes which do not necessitate such a tangible link to the United States and thus may in some situations plainly apply extraterritorially. The cases cited by defendants to advance their due process arguments all involve such applications of other statutes. *See, e.g.*, *United States v. Al Kassar*, 660 F.3d 108, 116-18 (2d Cir. 2011) (rejecting the due process arguments of a foreign defendant charged with various conspiracy charges for foreign arms sales); *United States v. Umeh*, 527 Fed. Appx. 57, 63 (2d Cir. 2013) (rejecting the due process arguments of a foreign defendant convicted on drug conspiracy charges for entirely foreign conduct). Those cases are thus distinguishable from the situation here.

Moreover, in a directly analogous case, another trial court of this district recently concluded that the wire fraud prosecution of a foreign Yen LIBOR manipulator alleged only "a domestic application" of Section 1343, and thus was free from asserted due process concerns. *United States v. Hayes*, __ F. Supp. 3d __, 2015 WL 4620254, at *6 (S.D.N.Y. Aug. 3, 2015). Rejecting the very arguments advanced by defendants in this case, the trial court in *Hayes* determined that the alleged use of "United States wires" to "manipulate the LIBOR for Yen" was sufficient to secure jurisdiction and dispense with any claims of "extraterritoriality." *Id.*

Accordingly, because the Government alleged and established that the defendants here used, or caused the use of, U.S. wires in furtherance of their fraudulent scheme, it relied only on a domestic application of Section 1343 over which the Court indisputably had jurisdiction. The defendants' due process assault on the "extraterritoriality" of their prosecution is thus misguided and should be rejected.

**B.      A Sufficient Nexus Exists Between Defendants and the United States.**

Even if defendants' prosecution involved an extraterritorial application of Section 1343, their actions had sufficient effects in the United States and on U.S. entities—about which they knew—to alleviate any due process concerns.

The Second Circuit stated in *United States v. Yousef* that "to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." 327 F. 3d 56, 111 (2d Cir. 2003) (quoting *United States v. Davis*, 905 F.2d 245, 248-49 (9th Cir. 1990)), and rejecting the defendants' due process claim). The Second Circuit articulated and applied the same principle in *United States v. Al Kassar*, 660

F.3d 108, 118 (2d Cir. 2011) (holding, as in *Yousef*, that the required nexus had been demonstrated).[18]

"For non-citizens acting entirely abroad," a sufficient "jurisdictional nexus exists when the aim of that activity is to cause harm inside the United States or to U.S. citizens or interests." *Kassar*, 660 F.3d at 118.  To establish that a defendant aimed to cause harm inside the United States or to U.S. persons, the Government need only show an "understanding" (*id.*) by the defendant that his actions would harm Americans or "could be expected to or did produce an effect in the United States."  *United States v. Yousef*, No. S3 08 Cr. 1213 (JFK), 2010 WL 3377499, at *4 (S.D.N.Y. Aug. 23, 2010)).  The Government need not, as defendants assert, prove a "substantial, direct and foreseeable" effect on the United States.  Def. br. at 29.  Indeed, another court of this district has held that "a 'substantial intended effect' in or on the United States *is sufficient but not necessary* to justify the extraterritorial application of federal criminal law," *Yousef*, 2010 WL 3377499, at *4 (emphasis added), and the Second Circuit repeatedly has found a "sufficient nexus" for due process purposes in circumstances where no "substantial, direct and foreseeable" effect was proven.  *See, e.g.*, *United States v. Umeh*, 527 Fed. Appx. 57, 63 (2d Cir. 2013) (holding that nexus requirement was satisfied where jury found that "each

---

[18] The Second Circuit's position is notably far from well-established.  Indeed, the First, Third, and Fifth Circuits have expressly rejected the "nexus" requirement, holding that due process is satisfied as long as application of a statute is not "arbitrary or fundamentally unfair."  *See, e.g., United States v. Suerte*, 291 F.3d 366, 375-76 (5th Cir. 2002); *United States v. Perez-Oviedo*, 281 F.3d 400, 402-03 (3d Cir. 2002); *United States v. Cardales*, 168 F.3d 548, 552-53 (1st Cir. 1999); *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056-57 (3d Cir. 1993).  And, in the Ninth Circuit, the "nexus" requirement does not apply in all cases. *See, e.g., United States v. Caicedo*, 47 F.3d 370, 373 (9th Cir. 1995) (holding that a nexus is not required for prosecutions under the Maritime Drug Law Enforcement Act involving "stateless vessels"); *accord United States v. Perlaza*, 439 F.3d 1149, 1167-68 (9th Cir. 2006).  Thus, while the Government does not question the force of Second Circuit authority in this Court, it asserts for preservation purposes that the nexus requirement established in *Yousef* is not a necessary component of due process.

defendant joined a conspiracy *knowing* that the cocaine to be trafficked would reach the United States") (emphasis added); *United States v. Ahmed*, 10 CR. 131 (PKC), 2011 WL 5041456, at *1 (S.D.N.Y. Oct. 20, 2011) (denying motion to dismiss on jurisdictional grounds despite absence of allegation that "the defendant engaged or intended to engage in specific acts either within the United States or directed at its citizens or property").[19]

The jury here heard extensive evidence establishing the defendants' understanding that their fraudulent conduct could, and did, produce harmful effects in the United States. Specifically, New York based traders Christian Schleup and Justin Sliney played an active role in the conspiracy.[20]  One of the objects of the conspiracy was to manipulate the LIBOR for the U.S. Dollar currency, which makes this case an easier call than *Hayes*, which was limited to the JYP currency.  And finally, every Rabobank trader who testified on the subject acknowledged understanding that Rabobank had swap counterparties in the United States.  Tr. 168:17-169:5 (Stewart); Tr. 308:7-20 (Robson); Tr. 1264:9-20 (Allen).

---

[19] The inapposite "substantial, direct and foreseeable" standard is from the Restatement (Third) of Foreign Relations Law, which recommends that a nation state consider "the extent to which [an] activity takes place within [its] territory, or has substantial, direct, and foreseeable effect upon or in the territory" before exercising prescriptive jurisdiction.  Restatement (Third) of Foreign Relations § 403(2)(a) (ALI 1987).  The Seventh Circuit in *In re Hijazi* (*see* Defs. Br. 29), merely recommended this standard as one for a trial court to consider in weighing whether a defendant's conduct had a sufficient nexus to the United States to allow for his prosecution.  *See* 589 F.3d 401, 412 (7th Cir. 2009).  However, even assuming the Restatement standard were applicable, defendants' knowledge and conduct would satisfy it, as the standard has been interpreted to require only "knowledge" of an effect in or on the United States.  *See United States v. Hijazi*, 845 F. Supp. 2d 874, 884 (C.D. Ill. 2011) (ruling that defendant's "knowledge that the United States was the ultimate payor" on a fraudulently inflated contract was "sufficient to establish that [his] actions were intended to have a substantial effect on the United States").

[20] *See*, *e.g.*, GX 101AM (Mr. Sliney to Mr. Allen, who in turn forwarded to Mr. Conti: "can you please set tomorrow's 6mL as high as possible?  Have a large reset here in NY"); Tr. 1205:13-21 (Mr. Allen admitting that Schleup and Sliney worked in New York and expressed LIBOR preferences); Tr. 178:3-10 (Stewart testifying that Schleup and Sliney worked in New York).

24

### C.       Defendants Had Sufficient Notice That Their Conduct Was Criminal.

Defendants argue that they did not receive the Fifth Amendment's required "fair warning" that "their conduct could expose them to criminal liability" because that they did not know it was illegal to "manipulate" LIBOR submissions to benefit Rabobank's swap positions at counterparties' expense.  Def. Br. 30.  That argument is contrary to the many facts establishing that the defendants understood their actions to bear the hallmarks of fraud.

Fair warning requires only that defendants "reasonably understand that their conduct was criminal and would subject them to prosecution somewhere."  *Al Kassar*, 660 F.3d at 119.  The crime of fraud is ancient and universal.  "[I]t is as old as falsehood and as versable as human ingenuity."  *United States v. Altman*, 48 F.3d 96, 102 (2d Cir. 1995) (internal quotations omitted).   As set forth in Section II, *supra*, evidence presented at trial showed that the defendants knew their manipulated LIBOR submissions (1) considered trading preferences that lacked any honest relation to their assessment of lending rates, and (2) would deprive Rabobank's swap counterparts of revenue from certain trades.  Defendants' knowledge of these facts provided them with sufficient notice under the Fifth Amendment that their conduct was criminal.  *Cf. Hayes*, 2015 WL 4620254, at *6 (holding in similar LIBOR-manipulation case that defendants had fair warning that their conduct was criminal).  The Court accordingly should reject the defendants' due process challenge to their prosecution.


ANDREW WEISSMANN                                    JEFFREY D. MARTINO
Chief, Fraud Section                                        Chief, New York Office

/s Brian R. Young
CAROL SIPPERLY                                          MICAHEL T. KOENIG
Senior Litigation Counsel                               Trial Attorney
BRIAN R. YOUNG                                          U.S. Department of Justice
Assistant Chief                                              Antitrust Division

U.S. Department of Justice                    450 5th Street, N.W.
Criminal Division                             Washington, D.C., 20001
1400 New York Ave., NW                        (202) 616-2165
Washington, D.C. 20005
(202) 616-3114

Dated: December 15, 2015