UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA            :

    -v-                             :          S1 14 Cr. 272

                                    :          OPINION AND ORDER

                                    :
ANTHONY ALLEN, ANTHONY CONTI, et al. :

    Defendants.                     :
------------------------------------x

JED S. RAKOFF, U.S.D.J.

On October 16, 2014, defendants Anthony Allen and Anthony Conti were charged in a Superseding Indictment with conspiracy to commit wire fraud and bank fraud, as well as several substantive counts of wire fraud. See Superseding Indictment, Dkt. 24. On July 17, 2015, defendants moved, pursuant to Kastigar v. United States, 406 U.S. 441 (1972), to dismiss the Superseding Indictment or, in the alternative, to suppress the testimony of Government cooperator Paul Robson and "all evidence derived from Mr. Robson's testimony." See Memorandum of Law in Support of Defendants' Motion to Dismiss the Superseding Indictment on Kastigar Grounds ("Defs. Br."), Dkt. 76, at 1.[1] Defendants claimed, in a nutshell, that the testimony they were compelled to give to the United Kingdom's Financial Conduct Authority tainted the U.S. Government's case against them,

---

[1] There have been multiple rounds of briefing on defendants' Kastigar motion. The Court refers to the briefs filed by the parties in July and August 2015 as "Defs. Br.," "Gov't Opp. Br.," and "Defs. Reply Br."; to the briefs filed simultaneously in January 2016 after the Kastigar hearing as "Defs. Post-Hearing Br.," "Gov't Post-Hearing Br.," and "Gov't Opp. Post-Hearing Br."; and to the briefs filed in December 2015 and January 2015 in connection with defendants' motion to compel additional Kastigar-related discovery (denied on Jan. 7, 2016) as "Defs. Discovery Br.," "Gov't Opp. Discovery Br.," and "Robson Opp. Discovery Br." The full names of all these briefs, as relevant, are identified in this Opinion.

particularly as a result of the review of this testimony by Mr. Robson, who subsequently cooperated with the Government and testified at the defendants' trial. The Government, according to defendants, had the "affirmative duty" to prove, pursuant to Kastigar v. United States, that "the evidence it proposes to use is derived from a legitimate source wholly independent of the compelled testimony." Because the Government allegedly could not meet that burden, the Court, according to defendants, had to dismiss the indictment or suppress Mr. Robson's testimony and evidence derived from that "testimony."[2] See Defs. Br. at 9-10, 17; Kastigar, 406 U.S. 441 at 460.

On September 7, 2015, following the initial briefing and oral argument on defendants' Kastigar motion, the Court determined that an evidentiary hearing (a "Kastigar hearing") would need to be held in order for the Court to definitively resolve the motion. See Order dated Sept. 7, 2015, Dkt. 111. By order dated September 10, 2015, the Court further determined that, in accordance with prevailing practice in the Second Circuit, the Kastigar hearing (if still relevant) would take place following the conclusion of the defendants' trial. See Order dated Sept. 10, 2015, Dkt. 112; see also United States v. Volpe, 42 F. Supp. 2d 204, 219 (E.D.N.Y. 1999) ("While the court has discretion to hold the [Kastigar] hearing before, during, or after the trial . . . it is the general practice

---

[2] Although defendants' brief speaks of suppressing evidence derived from Mr. Robson's "testimony," they appear to mean evidence obtained by the Government as a result of Mr. Robson's cooperation (in testimonial form or otherwise) following his exposure to the defendants' compelled testimony.

in this circuit to defer such a hearing until after trial."). On November 5, 2015, following a three-week jury trial, a jury found defendants Allen and Conti guilty on all counts. See Verdict, Dkt. 147. (General familiarity with the trial proceedings is here presumed.)

On December 16 and 17, 2015, the Court held a Kastigar hearing at which the Government sought to show that its evidence was derived from legitimate sources wholly independent of defendants' compelled testimony.[3] At the hearing, the Court heard testimony from Mr. Robson and FBI Agent Jeffrey Weeks. In addition, the Court, on consent, received in evidence various declarations and other written evidence previously submitted in connection with the Kastigar motion.

Following the Kastigar hearing, the Court received still further briefing and submissions on the Kastigar motion. See Government's Post-"Kastigar" Hearing Brief ("Gov't Post-Hearing Br."), Dkt. 208; Defendants' Supplemental Memorandum of Law in Further Support of Their Motion to Dismiss the Superseding Indictment on Kastigar Grounds ("Defs. Post-Hearing Br."), Dkt. 209; Government's Response to Defendants' Supplemental Memorandum in Support of Their Motion to Dismiss on Kastigar Grounds, Dkt. 211; Defendants' Memorandum of Law in Opposition to the Government's Post-"Kastigar" Hearing Brief ("Defs. Opp. Post-Hearing Br."), Dkt. 212.

---

[3] As noted above, the Court denied defendants' motion to compel additional discovery related to their Kastigar motion on January 7, 2016. See Memorandum Order dated Jan. 7, 2016, Dkt. 206.

Having now carefully reviewed this mass of materials, and having assessed the demeanor and credibility of the witnesses at the Kastigar hearing (as well as, to the extent here relevant, the witnesses at the trial), the Court makes the following findings of fact and conclusions of law:

In 2012, the United Kingdom's Financial Conduct Authority ("FCA")[4] began an investigation into potential manipulation of the London Interbank Offered Rate ("LIBOR") at the Dutch bank Coöperatieve Centrale Raiffeisen-Borenleenbank B.A. ("Rabobank"). See Defs. Br. at 1. As part of this investigation, the FCA interviewed defendant Allen on June 20 and 21, 2013, and defendant Conti on January 25, 2013. See GX 201 (Letter from Department of Justice ("DOJ") to Defense Counsel dated May 26, 2015), Dkt. 95-6.[5] Mr. Allen had served as Rabobank's Head of Liquidity and Finance at Rabobank from 2005 through approximately the end of 2008. See Defs. Br. at 3; Superseding Indictment dated June 25, 2015, Dkt. 62, ¶ 23. Mr. Conti was a cash trader at Rabobank and the primary U.S. dollar LIBOR submitter at that bank until about April 2009. See Defs. Br. at 4; Superseding Indictment ¶ 26. The FCA's interviews of defendants Allen and Conti were conducted on a "compelled" basis, in the sense that failure to respond could result, under UK law, in

---

[4] The Financial Conduct Authority ("FCA") and the Prudential Regulation Authority replaced the U.K. Financial Services Authority ("FSA") on or about April 2013. See GX 213 (Declaration of Daniel A. Braun), Dkt. 190-6, at 1 n.1. For convenience, this Opinion uses the acronym "FCA" to refer to all these entities.

[5] This letter indicates that the FCA interviewed defendant Conti on June 25, 2013, but the transcript of this interview - filed under seal - states that the date of the interview was January 25, 2013. Nothing turns on this discrepancy.

criminal penalties, including imprisonment. See UK Financial

Services and Markets Act of 2000, Part XI, at §177, Dkt. 76-7. On

January 17, 2013, the FCA conducted a compelled interview of Paul

Robson, another former Rabobank trader who served as Rabobank's

primary submitter of Yen LIBOR until at least November 2008. See

Defs. Post-Hearing Br. at 3; DX608B, Dkt. 210-5; Indictment dated

Apr. 28, 2014, Dkt. 5, ¶ 17.

In November 2013, the FCA sent Mr. Robson's UK counsel, Steven

Francis, a warning notice informing him that the FCA intended to

take further action against Mr. Robson. See DX 608S ("Robson

Declaration"), Dkt. 202-3, ¶ 4; Memorandum in Opposition to

Defendants' Motion to Dismiss Based on Kastigar ("Gov't Opp. Br."),

Dkt. 95, at 6. Accompanying the warning notice, pursuant to UK law,

were transcripts of interviews the FCA had conducted with

individuals allegedly related to the LIBOR investigation, including

defendants Allen and Conti. See Robson Declaration ¶ 4; UK Financial

Services and Markets Act XXVI § 394(1), Dkt. 76-7.

Mr. Robson reviewed the FCA transcripts in November or December

2013. See Robson Declaration ¶ 5.[6] Mr. Robson testified at the

Kastigar hearing that his UK counsel "instructed [him] to have a

read through, highlight anything that was relevant or [he] had any

---

[6] At the Kastigar hearing, Mr. Robson initially and, the Court finds,
inadvertently testified that he reviewed the FCA transcripts in November 2012, not
in November or December 2013 as his declaration filed in August 2015 had attested.
See Tr. 4:19-5:6; Robson Declaration ¶ 5; Memorandum Order dated Jan. 7, 2016 at 4
n.3. This was an obvious mistake – all the evidence indicates that the correct
year was 2013 – and, indeed, on cross-examination, Mr. Robson quickly acknowledged
his mistake, see Transcript of Kastigar Hearing ("Tr.") 17:15-19.

questions about, and then let [his UK counsel] know when [he was] done." Transcript of Kastigar Hearing ("Tr.") at 5:24-6:2. Mr. Robson duly reviewed the transcripts over the course of two afternoons, see Tr. at 6:3-12, and underlined or circled certain passages in the transcripts, including parts of the transcripts of defendants' testimony. See Tr. 77:11-79:8. (At the direction of the Court, these marked-up transcripts were subsequently furnished to defendants' counsel.) In addition, Mr. Robson wrote some pages of independent notes. See Tr. at 79:2-7. (These notes, as to which privilege was claimed by Mr. Robson, were reviewed by the Court in camera and found not to add materially to the evidence to which defense counsel already had access. See Memorandum Order dated Jan. 7, 2016 at 8.)

Before Mr. Robson could discuss any of this with his UK counsel, that counsel instructed Mr. Robson "to seal the box, mark it with legal/professional privilege, and put it out of the way, so I [Mr. Robson] put it in the attic." Tr. at 6:19-21. This was done "because the FCA investigation was delayed in favor of criminal investigations." Paul Robson's Memorandum of Law in Opposition to Allen and Conti's Motion to Compel Further Kastigar Discovery ("Robson Opp. Discovery Br.") at 4. Thereafter, Mr. Robson had no further contact with the materials, except that, in July 2014, at the request of his US counsel (Justin Weddle, Esq.), Mr. Robson removed some of the FCA transcript binders from the box and conveyed them to his US counsel, and subsequently, again at the instruction

of his US counsel, Mr. Robson sent the box of remaining materials to that counsel's US law firm. Robson Declaration ¶ 7; see also Robson Opp. Discovery Br. at 2. On neither occasion did Mr. Robson further review the transcripts of defendants' compelled testimony. Robson Declaration ¶ 6.

Meanwhile, on October 29, 2013, the Department of Justice entered into a Deferred Prosecution Agreement with Rabobank. See Gov't Opp. Br. at 3; GX 196 ("Statement of Facts"), Dkt. 95-1. On April 28, 2014, a US Grand Jury filed an indictment against Mr. Robson and two other former Rabobank employees, Paul Thompson and Tetsuya Motomura. See Indictment dated Apr. 28, 2014, Dkt. 5. Another former Rabobank employee, Takayuki Yagami, pled guilty to conspiracy to commit wire fraud and bank fraud on June 10, 2014. See Transcript of Proceedings dated June 10, 2014, Dkt. 16.

On July 17 and 18, 2014, the Government conducted an interview of Mr. Robson pursuant to a proffer agreement. See Agreement dated July 17, 2014, Dkt. 76-4; DX608C, Dkt. 202-1. On August 18, 2014, Mr. Robson pled guilty to conspiracy to commit wire fraud and bank fraud. See Transcript of Proceedings dated Aug. 18, 2014, Dkt. 21. He did so pursuant to a pursuant to a plea agreement in which Mr. Robson agreed to "cooperate fully" with the Government's investigation. See DX 608O, Dkt. 202-2, at 2-3. On October 16, 2014, the Government filed a superseding indictment, which charged defendants Allen and Conti for the first time with conspiracy to commit wire fraud and bank fraud, as well as several substantive

counts of wire fraud. See Superseding Indictment, Dkt. 24. On

November 5, 2015, as mentioned, a jury found defendants Allen and

Conti guilty on all counts. See Verdict, Dkt. 147.

Against this factual background, defendants contend that Mr.

Robson's review of defendants' compelled testimony before his

decision to cooperate with the Government and testify against

defendants fatally tainted their indictment and conviction. The

Fifth Amendment to the United States Constitution provides that

"[n]o person . . . shall be compelled in any criminal case to be a

witness against himself." U.S. Const. amend. V. In Kastigar v.

United States, the Supreme Court held that the scope of the immunity

provided by 18 U.S.C. § 6002[7] - i.e., immunity from both direct use

and derivative use of the compelled testimony - is coextensive with

the scope of the Fifth Amendment privilege against self-

incrimination. See Kastigar, 406 U.S. at 453. Pursuant to Kastigar,

therefore, a witness may be compelled to testify over a claim of

privilege if granted immunity pursuant to 18 U.S.C. § 6002.

Kastigar, 406 U.S. at 448, 453. But if the immunized person is then

prosecuted, the Government has "the affirmative duty to prove that

---

[7] 18 U.S.C. § 6002 states: "Whenever a witness refuses, on the basis of his
privilege against self-incrimination, to testify or provide other information in a
proceeding before or ancillary to—(1) a court or grand jury of the United States,
(2) an agency of the United States, or (3) either House of Congress, a joint
committee of the two Houses, or a committee or a subcommittee of either House, and
the person presiding over the proceeding communicates to the witness an order
issued under this title, the witness may not refuse to comply with the order on
the basis of his privilege against self-incrimination; but no testimony or other
information compelled under the order (or any information directly or indirectly
derived from such testimony or other information) may be used against the witness
in any criminal case . . ."

the evidence it proposes to use is derived from a legitimate source
wholly independent of the compelled testimony." Kastigar, 406 U.S.
at 460.[8] The Government must make this showing by a preponderance of
the evidence. See United States v. Nanni, 59 F.3d 1425, 1431-32 (2d
Cir. 1995).

As to the issue of what constitutes illicit "use" of compelled
testimony under Kastigar, the Second Circuit has held that "the
Fifth Amendment prohibits the use of immunized testimony in two
circumstances: (1) where the immunized testimony has some
evidentiary effect in a prosecution against the witness, or (2)
where there is a recognizable danger of official manipulation that
may subject the immunized witness to a criminal prosecution arising
out of the investigation in which the testimony is given." United
States v. Helmsley, 941 F.2d 71, 82 (2d Cir. 1991). The Government
may also violate the Fifth Amendment when a cooperating witness's
exposure to compelled testimony motivates that witness to cooperate
and testify against the defendants. See, e.g., United States v.
Biaggi, 909 F.2d 662, 689-990 (2d Cir. 1990); United States v.
Kurzer, 534 F.2d 511, 519 (2d Cir. 1976).[9]

---

[8] The Government devotes much of its original brief on the Kastigar motion to the
argument that Kastigar does not apply when the compelled testimony is elicited by
a foreign government. See Gov't Opp. Br. at 7-14; Gov't Post-Hearing Br. at 1 n.1.
Defendants argue, by contrast, that Kastigar is applicable even in such
circumstances. See Defs. Reply Br. at 1-6; Defs. Opp. Post-Hearing Br. at 1 n.2.
Deeply interesting though this question is, the Court has no occasion to resolve
it here, because, even assuming Kastigar applies to testimony compelled by a
foreign sovereign, the Government has met its Kastigar burden on the facts here
determined.

[9] Defendants here seek to rely on authority from the D.C. Circuit, notably United
States v. North, 910 F.2d 843 (D.C. Cir. 1990) (North I), opinion withdrawn and

Needless to say, however, not every form of exposure to compelled testimony constitutes a Kastigar violation. For example, the Second Circuit, in United States v. Mariani, 851 F.2d 595, 600 (2d Cir. 1988), distinguished the Eighth Circuit case United States v. McDaniel, 482 F.2d 305 (8th Cir. 1973), which held that "use" for Kastigar purposes "could conceivably include assistance in focusing the investigation, deciding to initiate prosecution, refusing to plea-bargain, interpreting evidence, planning cross-examination, and otherwise generally planning trial strategy." McDaniel, 482 F.2d at 311. The Second Circuit, after quoting this language from McDaniel, responded that "[t]o the extent that McDaniel can be read to foreclose the prosecution of an immunized witness where his immunized testimony might have tangentially influenced the prosecutor's thought processes in preparing the indictment and preparing for trial, we decline to follow that reasoning." Mariani, 851 F.2d at 600. Reaffirming this conclusion in United States v. Rivieccio, 919 F.2d 812, 815 & n.3 (2d Cir. 1990), the Second Circuit held that "[t]o the extent the Government's thought process or questioning of witnesses may have been influenced by Appellant's

---

superseded in part on reh'g, 920 F.2d 940 (D.C. Cir. 1990); United States v. North, 920 F.2d 940, 942 (D.C. Cir. 1990) (North II); and United States v. Poindexter, 951 F.2d 369 (D.C. Cir. 1991). See, e.g., Defs. Post-Hearing Br. at 8-9. While the Court is of the view that the Government would likely meet its Kastigar burden under the standards of the D.C. Circuit, especially in light of U.S. v. Slough, 641 F.3d 544 (D.C. Cir. 2011), the Court sees no reason to discuss this matter further, as the Court is obligated to apply the standards set by the Second Circuit.

immunized testimony, we hold that any such use was merely tangential and was therefore not a prohibited use."[10]

Although the Government bears the ultimate burden of proving that it did not commit a Kastigar violation, a defendant must initially suggest in what respect it is claimed such a violation occurred. Here, the defendants make four such suggestions. First, they suggest that Mr. Robson's decision to cooperate was influenced by his review of defendants' compelled testimony. See Defs. Post-Hearing Br. at 1-2. Second, defendants suggest that "Mr. Robson's cooperation, and the tainted statements he made to prosecutors as part of that cooperation, played an important role in the Government's decision to prosecute Defendants." Defs. Discovery Br. at 1. Third, defendants suggest that the grand jury indicted them on the basis of tainted evidence that came from Mr. Robson and was described to the grand jury by FBI case agent Jeffrey Weeks. See Defs. Discovery Br. at 1. Fourth, defendants suggest that the testimony Mr. Robson provided to the jury at defendants' trial was affected by his review of defendants' compelled testimony. See Defs.

---

[10] As to the remedy for a Kastigar violation, ordinarily "a violation of the privilege against self-incrimination . . . requires only the suppression at trial of a defendant's compelled testimony." Rivieccio, 919 F.2d at 816. Therefore, if a court reviewing the matter after trial finds a Kastigar violation, it must consider whether the failure to suppress any tainted evidence at trial was harmless error. See Rivieccio, 919 F.2d at 816-17; United States v. Gallo, 859 F.2d 1078, 1082-83 (2d Cir. 1988). There are exceptions, however, when "the defendant testifies under immunity before the same grand jury returning the indictment or when the immunized testimony is placed before the indicting grand jury," in which case the indictment must be dismissed, and "when the government concedes that the indictment rests almost exclusively on tainted evidence," in which case the indictment may be dismissed. Rivieccio, 919 F.2d at 816 n.4.

Post-Hearing Br. at 2.[11] Since each of these suggestions are at least arguably plausible, the burden passes to the Government to disprove each of them by a preponderance of the evidence. The Court therefore considers each of them in turn.

First, regarding whether Mr. Robson decided to cooperate based partially on his review of defendants' compelled testimony, defendants hypothesize that this review indicated to Mr. Robson that defendants would not corroborate the testimony that Mr. Robson had provided during his own FCA interview, thereby reducing Mr. Robson's chances for a successful defense and making him more likely to cooperate.[12] See Defs. Post-Hearing Br. at 15-16. Further, according to defendants, Mr. Robson learned from this review that Mr. Conti had shared information with the FCA that Mr. Robson had not revealed, prompting fears that Mr. Conti would cooperate against him and inducing Mr. Robson to arrange his own proffer. See Defs. Post-Hearing Br. at 22-24.

---

[11] Defendants also conjectured in briefing on their motion to compel discovery that if Mr. Robson's US attorney, Mr. Weddle, reviewed defendants' compelled testimony and used information from that review to prepare Mr. Robson for his proffer meeting with the Government in July 2014, then that would be an additional Kastigar violation. See Defs. Discovery Br. at 2. To address this issue, the Court solicited and received from Mr. Weddle a written statement and various materials, which, because of their privileged status, it reviewed in camera. On this basis, the Court determined there was no substance to the defendants' conjecture, but it filed the materials under seal so as to be available for any appellate review. See Memorandum Order dated Jan. 7, 2016, Dkt. 206, at 8-9.

[12] Defendants note, for example, that when Mr. Robson was asked by the FCA about LIBOR requests from fellow Rabobank employees Mr. Thompson and Mr. Yagami, he testified that "it's part of the instruction of Tony Allen that we should all be discussing, um, liquidity so that we can set an appropriate LIBOR to reflect our liquidity position to the market." See DX608B (Mr. Robson FCA testimony) at 97-99. However, Mr. Allen testified to the FCA, in a part of the transcript that Mr. Robson underlined while reviewing it, that Mr. Allen never told Mr. Robson to speak to Mr. Yagami or Mr. Thompson to obtain information for use in setting LIBOR. See DX900A, Dkt. 202-7, at 67, 122-23.

These speculations are contradicted, however, both by the evidence the Government adduced at the <u>Kastigar</u> hearing and at the trial, and by the logic of Mr. Robson's situation. The evidence at trial, though directed at the defendants, amply showed how strong the case was against Mr. Robson. It was no wonder that he, like the overwhelming majority of those indicted in federal cases, chose to plead guilty. But once the decision to plead guilty was reached, it would have bordered on malpractice for Mr. Robson and his counsel not to seek the huge potential sentencing benefits provided by entering into a cooperation agreement with the Government. Thus, the Court finds wholly credible Mr. Robson's testimony at the <u>Kastigar</u> hearing that his review of defendants' compelled testimony did not motivate him to cooperate, <u>see</u> Tr. 8:12-14, 11:4-8, but that, rather, he realized when he was indicted in the U.S. that if he cooperated, "it would be helpful to my cause hopefully." Tr. 15:14-16:6.[13] This is patently obvious. <u>Cf.</u> <u>United States v. Blau</u>, 159 F.3d 68, 73 (2d Cir. 1998) (affirming the district court's denial of defendant's <u>Kastigar</u> claim where the "district court credited Lupo's explanation at trial that it was solely Lupo's desire to be released from prison that led him to seek out FBI Agent Meyer, to cooperate with the government and, ultimately, to implicate Blau.").

---

[13] Both at trial and in their <u>Kastigar</u> submissions, defendants attempt to impugn Mr. Robson's credibility with the usual arguments about prior false statements, alleged inconsistencies, and the like. While the Court has carefully considered these arguments, it finds them totally unpersuasive in this case. To the contrary, the Court finds Mr. Robson's testimony, both at the trial and at the <u>Kastigar</u> hearing, to be highly credible.

Second, with respect to defendants' suggestion that "Mr. Robson's cooperation, and the tainted statements he made to prosecutors as part of that cooperation, played an important role in the Government's decision to prosecute Defendants," Defs. Discovery Br. at 1, the Government offers two responses, one legal and the other factual.

As a legal matter, the Government contends that a decision to prosecute does not count as a "use" under Kastigar, so that when it comes to a charging decision, the Government bears no burden to show a "legitimate source wholly independent of the compelled testimony." See Gov't Post-Hearing Br. at 3-4. This is a plausible argument, and one that Second Circuit precedent does not foreclose. See Mariani, 851 F.2d at 600 (distinguishing Eighth Circuit precedent that would treat "deciding to initiate prosecution" as an impermissible use under Kastigar); Rivieccio, 919 F.2d at 815 ("To the extent the Government's thought process or questioning of witnesses may have been influenced by Appellant's immunized testimony, we hold that any such use was merely tangential and was therefore not a prohibited use."); see also Slough, 641 F.3d at 554 (D.C. Cir. 2011) (noting that the Second Circuit, along with some other circuits, has not banned all non-evidentiary uses of compelled testimony, and stating that "at least as to decisions to indict, we join those circuits refusing to find such decisions vulnerable on the ground of links to immunized statements."); but see United States v. Kristel, 762 F. Supp. 1100, 1109 (S.D.N.Y. 1991) (dismissing the indictment where

the Court was "convinced that the use of the immunized testimony or cooperating information of Mr. Kristel played an important part in the Government's decision to investigate and prosecute Mr. Kristel").

Nevertheless, the Court need not reach this issue, because the Government has adduced more than sufficient evidence to prove, by a preponderance of the evidence and to the Court's satisfaction, that the decision to indict the defendants had a more than sufficient independent basis. To begin with, the Government showed that it possessed significant evidence incriminating the defendants prior to Mr. Robson's cooperation. Indeed, the DOJ's Deferred Prosecution Agreement with Rabobank, dated October 2013, included a Statement of Facts citing several occasions on which "Submitter-1" and "Submitter-3" (later identified by the Government as Anthony Conti and Anthony Allen, respectively) allegedly participated in a scheme to manipulate LIBOR to favor Rabobank's positions. See Gov't Opp. Br. at 3-4; Gov't Post-Hearing Br. at 8; Statement of Facts ¶¶ 21, 22, 24, 28, and 29.[14] Additionally, as defendants acknowledge, "every

---

[14] The cited chats and emails included such inculpatory material as: "On November 15, 2007, [Submitter-9] explained to [Mr. Conti]: 'The fixinh [sic] should be done by cash desk in agreement with deriv. I do the fixing I ask swap desk what they have.' [Mr. Conti] replied: '[Lee Stewart] has big fixing so we help him today . . . i [sic] am low because [Lee Stewart] has fixing. . I [sic] go higher tomorrow.'" Statement of Facts ¶ 19; see Gov't Opp. Br. at 3; "On December 1, 2006, Trader-2 again wrote to [Mr. Allen]: 'Appreciate 3s go down, but a high 3s today would be nice . . .cheers chief.' [Mr. Allen] wrote back: 'I am fast turning into your LIBOR bitch!!!!'" Statement of Facts ¶ 28; see Gov't Opp. Br. at 4; and "[Mr. Allen], who supervised the Yen LIBOR submitters in addition to the U.S. Dollar LIBOR submitters, was aware of the conduct on the desk he supervised and played an active role in it. As a further example, on March 14, 2007, Trader-4 messaged [Mr. Allen] and asked: 'Is [Submitter-5] in mate?' [Mr. Allen] replied: 'Not yet,' and asked: 'can I help?' Trader-4 wrote back: 'No worries mate, I think [Submitter-4] just wanted him to nudge up a few of the LIBORs.. Will send him a mail.' [Mr.

communication presented at Defendants' trial was in the Government's possession before April 2014." Defs. Post-Hearing Br. at 29; GX 208, Dkt. 190-1 (dates of production of exhibits admitted at trial); see also GX191, Dkt. 210-26 (Government grand jury exhibits and dates of production from Rabobank). Furthermore, before Mr. Robson began to cooperate, the Government had already met with numerous Rabobank traders who provided incriminating information about Mr. Allen and Mr. Conti. See Tr. 139-143 (Kastigar hearing testimony of FBI Agent Jeffrey Weeks, citing FBI interview reports); see also, e.g., GX 183 at 5 (FBI interview with Takayuki Yagami), GX 180 at 4 (FBI interview with Lee Stewart); GX 182 at 8-9 (FBI interview with Saleem Khatri).

In light of this substantial documentary evidence and testimony, the Court finds fully credible prosecutors' affidavits stating that they had identified defendants Allen and Conti as potential targets through means unrelated to any exposure to defendants' compelled testimony. For example, prosecutor Michael Koenig, a member of DOJ's trial team, indicated that when he was assigned to the investigation of Rabobank's involvement in the alleged LIBOR manipulation scheme in late 2012, "Anthony Allen and Anthony Conti had already been identified as subjects of the investigations, and voluminous documentary evidence relating to their role and involvement in the scheme had been collected and identified." GX 217 (Declaration of Michael T. Koenig), Dkt. 190-10,

---

Allen] replied: 'Ok cc [additional individual] and [Mr. Conti] on it aswell [sic] mate Just in case.'" Statement of Facts ¶ 42; See Gov't Opp. Br. at 4.

¶ 2. Likewise, prosecutor Brian Young, another member of the trial team, stated that "[a]t some point during the first week of November 2013, I read Rabobank's [Deferred Prosecution Agreement] and, based upon the communications cited therein . . . it became obvious to me that Mr. Allen and Mr. Conti participated in an illegal conspiracy and scheme to manipulate the LIBOR benchmarks." GX 216 (Declaration of Brian R. Young), Dkt. 190-9, ¶ 3.

At the same time, the Government has also provided much evidence to show that prosecutors were not exposed to defendants' compelled testimony, whether through Mr. Robson or otherwise. Regarding direct contact, the key prosecutors, including trial attorneys Carol Sipperly, Brian Young, and Michael Koenig, all submitted affidavits indicating that they had no exposure to defendants' compelled testimony.[15] See GX 213-218, Dkt. 190:6-11. Further, a member of the DOJ's Rabobank investigation team attested that he gave a presentation to FCA representatives in London on the Fifth Amendment and Kastigar, in order to explain the importance of maintaining a "wall" between the two countries' investigations. See Gov't Post-Hearing Br. at 6, citing GX 213 (Declaration of Daniel A. Braun). The Government has also provided letters between DOJ personnel and UK authorities in which DOJ asked UK investigators not to share with them any information derived from compelled interviews, and UK authorities confirmed that they would refrain from doing so. See, e.g., GX 197 (DOJ Letter to UK Financial

---

[15] So-called "filter counsel" for the Government, distinct from the prosecution trial team, has handled defendants' Kastigar motion. See Gov't Opp. Br. at 2 n.1.

Services Authority dated Oct. 28, 2011), Dkt. 95-2; GX 198

(Financial Services Authority Letter to DOJ dated Nov. 1, 2011),

Dkt. 95-3. Also, at the Kastigar hearing, Agent Weeks testified

about the DOJ's "day one/day two" approach, under which the DOJ

would seek to interview subjects first, before the FCA. See Tr.

135:13-36:15.

     As for indirect contact via Mr. Robson, Mr. Robson and Agent

Weeks repeatedly testified at the Kastigar hearing that Mr. Robson

was warned by his attorney and the Government not to share any

information learned from the FCA with the Government. See Tr. 9:23-

10:13; 136:16-37:1.[16] While a prosecutor's bald assertion that

immunized testimony was not used is insufficient in itself to meet

the Government's Kastigar burden, Tantalo, 680 F.2d at 908, the

prosecution's sworn statements and letters, evaluated in light of

the rest of the evidence, credibly show that there was a strict and

effective wall of separation between defendants' compelled testimony

and the prosecution. The Court concludes, therefore, that,

notwithstanding the happenstance that Mr. Allen and Mr. Conti were

not indicted until after the start of Mr. Robson's cooperation, they

would likely have been indicted in any event and that, moreover, Mr.

---

[16] The Court is unpersuaded by the defendants' suggestion that the statement in the
FBI interview report of Mr. Robson's proffer session that Mr. Robson was told not
to "share with DOJ any information that was provided to him by the UK's Financial
Conduct Authority in the course of the interview he had with them" (emphasis
added), see Defs. Opp. Post-Hearing Br. at 20-21, negates the testimony of
prosecution witnesses at the Kastigar hearing. It seems plain that the relevant
parties understood FCA-related warnings to apply beyond information learned at Mr.
Robson's own FCA interview.

Robson's cooperation did not indirectly provide the Government with any tainted information.

In reaching these conclusions, the Court is mindful of the statement made to the Court at Mr. Robson's plea hearing that "there is also a chance that we would seek a superseding indictment in light of information that has come to light from our two cooperators [Mr. Robson and Mr. Yagami]." Transcript dated Aug. 18, 2014, Dkt. 21, at 25:15-18. But the evidence is overwhelming that the Government was already contemplating indicting Mr. Allen and Mr. Conti well before Mr. Robson and Mr. Yagami began to cooperate, but that they preferred to go after the easy targets (Mr. Robson and Mr. Yagami) before indicting the bigger fish.

Further still, even if Mr. Robson's cooperation played a role in inducing the Government to pursue defendants' indictment, a Kastigar violation arises only if Mr. Robson's cooperation provided the Government with valuable information on the defendants that was derived from defendants' compelled testimony, and the aforementioned evidence satisfies the Court that this was not the case.

Attempting to prove otherwise, the defendants argue that Mr. Robson told the Government about points he had not mentioned in his own compelled interview with the FCA. These points included the existence of a LIBOR "roundtable" at which traders discussed their positions; the fact that Christian Schluep made LIBOR requests to the defendants in writing when Mr. Robson had not been copied on these emails; the occurrence of an altercation between Damon Robbins

and Lee Stewart over LIBOR submissions; the fact that Mr. Schluep's requests were prioritized before Mr. Stewart's; and a communication between Paul Thompson and Mr. Conti suggesting that Mr. Conti took his own positions into account. See Defs. Post-Hearing Br. at 17-19, 24-27.

But quite apart from the fact that Mr. Robson's testimony to the FCA was, as he repeatedly admitted (see Trial Transcript dated Oct. 20, 2015 at 418:8-10; Tr. 185:18-20), a fabrication designed to give the false appearance of innocence – so that he had no motivation to mention these incidents – the Court finds that the Government has shown a wholly independent source, other than defendants' compelled testimony, for each of these pieces of evidence (see discussion of Government charts, infra).

Defendants also emphasize that Mr. Robson read in their compelled testimony about emails and chats on which he was not copied. See, e.g., Defs. Post-Hearing Br. at 17, 25-26. But in light of Mr. Robson's close physical proximity to, and personal involvement with, the defendants and other Rabobank traders for years, the Court finds credible Mr. Robson's testimony that he had personal, if sometimes indirect, knowledge of such messages. See Tr. 13:9-18, 221:12-16.[17]

---

[17] Contrary to defendants' claims, see Defs. Post-Hearing Br. at 13, the Court does not view as genuinely inconsistent Mr. Robson's review of these chats and emails in defendants' compelled testimony, on the one hand, and his testimony at the Kastigar hearing that he learned no new information from his review of defendants' compelled testimony. See Tr. 8:15-20. As Mr. Robson testified at the Kastigar hearing, his review of written communications in which he did not participate confirmed his contemporaneous observations. See Tr. 13:9-18.

Further, regardless of how Mr. Robson learned of particular emails and chats, there is no material evidence that his cooperation was responsible for bringing these communications to the attention of the Government, and there is very strong evidence to suggest that he did not. In addition to the Kastigar hearing testimony of Mr. Robson and FBI Agent Jeffrey Weeks to this effect, see Tr. 142:12-44:20, 221:9-222:11, the Government has shown that it possessed all the communications admitted at trial and presented to the grand jury before Mr. Robson's cooperation began. See GX 208, Dkt. 190-1 (dates of production of exhibits admitted at trial); GX 191, Dkt. 210-26 (Government grand jury exhibits and date of production from Rabobank); see also Defs. Post-Hearing Br. at 29. The Court therefore finds that the Government has showed that Mr. Robson's cooperation did not provide the Government with evidence derived from defendants' compelled testimony that affected the Government's decision to prosecute the defendants.

Third, as to whether the Government presented tainted evidence to the grand jury, Agent Weeks, who testified to the grand jury, stated that he was not exposed to the contents or substance of defendants' FCA testimony. See GX199, Dkt. 95-4, ¶ 3; see also Tr. 135-36. Nevertheless, there remains the issue of whether Agent Weeks, who had interviewed Mr. Robson, Tr. 137:9-11, presented testimony to the grand jury that derived from Mr. Robson's review of defendants' compelled testimony. Based on Agent Weeks's testimony at the Kastigar hearing and the transcript of his grand jury

appearance, the Court concludes that a substantial portion of Agent Weeks's testimony came from sources independent of Mr. Robson, let alone of Mr. Robson's review of defendants' FCA transcripts. See GX 186 (Agent Weeks's grand jury testimony); Tr. 154-59. For example, Agent Weeks presented chats and emails to the grand jury, see, e.g., GX 186, 17:7-22:4, and discussed evidence provided by Mr. Yagami's cooperation, see GX 186, 14:22-15:21. Agent Weeks also testified that his statement to the grand jury that "Mr. Allen was really the person who directed all the LIBOR submitters how to submit their rates" derived from information provided by multiple witnesses, including Salim Khatri and Christian Schluep. See Tr. 155:12-57:4; GX 186, 5:14-15.

It is true that, as Agent Weeks also testified, a few material parts of his grand jury testimony derived exclusively from Mr. Robson. These included Agent Weeks's statement "So [Mr. Allen] instructed, specifically instructed, LIBOR submitters in London to consider the positions and the requests of Rabobank traders and adjust their submissions for LIBOR and various currencies based on the means of those traders," GX 186, 5:15-20: see Tr. 157:5-158:1, and the statement "Mr. Robson said that sitting near Mr. Conti he was aware that Mr. Conti set U.S. dollar LIBOR rates in which he considered his own positions as appropriate reason or justification for setting the rates." GX 186, 12:20-24; see Tr. 243:25-244:13. Nevertheless, the Court finds that the Government has shown an independent source for Mr. Robson's testimony on these points, to

wit, his personal experience and observations, as described above.
Therefore, the Court concludes that the Government has satisfied its
Kastigar burden with respect to testimony presented to the grand
jury.

Fourth, regarding defendants' contention that the Government
introduced tainted evidence at trial, even the defendants, as noted
earlier, recognize that "every communication presented at
Defendants' trial was in the Government's possession before April
2014." Defs. Post-Hearing Br. at 29; see also Tr. 142:12-144:20
(testimony of Agent Weeks). Likewise, the Government presented
testimony to the jury from its other cooperators Mr. Yagami and Mr.
Stewart, who had not been exposed to defendants' compelled
testimony. See Gov't Post-Hearing Br. at 15; GX212 (declaration of
FBI Agent Michael McSwain) ¶ 4; GX 221 (letter from FCA) ¶¶ 3-4.

Regarding Mr. Robson's testimony, the Government provided – and
the Court has carefully reviewed – charts comparing Mr. Robson's
trial testimony with defendants' compelled testimony. See GX 209,
210; Gov't Post-Hearing Br. at 18-19. The Court finds convincing the
Government's demonstration, through these charts and Mr. Robson's
testimony at the Kastigar hearing, see, e.g., Tr. 11:4-12:20, that
the evidence presented by Mr. Robson to the jury had sources wholly
independent from defendants' compelled testimony. The Government has
not merely shown "the availability of wholly independent evidence
from which it might have procured indictment or conviction had it
not used the immunized testimony," Pelletier, 898 F.2d at 303, but

23

rather has proved to the Court's satisfaction that Mr. Robson did not actually rely on defendants' compelled statements or use them in his testimony. For example, the fact that fellow trial witnesses Mr. Yagami and Mr. Stewart corroborated some of Mr. Robson's testimony, see, e.g., GX 209, 1-5; GX 210, 1-10, shows that the relevant information about defendants was known by co-workers who had not been exposed to their compelled testimony, raising the likelihood that Mr. Robson, through his years of personal experience at Rabobank, had alternative sources for this information. The Court finds unconvincing, by contrast, defendants' speculations that certain aspects of Mr. Robson's testimony were derived from the defendants' compelled testimony. While the Government bears the Kastigar burden, it need not disprove every hypothesized chain of taint. See Helmsley, 941 F.2d at 80-82.

There was, in fact, no overlap between the great bulk of Mr. Robson's trial testimony and defendants' compelled statements. See, e.g., GX 209, 10-14; 210, 8-11. Moreover, on crucial issues, the defendants at their compelled interviews either flatly disavowed or said they did not recall the incriminating information that Mr. Robson provided the jury – so there clearly was no taint. Compare, e.g., Trial Transcript dated Oct. 19, 2015 at 323:12-324:1 (Mr. Robson received requests from Mr. Yagami and told Mr. Allen), with DX900 (Mr. Allen's compelled testimony) 191:7254-7261 (indicating, in response to the question whether Mr. Robson told Mr. Allen that Mr. Yagami made LIBOR submission requests to Mr. Robson, "No. I

don't recall that, no."); Trial Transcript dated Oct. 19, 2015 at 324:5-20 (Mr. Conti would ask "all of the interested parties" what the LIBOR submission would be, and in some cases, the interested parties "would preempt the conversations and say 'Tony what are you going for the LIBOR today? I need this. I need that.'"), with DX901 (Mr. Conti's compelled testimony), Jan. 25, 2013, 49:1594-1616, 56:1841-57:1852 (Mr. Conti answered in the negative to the question whether he changed his LIBOR submissions in response to requests, indicated that he would have "forgotten about" requests "almost immediately," and said he could not recall anyone making requests except Mr. Schluep and Mr. Stewart). As the Court stated in Gallo, 863 F.2d at 190, "The [compelled] testimony consisted mostly of denials and ambiguous answers. In short, there was nothing to use."

For all the foregoing reasons, the Court denies the defendants' Kastigar motion in its entirety.[18]

The Clerk of Court is directed to close docket entry 75.

SO ORDERED.

Dated: New York, NY
       February 11, 2016

_____
JED S. RAKOFF, U.S.D.J.

_____

[18] Because the Court concludes that the Government has met its Kastigar burden, it does not reach the question of whether, if the Government had not shown an independent source for its evidence, any errors in admitting tainted testimony were harmless (as the Government argues, see Gov't Post-Hearing Br. at 28-29).