UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------x
UNITED STATES OF AMERICA          :

      -v-                          :

                                :

ANTHONY ALLEN, ANTHONY CONTI, et al. :

    Defendants.                    :
------------------------------------x

                      S4 14 Cr. 272

                OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.

On November 5, 2015, following a three-week jury trial, defendants Anthony Allen and Anthony Conti were convicted of conspiracy to commit wire fraud and bank fraud, as well as several substantive counts of wire fraud. See Verdict, Dkt. 147. The basic charge was that defendants, employees of the Dutch bank Coöperatieve Centrale Raiffeisen-Boerenleenbank B.A. ("Rabobank"), had participated in a scheme to manipulate the London Interbank Offered Rate ("LIBOR") to favor the trading positions of Rabobank traders. Defendants Allen and Conti now move for a judgment of acquittal pursuant to Fed. R. Crim. P. 29(c) or, in the alternative, for a new trial pursuant to Fed. R. Crim. P. 33(a). For the reasons stated below, defendants' motion is hereby denied in its entirety.

Fed. R. Crim. P. 29(a) provides that "the court on the defendant's motion must enter a judgment of acquittal of any offense for which the evidence is insufficient to sustain a conviction." In evaluating a motion for a judgment of acquittal, a court should consider whether, "after viewing the evidence in the light most

favorable to the prosecution, <u>any</u> rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." <u>Jackson v. Virginia</u>, 443 U.S. 307, 319 (1979). Fed. R. Crim. P. 33(a) provides that "[u]pon the defendant's motion, the court may vacate any judgment and grant a new trial if the interest of justice so requires." Here, defendants make six principal arguments in support of their motion.

<u>First</u>, defendants claim that no rational juror could find that they participated in a scheme to defraud by means of false or fraudulent representations, because defendants' LIBOR submissions were not actionable misstatements under the wire fraud statute. <u>See</u> Memorandum of Law in Support of Defendants' Post-Trial Motion for a Judgment of Acquittal or New Trial ("Defs. Br."), Dkt. 185, at 1-9; <u>see also</u> 18 U.S.C § 1343 ("Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, transmits or causes to be transmitted by means of wire, radio, or television communication in interstate or foreign commerce, any writings, signs, signals, pictures, or sounds for the purpose of executing such scheme or artifice, shall be fined under this title or imprisoned not more than 20 years, or both.").

Defendants note that the indictment charged the defendants with "making USD and Yen LIBOR submissions that were intended to benefit Rabobank's traders rather than making submissions that reflected the perceived rate at which Rabobank could borrow unsecured funds."

2

Superseding Indictment dated June 25, 2015, Dkt. 62, ¶ 29(b); <u>see</u> Defs. Br. at 2. But, according to defendants, the Government did not produce evidence at trial as to defendants' perceptions of the real rate at which Rabobank could borrow funds on the days on which Rabobank's LIBOR submissions were allegedly false or fraudulent. <u>See</u> Defs. Br. at 2. Therefore, in defendants' view, the Government failed to show that defendants' estimates of Rabobank's borrowing costs did not genuinely answer the question asked of LIBOR submitters by the British Bankers' Association ("BBA"): "At what rate could you borrow funds, were you to do so by asking for and then accepting inter-bank offers in a reasonable market size just prior to 11am?" <u>See</u> Defs. Br. at 2-3; Reply Memorandum of Law in Further Support of Defendants' Post-Trial Motion for a Judgment of Acquittal or New Trial ("Defs. Reply Br."), Dkt. 207, at 4-5; GX116A-G. Defendants further claim that because there was a range of accurate responses to the BBA's query, proof that a defendant was influenced by Rabobank traders' requests to submit a higher or lower rate does not constitute proof that the rates defendants submitted failed to reflect their honest opinions of Rabobank's costs of borrowing. <u>See</u> Defs. Reply Br. at 1-2.

In the Court's view, the relevant issue was not the accuracy or inaccuracy of defendants' LIBOR submissions, but the intent with which these submissions were made. <u>See</u> <u>United States v. Amrep Corp.</u>, 560 F.2d 539, 544 (2d Cir. 1977) ("The expression of an opinion not honestly entertained is a factual misrepresentation."). And indeed,

the Government's theory was that the fraud arose because "each LIBOR submission made the implicit statement that the number submitted was calculated according to the [BBA] definition," while "in fact, the evidence showed that the submissions reflected what Rabobank's traders needed to make money at the expense of another party." Memorandum in Opposition to Defendants' Motion for Judgment of Acquittal ("Gov't Opp. Br."), Dkt. 196, at 3.[1] The Court finds that at trial, the Government presented ample evidence from which a juror could reasonably conclude that defendants participated in such a scheme to defraud. See Gov't Opp. Br. at 2 & nn.1-3 (citing numerous emails, chats, and testimony presented at trial).

But, defendants further contend, they had no duty to disclose the factors that informed their LIBOR submissions – including, if applicable, the positions of Rabobank traders. See Defs. Br. at 3. Moreover, defendants claim, the counterparty witnesses that the Government presented at trial did not testify as to their expectations about which factors defendants were considering in making LIBOR submissions. See Defs. Br. at 5. According to defendants, even if "implicit false statements" were actionable under the wire fraud statute – which they deny, see Defs. Reply Br. at 3-4 – criminal liability cannot be imposed simply for failure to comply with failure to comply with industry rules, such as those of

---

[1] Contrary to defendants' suggestions, see Defs. Br. at 4 n.2, the Court does not view the Government's agreement with the inclusion of "misleading half-truths" in the jury instructions, see Tr. 1353:10-18; 1387:14-1388:18; Jury Instructions at 17, as a "constructive amendment" of the Indictment. See Superseding Indictment ¶ 29.

the BBA. See Defs. Br. at 5, citing United States v. Finnerty, 533
F.3d 143, 149 (2d Cir. 2008) (rejecting an attempt by "the
government . . . to impose criminal liability based on a background
assumption of compliance with [New York Stock Exchange] rules.").

The Court finds defendants' arguments on this point to be
unavailing. "A duty to disclose can also arise in a situation where
a defendant makes partial or ambiguous statements that require
further disclosure in order to avoid being misleading." United
States v. Autuori, 212 F.3d 105, 119 (2d Cir. 2000). Here, the jury
could reasonably find that in submitting LIBOR, defendants
effectively represented that they were responding in good faith to
the BBA's query about the rate at which Rabobank could borrow funds,
and that this representation was false or fraudulent because
defendants' submissions reflected, in material part, an intent to
benefit Rabobank's trading positions.[2] Criminal liability in this
case is being applied for making these false or fraudulent
representations – not simply for the failure to follow BBA rules.
See also United States v. Morgenstern, 933 F.2d 1108, 1113 (2d Cir.
1991) (finding a fraudulent misrepresentation where "by mixing
negotiation of legitimate checks with unauthorized deposits of
fraudulently procured checks, Morgenstern sought to convey the
misleading impression that he was acting within the scope of his

---

[2] The Court finds that the Government did not ultimately proceed on a theory that
defendants had omitted certain factors from the representations they made. See
Trial Transcript ("Tr.") 1388:16-18 (the Court striking "omissions" from the jury
instructions).

legitimate authority and that there was nothing extraordinary about these transactions.").

Put differently, "deception . . . irreducibly entails some act that gives the victim a false impression," United States v. Finnerty, 533 F.3d 143, 148 (2d Cir. 2008) (internal quotation marks omitted), and in this case a jury could reasonably find that defendants gave counterparties the false impression that they were making good faith estimates of Rabobank's borrowing costs instead of making LIBOR submissions to benefit Rabobank's trading positions. For example, counterparty witnesses testified that they would likely not have entered into interest rate swaps with Rabobank had they known that defendants' LIBOR submissions were being manipulated in order to benefit Rabobank's trading positions. See, e.g., Trial Transcript ("Tr.") 827:18-828:15 (testimony of Tracy Twomey); 837:21-838:1 (testimony of Michael DiTore); 499:17-500:10 (testimony of Timothy Smith). Since counterparties entered into, and remained in, these transactions, a reasonable juror could infer they did not expect defendants' LIBOR submissions to be influenced by an interest in benefiting Rabobank's trading positions. In sum, the Court determines that a rational juror could have found that defendants participated in a scheme to defraud by means of false or fraudulent representations or pretenses within the meaning of the wire fraud statute.

Second, defendants claim that the Government failed to prove materiality. See Defs. Br. at 10. "[M]ateriality of falsehood is an

6

element of the federal mail fraud, wire fraud, and bank fraud statutes." Neder v. United States, 527 U.S. 1, 25 (1999). "A false statement is material if it has a natural tendency to influence, or [is] capable of influencing, the decision of the decisionmaking body to which it was addressed." Id. at 16. Defendants argue, for example, that because counterparties decided to enter swap contracts with Rabobank several years before the LIBOR submissions that were claimed to have been affected by Rabobank traders' preferences, counterparties could not have been influenced by defendants' alleged fraud. See Defs. Br. at 10-11.

The Court finds, however, that there was more than sufficient evidence from which a reasonable juror could conclude that defendants' representations were "capable of influencing" Rabobank's counterparties.[3] For example, Tracy Twomey of Superstore Industries testified that "If there was a potential for Rabobank to manipulate the interest rate, then we probably wouldn't have entered into it because if the interest rate could have been manipulated higher or lower, we wouldn't have wanted to be involved in it." Tr. 827:24-828:2. See also Tr. 500:2-10 (testimony of Timothy Smith); 837:21-838:2 (testimony of Michael DiTore). While testifying, Mr. Allen

---

[3] Defendants also argue that the Government had to show that their LIBOR submissions were "capable of influencing" the British Bankers' Association (BBA), the body to which, according to defendants, they were "addressed." See Defs. Br. at 10; Defs. Reply Br. at 6. However, the Second Circuit has not adopted the "convergence" theory — according to which defendants must have made "fraudulent misrepresentations directly to at least some of the injured parties," United States v. Brennan, 938 F. Supp. 1111, 1128 (E.D.N.Y. 1996), rev'd on other grounds, 183 F.3d 139 (2d Cir. 1999). See United States v. Eisen, 974 F.2d 246, 253 (2d Cir. 1992); United States v. Chalmers, 474 F. Supp. 2d 555, 563 n.3 (S.D.N.Y. 2007). The Court declines to adopt the convergence theory here.

himself responded "I presume not" to the question of whether
financial institutions would have wanted to enter into interest rate
swaps with Rabobank if they had known that Rabobank traders were
trying to manipulate LIBOR. See Tr. 1278:12-21. Testimony from the
Government's cooperating witnesses similarly helps to support a
reasonable inference that counterparties would have been influenced
by knowledge that Rabobank was submitting LIBOR in accordance with
traders' preferences. See, e.g., Tr. 414:9-17; 697:10-19.

Defendants' claim that some of the counterparties executed swap
contracts with Rabobank prior to the dates of certain allegedly
fraudulent LIBOR submissions, see Defs. Br. at 10-11, is not to the
contrary. The Government presented evidence that defendants' scheme
had begun before counterparties executed these contracts and before
the "fixing dates" of these contracts, see Gov't Opp. Br. at 11-12.
Moreover, the jury could reasonably have inferred that
counterparties would have terminated swap contracts with Rabobank,
or otherwise changed their behavior, had they known of defendants'
allegedly fraudulent scheme. Most fundamentally, materiality, as
defendants concede, see Defs. Reply Br. at 8, is an objective
standard. "[A] misrepresentation is material if it is capable of
influencing the decisionmaker, no matter what the victim decides to
do." United States v. Corsey, 723 F.3d 366, 373 n.3 (2d Cir. 2013)
(per curiam), as corrected (July 24, 2013). The Court therefore
declines to enter a judgment of acquittal or to order a new trial on
the ground that the Government failed to prove materiality.

8

Third, defendants argue that no reasonable juror could have concluded that defendants intended actual harm. See Defs. Br. at 14-16. While the language of the mail and wire fraud statutes "does not require the government to prove that the victims of the fraud were actually injured, the government must, at a minimum, prove that defendants contemplated some actual harm or injury to their victims." United States v. Novak, 443 F.3d 150, 156 (2d Cir. 2006) (internal quotation marks omitted). In this case, the Court finds that the Government presented sufficient evidence that defendants indeed contemplated some actual harm. For example, Mr. Allen while testifying answered "yes" to the question "And you understood that if the individual on one side of an interest rate swap was manipulating LIBOR, the other side would lose money?" See Tr. 1265:3-6.

Defendants suggest that the jury was permitted to convict them on the basis that counterparties would have refused to deal with Rabobank "on general principles" if they had known of the scheme. See Defs. Br. at 16 n.4. But in fact, a jury could reasonably have concluded that defendants' scheme "deprive[d] the victim of potentially valuable economic information" and "depend[ed] for [its] completion on a misrepresentation of an essential element of the bargain." United States v. Binday, 804 F.3d 558, 570 (2d Cir. 2015) (internal quotation marks omitted). The Court therefore determines that a reasonable juror could have found that defendants intended to cause actual harm.

9

Fourth, defendants contend that no reasonable juror could find that the wires alleged in Counts 6 through 19 were transmitted in furtherance of defendants' alleged scheme. See Defs. Br. at 17-18. The wires in question consist of Thomson Reuters's publication of LIBOR from the United Kingdom to New York, New York, among other places. See Superseding Indictment § 156. Defendants reason that there is no evidence that the information transmitted by Thomson Reuters was "false or fraudulent," in the sense that "the interest rate published was something other than a trimmed average of the Panel Banks' estimated borrowing costs," and Thomson Reuters was required under its contract with the BBA to publish LIBOR every day. See Defs. Br. at 18.

In the Court's view, however, the wires alleged in Counts 6 through 19 could reasonably be characterized as transmitted in furtherance of defendants' alleged scheme, since their transmission is plausibly viewed as "a step in the plot." Schmuck v. United States, 489 U.S. 705, 711 (1989) (alteration omitted). The fact that the wires in question were legally required to be sent does not mean they were not transmitted in execution of this scheme. See United States v. Helmsley, 941 F.2d 71, 94-95 (2d Cir. 1991). Moreover, it is well settled that the wires themselves need not contain fraudulent information. See United States v. Tocco, 135 F.3d 116, 125 (2d Cir. 1998); United States v. Carpenter, 791 F.2d 1024, 1035 (2d Cir. 1986). Additionally, this is not a case where, as in the mail fraud United States v. Maze, 414 U.S. 395 (1974), the relevant

10

wires were used merely "as a result of the fraudulent scheme,"
rather than "for the purpose of executing" it. See Maze, 414 U.S. at
404-05 (internal quotation marks omitted). The Court hence
determines that a reasonable juror could have found that the wires
alleged in Counts 6 through 9 were transmitted for the purpose of
furthering defendants' fraudulent scheme.

Fifth, defendants argue that no reasonable juror could find
that defendants' alleged scheme "affected" a "financial institution"
within the meaning of 18 U.S.C. § 3293(2), which extends the statute
of limitations for wire fraud to ten years if the offense "affects a
financial institution." See 18 U.S.C. § 3293(2) (codifying part of
the Financial Institutions Reform, Recovery, and Enforcement Act of
1989, or FIRREA). The jury in the instant case was instructed, in
connection with the allegation that "the scheme to defraud directly
affect[ed] a financial institution," that

> the Government must prove beyond a reasonable doubt as to
> each count that at least one of the following financial
> institutions – Bank of America, Citibank, JP Morgan Chase,
> Morgan Stanley, PNC Bank, U.S. Bank N.A., and/or Wachovia
> N.A. – was both (a) insured by the Federal Deposit Insurance
> Corporation, and (b) directly affected by the scheme to
> defraud in the sense either that the fraud created an
> increased risk of loss for that bank or that the investment
> decisions of that bank would have been different if the bank
> had known of the fraud.

Jury Instructions, Dkt. 146, at 20-21. According to defendants, the
fact that a bank would have made different investment decisions if
it had known of the fraud does not count as a bank's being
"affected," see Defs. Br. at 19-21, and, in any case, the Government

11

failed to establish that any FDIC-insured institution would have
made a different investment decision, especially since the
counterparty witnesses who testified at trial did not work for FDIC-
insured institutions. See Defs. Br. at 21-22. Defendants further
argue that the Court should enter a judgment of acquittal on several
specific counts because there was insufficient evidence that an
FDIC-insured institution was affected by the Rabobank LIBOR
submissions related to those counts. See Defs. Br. at 22-28.

The Court, however, holds that the Government presented
sufficient evidence that a financial institution was "affected"
within the meaning of 18 U.S.C. § 3293(2). The Second Circuit has
stated that § 3293(2) "broadly applies to any act of wire fraud that
affects a financial institution." United States v. Bouyea, 152 F.3d
192, 195 (2d Cir. 1998) (per curiam) (internal quotation marks
omitted). Additionally, "the verb 'to affect' expresses a broad and
open-ended range of influences," United States v. Heinz, 790 F.3d
365, 367 (2d Cir. 2015), cert. denied, 136 S. Ct. 801 (2016).
Against this background, if a juror concludes that a bank would have
made different investment decisions if it had known of the fraud,
then a juror could legitimately conclude that a bank was "affected"
within the meaning of FIRREA. Further, a reasonable juror in the
instant case could have concluded that financial institutions
insured by the Federal Deposit Insurance Corporation (FDIC) would,
if they had known of defendants' alleged fraud, have made different
investment decisions or would have been otherwise "affected." See,

e.g., Tr. 827:18-828:12 (testimony of Tracy Twomey); 837:21-838:1
(testimony of Michael DiTore); 499:17-500:10 (testimony of Timothy
Smith). The fact that the counterparty witnesses who actually
testified at trial did not work for FDIC-insured institutions, see
Defs. Br. at 21-22, is not dispositive, since Rabobank's FDIC-
insured counterparties were similarly situated with respect to the
consequences of interest rate swaps with Rabobank.[4]

        As to defendants' claims that several specific counts should be
dismissed, FIRREA "requires only that the 'offense' — meaning the
entire scheme — affect the financial institution, not that
individual [uses of the wires] do so." United States v.
Rubin/Chambers, Dunhill Ins. Servs., 831 F. Supp. 2d 779, 783
(S.D.N.Y. 2011), quoting United States v. Martinez, No. 98-1438,
1999 WL 38842, at *2 (2d Cir. Jan. 27, 1999) (summary order). In the
Court's view, the Government presented sufficient evidence that the
defendants' alleged scheme affected one or more financial
institutions. See, e.g., GX 103E (chart showing fixing dates for
Rabobank swap contracts with numerous counterparties, including

---

[4] According to the Government, the defendants violated an agreement reached during
trial in arguing on the instant motion that the Government did not show an FDIC-
insured institution was affected because the counterparty witnesses did not work
for FDIC-insured financial institutions. This agreement, the Government indicates,
provided for the Government not to call additional counterparty witnesses, this
time from FDIC-insured institutions, provided that defendants did not argue "the
government failed to prove an affect [sic] on [Bank of America] because you did
not even hear a witness from BOA." See Gov't Opp. Br. at 18, citing Exhibit A
(emails dated Oct. 21, 2015), Dkt. 196-1. The Court tends to agree with the
Government that defendants should not have made this commitment if they intended
to make the arguments they presented in the instant motion. Independently of any
agreement between the parties, however, the Court finds that the Government did
not need to present testimony from counterparty witnesses who worked for FDIC-
insured institutions in order to satisfy the statute of limitations.

FDIC-insured ones); Tr. 815:4-20 (stipulation of FDIC-insured status of several financial institutions).

Defendants respond that the language "as to each count" in the Court's jury instructions, quoted above, required the Government to prove that a financial institution was affected by the specific wires alleged in each count. See Defs. Reply Br. at 15. However, the Court's jury instructions, read in context and "taken as a whole," BAII Banking Corp. v. UPG, Inc., 985 F.2d 685, 696 (2d Cir. 1993), conveyed that the wires alleged in each count had to be part of defendants' scheme, and that the scheme had to affect at least one of the named financial institutions. For these reasons, the Court concludes that the ten-year statute of limitations was satisfied.

Sixth, and finally, defendants contend that their prosecution violated the Fifth Amendment's Due Process Clause. They claim that the Government applied the federal wire fraud statute extraterritorially and had no license to do so, since there was no sufficient nexus between the defendants and the United States. See Defs. Br. at 28-29. Defendants also argue that they lacked fair warning that their conduct could subject them to criminal liability. See Defs. Br. at 30-31.

The Second Circuit has held that "[i]n order to apply extraterritorially a federal criminal statute to a defendant consistently with due process, there must be a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or fundamentally unfair." United

14

States v. Al Kassar, 660 F.3d 108, 118 (2d Cir. 2011). A threshold question, however, is whether the wire fraud statute is actually being applied extraterritorially in this case, and the Court holds that it is not.[5]

Defendants Allen and Conti were charged and convicted of using U.S. wires to further a fraudulent scheme. Specifically, the indictment charged that the wires used to settle payments under interest rate swap contracts, and the wires that Thomson Reuters used to publish LIBOR to subscribers in New York, originated or terminated in New York. See Superseding Indictment ¶¶ 148, 150, 152, 154, 156.[6] It is undisputed that these wires did, in fact, travel in or out of New York. See Tr. 819:4-7, 821:23-822:3. Such acts were properly prosecuted as a domestic criminal violation. See United States v. Kim, 246 F.3d 186, 191 (2d Cir. 2001) (noting that the "intended purpose" of the wire fraud statute is "to prevent the use of our telecommunication systems in furtherance of fraudulent enterprises") (alterations omitted); United States v. Gilboe, 684 F.2d 235, 238 (2d Cir. 1982) ("jurisdiction under [18 U.S.C. § 1343] is satisfied by defendant's use of the wires to obtain the proceeds

---

[5] The Court thus does not reach the question of whether the prosecution of defendants has met the requirements for extraterritorial application of the wire fraud statute – although the Court deems it likely that a scheme that so clearly contemplated defrauding of U.S. banks would meet the test in Morrison v. Nat'l Australia Bank Ltd., 561 U.S. 247 (2010).

[6] Although Thomson Reuters and not defendants published the wires relevant to Counts 6-19, see Defs. Reply Br. at 17, Thomson Reuters' publication of these wires – including, even if not exclusively, to the United States – was a necessary part of the fraudulent scheme of which defendants were charged and convicted. The same is true of the uses of wires alleged in Counts 2 through 5 of the indictment (to settle payments under interest rate swap contracts).

of his fraudulent scheme."); United States v. Hayes, 12-mj-3229, 2015 WL 4620254 (S.D.N.Y. Aug. 3, 2015) (concluding there was no extraterritorial application of the wire fraud statute in a case involving the alleged manipulation of Yen LIBOR and stating that a defendant's "argument that the location of the wires is 'ancillary' to the location of the scheme to defraud must, therefore, be rejected because the location of the wires is the Court's primary concern."). While "the presumption against extraterritorial application would be a craven watchdog indeed if it retreated to its kennel whenever some domestic activity is involved in the case," Morrison, 561 U.S. at 266, the Court determines that the uses of domestic wires alleged in the instant case meet the requirements for domestic application.

Even in light of the Court's conclusion that the wire fraud statute was not applied extraterritorially to defendants, the issue remains whether defendants had fair warning of criminal prosecution. See United States v. Lanier, 520 U.S. 259, 265-267 (1997). The Court hereby finds that defendants had fair warning. "Fair warning does not require that the defendants understand that they could be subject to criminal prosecution in the United States so long as they would reasonably understand that their conduct was criminal and would subject them to prosecution somewhere." Al Kassar, 660 F.3d at 119. Testimony at trial – not least from Mr. Allen himself – made clear that defendants would reasonably understand that taking Rabobank's trading positions into account when submitting LIBOR was

16

fraudulent and could subject them to prosecution. See, e.g., Tr. 1277:24-1278:23 ("You shouldn't take a trader's position into account. It's not relevant to LIBOR.").

The evidence that defendants cite is not to the contrary.[7] In particular, the fact that there may have been some confusion about how to set LIBOR when interbank lending was limited around the time of the financial crisis, see, e.g., GX110B, Dkt. 185-3, does not mean defendants were not on notice that taking Rabobank's trading positions into consideration in submitting LIBOR was improper and could subject them to criminal liability. The Court therefore concludes that defendants had fair warning and that their prosecution does not violate the Due Process Clause.

For all the reasons stated above, the Court denies defendants' motion for a judgment of acquittal or a new trial. The Clerk of Court is directed to close docket entry 184.

SO ORDERED.

Dated: New York, NY
       February 16, 2016

_____
JED S. RAKOFF, U.S.D.J.

---

[7] Defendants note, for example, a call between Mr. Allen and officials at the Federal Reserve in which Mr. Allen referred to the possibility that some banks (not specifically his own) may have been submitting LIBOR based on trading preferences. See Defs. Br. at 31, citing DX001CT, Dkt. 185-57.